IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

_____

MEAGAN PANDEY     :
            :
     Plaintiff,   :  Case No. 2:09-cv-0550
            :
   vs.      :  JUDGE MARBLEY
            :
RASCAL UNIT, LTD., et al.  :  MAGISTRATE JUDGE ABEL
            :
     Defendants.  :
_____

## U**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Meagan Pandey moves, pursuant to Fed.R.Civ.P. 56, this Court to issue summary judgment that (a) she was not an exempt "executive" or "administrative" employee under the Fair Labor Standards Act, 29 U.S.C. § 213(a)(1) and is, therefore, owed unpaid overtime wages for the overtime hours she worked, plus liquidated damages in an equal amount, and her reasonable attorney's fees and costs; (b) she performed compensable work during the week of January 1, 2007, and was not paid at least minimum wage for this work; and (c) Defendants are unable to establish the elements of their counterclaim under the Anti-Cybersquatting Consumer Protection Act because depositions, documents, her affidavit, and exhibits reflect the absence of any genuine issue of material fact on these issues and her entitlement as a matter of law to that judgment.

## **Memorandum in Support of Plaintiff's Motion for Summary Judgment**

### **Table of Contents**

Table of cases…………………………………………………………………………...5

List of exhibits……………………………………………………………………….....7

I.  Introduction and S.D. Ohio L.R. 7.2(a)(3) Summary……………………….…...................8

    A.  Unpaid Overtime Claim………………………………………….....................8

        1.  Executive Exemption……………………………………………..…..9

        2.  Administrative Exemption……………………...…………….………..10

        3.  Damages……………………………………………...…..10

    B.  Unpaid minimum wage claim………………………………………….....10

    C.  Cybersquatting Counterclaim………………………………….……………...11

II.  Statement of Facts……………………………………..………………………11

    A.  RASCAL's Business in General……………….....………………..................11

    B.  Travel Clinics…………………………………….……………...…..12

    C.  Dublin Location Clinics………………………...…………………….…14

    D.  RASCAL's Veterinary Assistants and Technicians……….…...…..……………..15

    E.  Pandey's Role and Duties at RASCAL as an Independent Contractor....…………...16

    F.  Pandey's Role and Duties at RASCAL as an Employee………………………....17

    G.  Pandey's Use of a Domain Name………...………...…………………….…...20

III.  Argument…………………………………..…..……………….………......22

    A.  Summary Judgment Must Be Granted When, on Material Facts
About Which No Genuine Issue Remains, the Opposing Party
Cannot Meet Its Burden of Proof.…………………………………………...…..22

    B.  Defendants Bear the Burden of Proof on Exemptions to the FLSA…........................23

C. On the Established Facts Defendants Cannot Prove Pandey is
Covered by the FLSA Executive Exemption…………………....….........................25

D. On the Established Facts Defendants Cannot Prove Pandey is
Covered by the FLSA Administrative Exemption………………....….........................27

   1. Defendants' Own Description of Pandey's Work Demonstrates
   that Nearly All of Her Tasks Were Nonexempt Activities...………...................31

       a. Veterinary Assisting and Cleaning…………………….…………..31

       b. Directing the "Flow" During Travel Clinics………...………………33

       c. Accounts Receivable and Collections……………………….……..37

       d. Reordering Supplies and Matching Invoices to
       Items Received…………………………………………...…………..…...37

       e. Scheduling Employees…………………………………….………......39

       f. Scheduling Travel Clinics and Individual Clients………….…..……40

       g. Talking to Clients and Clinic Organizers during
       Travel Clinics……………………………………………………...…..41

       h. Monitoring the Dublin Location Floor and Collecting
       Checklists……………………………………………………...…...43

       i. Collecting Money at the End of a Travel Clinic…………….....…...45

       j. Updating the RASCAL Website…………….....………………….…..45

       k. Handling Minor Client Complaints and Questions…..………....……46

       l. Working on the RASCAL Newsletter…………….…..….…………47

       m. Teaching Newer Employees Basic Tasks…………………….……47

       n. Screening Job Applicants, Giving Facility Tours,
       Placing Help Wanted Ads…………………….…………………...…..50

       o. Correcting Employees………………………………………...…...54

       p. Receiving Marketing Information and Scheduling
       Presentations from Suppliers…………………….……..……….....…56

q.  Updating RASCAL's Forms……………………...…………....…......56

r.  Terminating Employees……………….…………….……….…….57

s.  Attending an Employee Review………………….…..…………....…58

2.  The Administrative Exemption Does Not Apply Because
Pandey's Primary Duty Was the Performance of Nonexempt Work……………...59

a.  Comparative Wages………………………………….…...........61

b.  Comparative Importance of Duties………………….…………….....64

c.  Amount of Time Spent Performing Exempt Work…...…………….…67

d.  Employee's Relative Freedom from Direct Supervision………….......68

E.  Pandey Is Entitled to Damages, Fees, and Costs on Her Overtime Claim.................69

1.  Pandey Has Adduced Sufficient Evidence to Eliminate Any
Genuine Issue of Material Fact on the Hours She Worked for
Defendants and Her Rate of Pay……………………….…..………….…......71

2.  Pandey Is Entitled to Liquidated Damages Because Defendants
Are Unable to Prove Good Faith and Reasonable Grounds for
Believing They Complied with the FLSA……………………………………75

F.  Pandey Is Entitled to At Least a Minimum Wage for the Week She worked
But Was Not Paid………………………………………………………………...77

G.  The Cybersquatter Counterclaim Fails as a Matter of Law on the Facts
Established in the Record………………………………………………….................79

IV.  Conclusion and Request for Partial Summary Judgment……….………...………...…...88

**Table of Cases**

**U.S. Supreme Court**
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)
*Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388 (1960)
*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)
*Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709 (1986)
*U.S. v Rosenwasser*, 323 U.S. 360 (1945)

**Sixth Circuit**
*Ale v. Tennessee Valley Auth.*, 269 F.3d 680 (6th Cir. 2001)
*DaimlerChrysler v. The Net Inc.*, 388 F.3d 201 (6th Cir. 2004)
*Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968 (6th Cir. 1991)
*Ford Motor Co. v. Catalanotte*, 342 F.3d 543 (6th Cir. 2003)
*Justice v. Metropolitan Gov't of Nashville*, 4 F.3d 1387, 1392 (6th Cir. 1993)
*Lucas Nursery and Landscaping, Inc. v. Gross*e, 359 F.3d 806 (6th Cir. 2004)
*Martin v. Indiana Michigan Power Co.*, 381 F.3d 574 (6th Cir. 2004)
*McClanahan v. Mathews*, 440 F.2d 320 (6th Cir. 1971)
*Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989)
*Thomas v. Speedway SuperAmerica*, LLC, 506 F.3d. 496 (6th Cir. 2007)
*Renfro v. Ind. Mich. Power Co.*, 497 F.3d 573 (6th Cir. 2007)
*U.S. Dept. of Labor v. Cole Enterprises, Inc.*, 62 F.3d 775 (6th Cir. 1995)

**District Court of Ohio**
*Foster v. Nationwide Mut. Ins. Co.*, 695 F.Supp.2d 748 (S.D.Ohio 2010)
*Fulson v. Columbus*, 801 F.Supp. 1 (S.D.Ohio 1992)
*Viciedo v. New Horizons Computer Learning Center of Columbus, Ltd.*, 246 F.Supp.2d 886 (S.D.Ohio 2003)

**Ohio**
*White v. Murtis M. Taylor Multi-Serv. Ctr.*, 935 N.E. 2d 873 (Ohio Ct. App. 2010)

**Circuit Courts**
*Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317 (5th Cir. 1985)
*Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1125 (9th Cir. 2002).
*Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529 (2nd Cir. 2009)
*IntraComm, Inc., v Bajaj*, 492 F.3d 285 (4th Cir. 2007)
*Jackson v. Go-Tane Servs., Inc.*, 56 Fed.Appx. 267 (7th Cir. 2003)
*Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896 (3rd Cir. 1991)
*McLaughlin v. Ensley*, 877 F.2d 1207 (4th Cir. 1989)
*Reich v. Monfort, Inc.*, 144 F.3d 1329 (10th Cir. 1998)
*Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489 (2nd Cir. 2000)
*Virtual Works, Inc. v. Volkswagen of America, Inc.*, 238 F.3d 264, 267 (4th Cir. 2001)

**District Courts**
*Alvarez v. Key Transp. Serv. Corp.*, 541 F. Supp. 2d 1308 (S.D. Fla. 2008)

*Bay State Sav. Bank v. Baystate Fin. Servs.*, LLC, 484 F.Supp.2d 205 (D.Mass. 2007)
*Bertrand v. Children's Home*, 489 F. Supp. 2d 516 (D. Md. 2007)
*Cotten v. HFS-USA, Inc.*, 620 F.Supp. 2d 1342 (M.D. Fla. 2009)
*Friou v. L.E. Coppersmith Inc.*, 1998 WL 526378 (S.D. Tex. 1998) (copy attached)
*Giles v. City of New York*, 41 F.Supp. 2d 308 (S.D.N.Y. 1999)
*Gottlieb v. Construction Services & Consultants, Inc.*, 2006 WL 5503644 (S.D. Fla. 2006) (copy attached)
*Harrods Ltd. v. Sixty Internet Domain Names*, 110 F.Supp. 2d 420 (E.D. Va. 2000).
*Johnson v. Big Lots Stores, Inc.*, 604 F.Supp. 2d 903 (E.D. La 2009)
*Lang v. Midwest Advanced Computer Services, Inc.*, 506 F.Supp 594 (E.D. Mich. 1981)
*Marshall v. Nat'l Freight*, 1979 WL 1977 (D.N.J. 1979) (copy attached)
*McKinney v. United Stor-All Centers LLC*, 656 F. Supp. 2d 114 (D.D.C. 2009)
*Nationwide Payment Solutions, LLC v. Plunkett*, 697 F.Supp.2d 165 (D.Me. 2010)
*Perez v. RadioShack Corp.*, 386 F. Supp. 2d 979 (N.D. Ill. 2005)
*Rotondo v. City of Georgetown*, 869 F.Supp. 369 (D.S.C. 1994)
*Stranger v. Glenn L. Martin Co.*, 56 F.Supp. 163 (D.C. Md. 1944)

**State Courts**
*Butler v. Hartford Tech. Inst., Inc.*, 704 A.2d 222 (Conn. 1997)
*Nelson v. Master Vaccine, Inc.*, 382 N.W. 2d 261 (Minn. App. 1986)

**List of Attachments**

Appendix A: Spreadsheet of Defendants' employees' hours.
Appendix B: Calendar consolidating evidence regarding Plaintiff's hours worked.

Deposition transcript of Alba Gonzalez
Deposition transcript of Nicole Cornwell
Deposition transcript of Ashley Overbee

Affidavit of Meagan Pandey
Affidavit of Jena Sgobbo

Exhibit 1: RASCAL's 2007 payroll report
Exhibit 2: RASCAL's 2008 payroll report
Exhibit 3: Email from Yahoo! to Plaintiff confirming domain registration
Exhibit 4: RASCAL's articles of organization
Exhibit 5: Defendants' answers to Plaintiff's first discovery requests
Exhibit 6: Defendants' answers to Plaintiff's third discovery requests
Exhibit 7: Emails sent during the week of January 1, 2007
Exhibit 8: Cached domain name registration information from 10/16/07
Exhibit 9: Patient records evidencing Pandey's presence on a clinic

| | | | | |
|---|---|---|---|---|
| a. | 1/18/2007 Dublin | | y. | 7/17/2008 Fairfield |
| b. | 3/18/2007 Fairfield | | z. | 8/2/2008 Preble |
| c. | 4/29/2007 Dayton | | aa. | 8/16/2008 Mansfield |
| d. | 5/2/2007 Dayton | | bb. | 8/24/2008 Licking |
| e. | 6/19/2007 Dayton | | cc. | 8/30/2008 Ashland |
| f. | 7/12/2007 Licking | | dd. | 8/31/2008 Jackson |
| g. | 7/15/2007 Perry | | ee. | 9/13-14/2008 Jefferson |
| h. | 7/21/2007 Mansfield | | ff. | 9/17/2008 Fairfield |
| i. | 7/24/2007 Dayton | | gg. | 9/28/2008 Ashland |
| j. | 7/26/2007 Hocking | | hh. | 10/15/2008 Hocking |
| k | 8/11/2007 Athens | | ii. | 11/22/2008 Licking |
| l. | 8/16/2007 Licking | | jj. | 11/23/2008 Licking |
| m. | 8/21/2007 Dayton | | | |
| n. | 9/1/2007 Preble | | | |
| o. | 9/30/2007 Mansfield | | | |
| p. | 10/6/2007 Adams | | | |
| q. | 10/20/2007 Ashland | | | |
| r. | 12/15/2007 Licking | | | |
| s. | 12/22/2007 Jackson | | | |
| t. | 3/15/2008 Richland | | | |
| u. | 3/29/2008 Licking | | | |
| v. | 4/12/2008 Jackson | | | |
| w. | 6/7/2008 Hocking | | | |
| x. | 6/14/2008 Preble | | | |

# I.    Introduction and S.D. Ohio L.R. 7.2(a)(3) Summary

This motion seeks summary judgment on a number of issues relating to three claims in this case. All of the claims arise from Plaintiff Meagan Pandey's ("Pandey") employment with Defendant RASCAL Unit, LTD. ("RASCAL") and RASCAL's owner Defendant Alba Gonzalez ("Gonzalez").

## A.    Unpaid Overtime Claim

Pandey brings a claim for unpaid overtime wages pursuant to the Ohio Minimum Fair Wage Standards Act[1] ("OMFWSA") and the Fair Labor Standards Act[2] ("FLSA"). Pandey's claims arise because Defendants' misclassified Pandey as exempt.

RASCAL operates both a fixed site veterinary hospital and a traveling surgery truck. (Cornwell dep. at 49). RASCAL primarily performs low-cost, high-volume spay and neuter surgeries. (*Id*.). Gonzalez is RASCAL's owner and primary veterinarian. (Gonzalez dep. at 8).

Pandey began with RASCAL as an independent contractor. She was paid hourly and only for working on RASCAL's surgery truck. (Gonzalez dep. at 74-75).   At the start of 2007, RASCAL began paying Pandey as an exempt, salaried employee. This reduced Pandey's effective hourly wage from $15.00 per hour to about $10.17 per hour. *See infra* p. 63.

Defendants misclassified Pandey as "exempt" and refused to pay overtime wages. Defendants admit that they did nothing at all to ensure that Pandey was properly classified. (Gonzalez dep. at 133-134). Instead, they relied on the fact that someone Gonzalez had worked with at a veterinary hospital many years prior was titled "manager" and paid a salary. (Gonzalez dep. at 131-132).  Pandey was also titled "manager." Defendants claim that Pandey was exempt

---

[1] ORC 4111 *et seq.*
[2] 29 USC 202 *et seq.*

as either a *bona fide* executive or administrative employee. In reality, Pandey's title meant little; her duties were that of an experienced veterinary assistant. *See infra* pp. 17-19.

Defendants have the burden of proving that Pandey is exempt from receiving overtime for her work. *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 901 (3rd Cir. 1991). Exemptions are narrowly construed against employers. *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392 (1960). Only those employees that fit plainly and unmistakably within an exemptions terms and spirit will be denied the FLSA's protections. *Id.*

Defendant's burden of proof must be integrated in the analysis of Plaintiff's Motion for Partial Summary Judgment, *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), thereby imposing a heavier burden on Defendants to rebuff partial summary judgment.  Beyond that, the ultimate decision of whether an employee is exempt from overtime compensation is a question of law, *Ale v. Tennessee Valley Auth.*, 269 F.3d 680, 691 (6th Cir. 2001), which this Court may resolve based on the established facts.

### 1.     Executive Exemption

In order to classify an employee as a *bona fide* executive, the Department of Labor Regulations ("Regulations") list several requirements. 29 CFR 541.100. Defendants must prove each element of an exemption in order to avoid paying overtime to an employee. *Thomas v. Speedway SuperAmerica*, LLC, 506 F.3d. 496, 501 (6th Cir. 2007).  The Regulations require that an employee "customarily and regularly direct the work of two or more other employees." 29 CFR 541.100(2). "Two employees" is defined as some combination of employee hours that equal 80 per week. 29 CFR 541.104(a). "Customarily and regularly" means at least 75%-80% of the time. *See infra* p. 26.

Defendants' payroll records establish that RASCAL's other employees only worked 80 or more combined hours for 58 weeks of Pandey's 101 week-long employment. *See* Exhibits 1 and 2. This breaks down to 57.4% of the time, far below the required 75%-80% supervision time. In addition, Defendants cannot prove that Pandey's job duties meet the executive exemption's primary duty requirement.

### 2. Administrative Exemption

The administrative exemption requires that an employee's "primary duty" be the performance of exempt, administrative tasks as defined by the Regulations. 29 CFR 541.200. A detailed review of Pandey's duties and relevant case law demonstrates that virtually none of her duties were exempt administrative tasks. *See infra* pp. 31-59.

### 3. Damages

Pandey is entitled to time and a half for any hours she worked over forty in a week. 29 U.S.C. § 207(a)(1). For the most part, Defendants either do not or cannot dispute Pandey's estimate of her work hours. *See infra* pp. 71-74. Damages are simply calculated by multiplying Pandey's overtime hours by one and a half times her regular hourly rate. In total, Pandey is entitled to $44,943.75 in unpaid overtime wages.

Because Defendants did nothing to ensure Pandey was properly classified as exempt and recklessly disregarded by their cavalier approach to the FLSA her rights, they are precluded from showing good faith and reasonable grounds for believing they complied with the FLSA. Pandey is, therefore, entitled to liquidated damages equal to her unpaid overtime wages. *Martin v. Indiana Michigan Power Co.*, 381 F.3d 574, 584 (6th Cir. 2004). Reasonable attorney's fees and costs must also be awarded. 29 U.S.C. 216(b).

### B. Unpaid Minimum Wage Claim

Pandey also claims unpaid minimum wages for her work during the first week of January, 2007. *See infra* p. 71. It is undisputed that Defendants did not pay her for that week. It is also undisputed that Pandey performed work for Defendants during this week. (Gonzalez dep. at 112-113).

This motion asks only that the Court rule that a) Pandey was an employee entitled to minimum wages and b) that her work during that week was not *de minimis* in nature. The issue of how much time Pandey worked is a factual dispute for the jury.

###### C.     Cybersquatting Counterclaim

Defendants have asserted a counterclaim based on 15 U.S.C. § 1125(d), the Anti-cybersquatting Consumer Protection Act ("ACPA"). Defendants' claim arises from Pandey posting a "for sale" sign on www.rascalunit.com. The ownership of the domain name itself is at issue in this case.

Four alternative reasons doom the counterclaim. First, Pandey's actions, if inappropriate at all, did not constitute cybersquatting. Applying the ACPA to this case would stretch the Act far beyond its intended function. *See infra* p. 82. Second, Defendants did not have a protected "mark" prior to Pandey registering the domain name. *See infra* p. 83. Third, Pandey did not act in bad faith as required by the ACPA. *See infra* p. 84. Fourth, Pandey falls under the ACPA's "safe harbor" provision and is immune from prosecution as a cybersquatter. *See infra* p. 87.

## II.     Statement of Facts

### A.     RASCAL's Business in General

"RASCAL," or Roaming Animal Sterilization Clinic at Low-Cost, is a low-cost, high-volume, mobile veterinary practice. The company offers services both to individual pet owners and humane organizations. (Cornwell dep. at 49).

In one sense, RASCAL acts as a fairly traditional veterinary office. It provides animal health services at its Dublin office location. (*Id*.). RASCAL also operates a mobile surgical truck that allows it to offer services anywhere it can park. (*Id*.). RASCAL's truck is somewhat akin in size and shape to a large recreational vehicle. (Pandey affidavit ¶ 2). The truck's interior is a fully functional surgical suite and has rows of animal cages, storage space, a small examination table, and a surgery "room" in the back. (*Id*.).

### B. Travel Clinics

RASCAL's trucks set up shop in various places and conducts "travel clinics." (*Id*.). RASCAL's general focus during travel clinics is performing a high number of spay and neuter surgeries (around 30 "pack" surgeries, plus 20 to 30 "non-pack" surgeries[3]), as well as dental cleanings and vaccinations as needed.

Typically, humane organizations schedule travel clinics with RASCAL. (Gonzalez dep. at 364). The host organization takes care of certain aspects of the clinic such as choosing a suitable location for the RASCAL truck, soliciting community pet owners or rescuers to bring animals to the clinic, collecting money from pet owners, paying RASCAL for the services performed, and returning pets back to their owners. (Gonzalez dep. at 52, 59, 256, Overbee dep. at 186). RASCAL provides the equipment, supplies, veterinarian, and staff to perform the travel clinic.

Nicole Cornwell, RASCAL's veterinary technician supervisor, testified that a typical travel clinic workday starts around 7:00 AM. (Cornwell dep. at 51). Employees "do a walkthrough of the truck, making sure that everything's stocked for the day." (*Id*.). When this is completed, the staff boards the truck and travels to the travel clinic location.

---

[3] Pack surgeries are dog spays and neuters and cat spays. Non-pack surgeries are cat neuters. (Cornwell dep. at 89).

At the clinic location, the staff sets up the truck, gets supplies out of cages, sets up the surgery room, and prepares the paperwork (veterinary patient records) for the day's surgeries. (Cornwell dep. at 54). Once the setup is complete, the staff brings in animals to get weighed, measured, and sedated. (Cornwell dep. at 56). "We would try to get as many animals into the truck at once weighed and sedated prior to [Gonzalez] getting started for the day." (Gonzalez dep. at 256-257).

Once surgeries begin, they continue throughout the day. (Cornwell dep. at 57). In order to keep up with the high-volume of surgeries, RASCAL's staff brings a constant flow of animals in and out for measurement, sedation, recovery, and surgery. "Once [Gonzalez] got started for the day doing surgeries, then the staff would continuously have animals anesthetized and prepped for [Gonzalez]." (Gonzalez dep. at 257). The staff also cleans the truck and makes surgery records throughout the day. (Gonzalez dep. at 272).

As surgeries finish, RASCAL's staff creates "go-home bags" containing medication and information for owners. (Gonzalez dep. at 273). The animals and go-home bags are given to clinic organizers, who give the items to the pet owners. (Cornwell dep. at 69).

At the end of the surgery day, RASCAL collects the money due for the surgeries from the host organization. (Gonzalez dep. at 257). RASCAL's staff also performs additional cleaning and packing up. (*Id*.). Upon arriving back at the Dublin office location, the staff performs any final cleaning, restocking, and organizing. (Cornwell dep. at 62).

A "full" staff for a travel clinic is typically one veterinarian plus three or four additional staff members: one or two veterinary assistants and one or two veterinary technicians. (Gonzalez dep. at 305). Fewer people than that creates additional work. (Gonzalez dep. at 536).  Even with

a full staff, the high-volume work is so constant that employees do not typically receive meal breaks. Instead, meals are had "on the go." (Cornwell dep. at 63).

     **C.**     <u>**Dublin Location Clinics**</u>

     RASCAL also performs services at its office space in Dublin. (Gonzalez dep. at 325). The "office space" is a warehouse where RASCAL can park its truck.

     RASCAL performs some services (like routine wellness exams) in a sectioned-off exam room. RASCAL performs other services (like surgeries) on the truck. (Cornwell dep. at 93). The Dublin location also contains a small office area with four desks.

     RASCAL designates certain days for particular types of services. (*Id.*). The service types are "office appointments," "office surgeries," and "shelter surgeries." (Gonzalez dep. at 326).

     "Office surgery" days are essentially travel clinics conducted at the Dublin location. (Cornwell dep. at 95). Unlike travel clinics, RASCAL does not receive any assistance from humane organization volunteers. Therefore, these office surgery days are even busier than travel clinics. (Cornwell dep. at 95-96, Gonzalez dep. at 329).

     In addition to the duties that employees have on travel clinics, they are also responsible for interacting directly with pet owners, taking payments, and giving pets, medications, and instructions to pet owners. (Cornwell dep. at 95). A full staff for an office surgery day is typically a veterinarian plus four others (assistants and technicians). (Gonzalez dep. at 330).

     "Shelter surgery" days are like office surgery days except that a single animal rescue organization supplies all of the animals. (Cornwell dep. at 114). A full staff for a shelter surgery day is typically a veterinarian plus three others (usually a single technician and two assistants). (Gonzalez dep. at 463-464).

"Office appointment" days consist of more traditional veterinary services. (Cornwell dep. at 117). Pet owners make appointments during the day for services like general wellness exams and vaccinations. (*Id.*). A full staff for an office appointment day is a veterinarian plus two employees – one to handle the front (greeting clients, answering phones, and assisting as necessary) and another veterinary assistant or technician. (Gonzalez dep. at 464-465).

### D. RASCAL's Veterinary Assistants and Technicians

RASCAL's support staff is primarily comprised of two types of workers that handle the bulk of the work. The positions are titled "veterinary assistants" and "veterinary technicians."

Veterinary assistants do not require any formal training or licensing and perform a wide variety of tasks. Ashley Overbee, RASCAL's senior veterinary assistant[4] described the work:

> Vet assistant, typical day I would do invoicing, putting together pain medication and go home bags for clients after surgeries. Assisting on the truck helping technicians knock the surgeries out, and sometimes I would prep them.
> I also answered phones sometimes. Did instruments. Just kind of filled in the areas that needed done throughout the day.

(Overbee dep. at 46-47).

Assistants work directly with animals as required by the veterinarian. (Overbee dep. at 48). The assistants' tasks include restraining animals for shots or surgery, taking animals' measurements (like weight, temperature, pulse, respiration), bringing animals in and out of RASCAL's truck, trimming animals' nails, shaving animals, and giving some medications to animals. (Gonzalez dep. at 316).

Veterinary assistants perform other duties like putting together go-home bags for pet owners, inputting information regarding services in RASCAL's computer system, giving instructions to pet owners, answering phones (making appointments and answering questions),

---

[4] "Senior" veterinary assistant simply meant that Overbee had been at RASCAL longer than other assistants. (Overbee dep. at 38). She had no additional duties. (*Id.*).

and cleaning and wrapping instruments. (Overbee dep. at 46-47). Veterinary assistants also clean, mop, stock the truck, and fill out paperwork. (Overbee dep. at 48).

Veterinary Technicians require formal training. (Gonzalez dep. at 146-147). They also perform all tasks that an RASCAL veterinary assistant performs. This includes cleaning, stocking the truck, and answering phones. (Cornwell dep. at 52, 61, Gonzalez dep. at 451). Unlike assistants, technicians are also able to perform certain medical procedures.

### E.     Pandey's Role and Duties at RASCAL as an Independent Contractor

Pandey started working for RASCAL as an independent contractor in early 2006. Although RASCAL had no employees at that point, Pandey was dubbed "manager." (Gonzalez dep. at 63). Gonzalez claims that Pandey gave herself that title. (*Id*.).

Title notwithstanding, Pandey's primary role at this time was to assist on RASCAL's truck during travel clinics, schedule travel clinics, and solicit additional travel clinic business. (Gonzalez dep. at 46). Pandey was paid $15.00 per hour and only for the time she spent on RASCAL's truck. (Gonzalez dep. at 74-75).

Pandey spent at least 50% of her time on the truck acting as a veterinary assistant. (Gonzalez dep. at 50). The remainder of Pandey's time at travel clinics was spent answering questions from organizers and clients. (Gonzalez dep. at 51). "… we're talking about 20 to 30 people that were being scheduled at first and then as time went on 30 to 60 animals, every single animal coming with an individual, and a lot of people have questions." (Gonzalez dep. at 77).

Gonzalez conceded that Pandey did not really have any management duties at that time. "In 2006 we didn't have any actual employees. So there were no employees to oversee. She did some stuff that would be kind of like she helped with printing the schedule, she started doing that back then. At the beginning, we thought it was cool to wear different color shirts on different

16

days so she would tell people, like she would write a schedule and shuffle the colors of the shirts, for instance, that kind of stuff." (Gonzalez dep. at 63-64).

**F.**     **Pandey's Role and Duties at RASCAL as an Employee**

Pandey worked for RASCAL as an employee from January 1, 2007[7] until December 9, 2008. During this time, Pandey worked an average of 58.2 hours per week. *See infra* pp. 63-64.

She was placed on a salary that reflected her old wage as an independent contractor of $15.00 hour multiplied by 40 hours per week ($600 per week). Taking into account the hours Pandey actually worked, this change dropped her effective hourly pay from $15.00 per hour to about $10.17 per hour. *See infra* p. 63.

Pandey's duties as an employee were essentially the same as any other veterinary assistant plus some other secretarial and customer service work. Pandey kept the nominal title "manager" from the time when she was an independent contractor.

On travel clinics, Pandey primarily acted as a veterinary assistant. In this regard, Pandey's typical duties included performing the initial walkthrough on RASCAL's truck, setting up the truck after arrival at the site, bringing animals in and out of the truck, holding animals for sedation and procedures, taking animals' measurements, prepping for surgery, filling out paperwork, preparing medications, calling pet owners with questions, assisting with surgery, cleaning the truck, and creating go-home bags. (Cornwell dep. at 52, 54, 56, 58, 60-61, 69). These tasks "would probably fill up her day." (Cornwell dep. at 64).

Gonzalez admitted that "[s]ome days, yes, [Pandey] would have spent most of her time doing [veterinary assisting work]." (Gonzalez dep. at 291). Gonzalez was unsure, however, how often this would occur. (*Id*.). Overbee testified that Pandey spent most of her time performing veterinary assistant or technician duties. (Overbee dep. at 67).

17

Pandey also acted as a cashier at the end of travel clinics. (Gonzalez dep. at 277). Pandey added up the amounts due for services performed that day and presented the bill to the clinic organizer for payment. (*Id.*).

Pandey performed some customer service work during travel clinics. (Gonzalez dep. at 282). Pandey answered questions regarding scheduling or prices. (*Id.*).

When Pandey worked at the Dublin office location, she spent a portion of her time as a veterinary assistant. Her duties in that regard were similar to those described above. When Pandey was not directly performing veterinary assistant work, she worked in RASCAL's office area.

Gonzalez conceded that Pandey spent at least 20%-30% of her time acting as a veterinary assistant. (Gonzalez dep. at 445). Cornwell testified that Pandey spent about half of her time assisting during office surgery and shelter surgery days. (Cornwell dep. at 97, 116). On office appointment days, Cornwell testified that Pandey spent about 25%-50% of her time assisting. (Cornwell dep. at 122).

In RASCAL's office, Pandey performed some additional tasks. Gonzalez described Pandey's office-related tasks:

> She spent time researching information for grants for RASCAL Charities,[5] looking up, talking to the distributors about things with the invoices, pricing issues, getting the information.
> She would assemble for me a packet of what bills are due so that we would know everything that we needed to pay, and she would call and confirm with all the companies that if they were correct.
> She would spend quite a bit of time on the website and then also on scheduling of the staff. And then she would also spend quite a bit of time on travel clinic arrangements from setting the clinics up, talking to the organizers.
> ***

---

[5] RASCAL Charities is a non-profit animal welfare organization. (Gonzalez dep. at 33). It is kept "very separate" from RASCAL. (Gonzalez dep. at 37). Work done for RASCAL Charities is done on a volunteer basis and does not affect anyone's employment status with RASCAL. (Gonzalez dep. at 37-38). During Pandey's employment, she served on RASCAL Charities' board. (Gonzalez dep. at 37).

And then she would do the newsletter information for that. Updating forms as needed. Doing the accounts receivable. ***

(Gonzalez dep. at 334-335).

Pandey's primary role performing the above tasks as well as acting as an assistant as needed.

Q: During [2007], what was [Pandey's] primary role on these office surgery days?[6]

A: The same. It would have been doing office stuff, making sure the office stuff was taken care of, the admin stuff, the admin duties. And then assist as needed.

(Gonzalez dep. at 331).

Pandey's specific duties will be discussed in further detail below. *See infra* pp. 31-59.

Remarkably, Pandey was not paid at all for her first work of work as an employee. For most of 2006, Pandey worked for RASCAL as an independent contractor. (Gonzalez dep. at 80). This independent contractor relationship ended on December 31, 2006. (*Id.*).

During the first week of 2007, the RASCAL did not see any appointments or conduct clinics. (Gonzalez dep. at 86). Pandey used this time to put things in order for RASCAL's appointments next week. (Pandey affidavit ¶ 3). Pandey cleaned the office, made phone calls, and sent over twenty work emails. (*Id.*). *See also* Exhibit 7. In all, Pandey estimates that she performed approximately thirty hours of work. (Pandey affidavit ¶ 3).

In spite of this, Defendants did not pay Pandey for the first week of 2007. After Pandey's filed this lawsuit, Defendants claimed that she was not an employee for that one week and, thus, not entitled to minimum wage.

Q: Why was there a one-week long lag between when [Pandey] was an independent contractor and when she became an employee?

---

[6] Pandey's role or duties did not change from 2007 to the end of 2008. (Gonzalez dep. at 458). Pandey's role and duties were also the same during shelter surgery days in 2007-2008. (Gonzalez dep. at 462 – 464). Her duties in the office were also the same on office appointment days. (Gonzalez dep. at 471).

A: Because there was nothing going on during that week. So the business actually opened for 2007 at that point.

Q: What was she during that week?

A: What was she?

Q: I mean she wasn't an employee, she wasn't an independent contractor.

A: Future employee of Rascal.

(Gonzalez dep. at 85-86).

**G.      Pandey's Use of a Domain Name**

Before founding RASCAL, Gonzalez worked with Pandey for about three years at the Westerville East Animal Hospital. (Gonzalez dep. at 66, 249). At that time, Pandey was a veterinary assistant. (Gonzalez dep. at 66). Pandey had volunteered with mobile veterinary operations such as NOMAD. (Gonzalez dep. at 67).

Toward the end of 2005, Gonzalez decided to start her own mobile veterinary practice. Together, Pandey and Gonzalez came up with the "RASCAL" name for the new practice. (Gonzalez dep. at 253). On December 3, 2005, Pandey registered the domain name www.rascalunit.com. *See* Exhibit 3.

Gonzalez filed articles of organization with the Ohio Secretary of State to form a Limited Liability Company called RASCAL Unit, Ltd. *See* Exhibit 4. Gonzalez specified that RASCAL's effective date would be December 18, 2005 and it would last five years. *Id.*

Pandey used the domain name www.rascalunit.com to create a website for RASCAL. From the date that Pandey originally registered www.rascalunit.com until her termination at RASCAL, she personally paid the domain name registration fees and the hosting fees for RASCAL's website. (Pandey affidavit ¶ 4).

Pandey did not ask for any reimbursement for these expenses because she believed the domain name ultimately belonged to her. (*Id.*). Gonzalez could not recall whether Pandey asked for reimbursement for website and domain name expenses. (Gonzalez dep. at 74).

Pandey took on the financial risk, albeit tiny, that if RASCAL was ultimately unsuccessful or failed, she would be stuck with the bill for the domain name and hosting fees. Gonzalez admitted that RASCAL's survival was far from certain. (Gonzalez dep. at 83). She stated "2006 was very – it's a completely different concept what I created, so is it still going to be here tomorrow?" (*Id.*).

Until April 1, 2006, Pandey was not paid for any of the work she did to help get RASCAL started. Gonzalez dep. at 82). Up to that point, Pandey was simply volunteering her time to help a new spay and neuter project - exactly as she had done with NOMAD.

As a RASCAL employee, Pandey registered various "alias" domain names on RASCAL's behalf. (Gonzalez dep. at 625). Alias domain names are similar-sounding names (for example, www.rascalunit.org).

RASCAL ultimately terminated Pandey's employment on December 9, 2008. Shortly thereafter, RASCAL seized control of the domain name www.rascalunit.com by contacting the domain name registrar. (Gonzalez dep. at 631). RASCAL replaced Pandey's ownership and contact information with its own. (*Id.*).

In April 2009, Pandey regained access to www.rascalunit.com. (Gonzalez dep. at 637). Pandey replaced the previous website content with text stating the website was for sale. (*Id.*). This posting was up for two or three days before Defendants changed the content back to a website promoting RASCAL. (Gonzalez dep. at 638). There is absolutely no evidence that anyone avoided using Defendants' services because of the 2-3 days posting by Pandey. Nor is

there any suggestion that Pandey contacted Defendants and sought to sell back the website to them.  Finally, no evidence even insinuates that, through her exercise of control over the web site, Pandey took or directed past, current, or prospective clients of Defendants to another veterinary service providers.

## III.  <u>Argument</u>

### A.  <u>Summary Judgment Must Be Granted When, on Material Facts About Which No Genuine Issue Remains, the Opposing Party Cannot Meet Its Burden of Proof.</u>

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c) (2).  The party seeking summary judgment bears the initial burden of showing the absence of a genuine issue of material fact; however, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.  Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict."  *Id.* at 252.

In an FLSA action, where, as amplified below, the employer bears the burden of proof, the question becomes whether reasonable jurors could find by a preponderance of the evidence an executive or administrative exemption.  In turn, because Defendants' entitlement to that

exemption is a question of law, *Ale v. Tennessee Valley Auth.*, 269 F.3d 680, 691 (6th Cir. 2001), the focus is whether Defendants have presented evidence making more likely than not resolution of that question of law in their favor. *Martin*, 381 F.3d at 578 (Plaintiffs entitled to summary judgment unless employer "can come forward with evidence at least creating a genuine issue of material fact as to whether [Plaintiffs] meet[ ] each and every element of the exemption.").

On the ACPA counterclaim, Defendants also bear the burden of proof. They must establish by a preponderance of the evidence each and every element of the ACPA. Even if they satisfied that burden, which they conclusively did not at bar, Pandey may demonstrate that she is entitled to the ACPA safe harbor.

"[T]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. Columbus*, 801 F.Supp. 1, 4 (S.D.Ohio 1992). The nonmovant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.* Consequently, in responding to a summary judgment motion, the nonmoving party cannot rest on its pleadings but must present "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324.

### B.     Defendants Bear the Burden of Proof on Exemptions to the FLSA.

Pandey is seeking wages for the overtime hours she worked from January 1, 2007 until her termination on December 9, 2008.[7] Pandey brings this action pursuant to 29 U.S.C. § 207(a)(1) and O.R.C. 4111.01 *et seq.*

---

[7] There is some dispute of when Pandey actually started working for RASCAL. Because she did not work any overtime during the first or second week of January 2007, the dispute has no bearing on Pandey's overtime claims.

23

The FLSA requires employers to compensate employees that work more than forty hours in a workweek at one-and-one-half times their regular pay. 29 U.S.C. § 207(a)(1). Workers "employed in a *bona fide* executive, administrative, or professional capacity" are exempt from FLSA overtime requirements. 29 U.S.C. § 207(a)(1).  O.R.C. 4111 uses the same exemptions as the FLSA, so the Court need only analyze the FLSA exemptions. *Thomas*, 506 F.3d. at 501.

The FLSA is remedial in nature with the underlying policy of allowing employees to vindicate their rights and receive a fair wage. *White v. Murtis M. Taylor Multi-Serv. Ctr.*, 935 N.E. 2d 873 (Ohio Ct. App. 2010). Consequently, FLSA exemptions are to be "narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within [the exemptions'] terms and spirit." *Arnold,* 361 U.S. 388 at 392.

An employer must establish by clear and affirmative evidence that an employee meets every requirement of an exemption before an employee will be deprived of protection under the FLSA. *Thomas*, 506 F.3d. at 501. If the record is unclear as to an exemption requirement, employer will be held not to have satisfied its burden. *Martin*, 940 F.2d at 901.

These exemptions "are to be narrowly construed against the employers seeking to assert them." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960). *Accord Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501 (6th Cir. 2007).  Although clear and affirmative evidence must demonstrate that the employee meets every requirement of an exemption, *Ale*, 269 F.3d at 691 n. 4, the burden of proof Defendants shoulder at bar remains a preponderance of the evidence on their affirmative defenses of FLSA and O.R.C. exemptions.  *Renfro v. Ind. Mich. Power Co.*, 497 F.3d 573, 576 (6th Cir. 2007); *Foster v. Nationwide Mut. Ins. Co.*, 695 F.Supp.2d

748, 754 (S.D.Ohio 2010) ("The burden is on the employer to establish each element of the exemption by a preponderance of the evidence.").

   **C.**   **On the Established Facts Defendants Cannot Prove Pandey Is Covered by the FLSA Executive Exemption.**

   In order to properly classify an employee as a *bona fide* executive, an employer must prove *all* of the following:

> (1) The employee must be compensated on a salary basis of not less than $455 per week; [8]
>
> (2) The employee's primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3) The employee customarily and regularly directs the work of two or more other employees; and
>
> (4) The employee has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 CFR 541.100.

   In this case, Pandey does not meet the requirement of customarily and regularly directing other employees' work. RASCAL employed too few people for too few hours to make this possible. *See infra* pp. 26-27.  Beyond that, the fast and furious nature of Defendants' neutering clinics and the specific duties performed by technicians and assistants left no room for Pandey to supervise.  To the extent any supervisor directed employees' work during neutering clinics, that supervisor was exclusively Defendant Alba Gonzalez, RASCAL's owner.

   Pandey also does not meet executive exemption's primary duty requirement. Gonzalez testified that Pandey's primary duty was acting as a veterinary assistant and "…doing office

stuff, making sure the office stuff was taken care of, the admin stuff, the admin duties."
(Gonzalez dep. at 331).

Pandey's specific duties are analyzed in detail under the Administrative Exemption
heading. *See infra* pp. 31-59. That analysis is also relevant to the executive exemption, as is the
analysis of Pandey's primary duty. *See infra* pp. 59-69. It will not be duplicated under this
heading, but the Court should consider the primary duty analysis applicable to the executive
exemption.

In order to qualify as a *bona fide* executive, the Regulations require that an employee
"customarily and regularly directs the work of two or more other employees." 29 CFR 541.100.
"Two or more other employees" is defined as "two full-time employees or their equivalent." 29
CFR 541.104(a). More specifically, to qualify as an exempt executive, the employee must direct
the work of 80 employee hours per week. *Perez v. RadioShack Corp.*, 386 F. Supp. 2d 979, 985
(N.D. Ill. 2005).

The Regulations define "customarily and regularly" as "a frequency that must be greater
than occasional, but which, of course, may be less than constant." 29 CFR 541.701. "Tasks or
work performed 'customarily and regularly' includes work normally and recurrently performed
every workweek; it does not include isolated or one-time tasks." Id.

Courts have clarified the definition of "customarily and regularly" by requiring that *bona
fide* executive employees supervise 80 hours of other employees' work at least 75-80% of the
time. Supervision for less than this amount of time is not "customarily and regularly" supervising
as a matter of law. *McKinney v. United Stor-All Centers LLC*, 656 F. Supp. 2d 114, 131-132
(D.D.C. 2009). *See also, Perez*, 552 F. Supp. 2d at 742. (finding that "customarily and

---

[8] The parties do not dispute that Pandey meets the salary basis test. While Pandey was not paid for the first week of
January 2007, that is the subject of Pandey's minimum wage claim and not relevant for purposes of Pandey's

"regularly" meant directing the work of 80 employee hours 80% of the time or more.); *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1276 (11th Cir. 2008). (approving the trial court's use of an 80% threshold for the "customarily and regularly" requirement.); *Jackson v. Go-Tane Servs., Inc.,* 56 Fed.Appx. 267, 272 n. 8 (7th Cir. 2003). (stating that "where the supervised employees work 'full time' only 67% of the time over the relevant time period, such amount of supervision falls short of the 'regular and customary' supervision of full-time employees.").

Pandey could not have "customarily and regularly" directed the work of two or more other employees because RASCAL employed too few people for too few hours to meet the "customarily and regularly" 75%-80% requirement. Defendants employed Pandey for approximately 101 weeks. At most, RASCAL's employees worked 80 or more combined hours for 58 of those weeks (57.4%). *See* Exhibits 1 and 2. For the Court's convenience, a chart summarizing RASCAL's employees' hours is attached to this memorandum as Appendix A.[9] An employer's failure to meet any one of the requirements of an exemption means that an employee does not fall under the exemption as a matter of law. *Thomas*, 506 F.3d at 501. There is no genuine issue of material fact blocking judgment as a matter of law that Pandey was not a *bona fide* executive employee.

### D.   On the Established Facts Defendants Cannot Prove Pandey Is Covered by the FLSA Administrative Exemption.

An employer must prove the following in order to properly classify an employee as an exempt administrative employee:

> (1) The employee must be compensated on a salary basis of not less than $455 per week;

---

overtime claim motion.
[9] This chart is based on the biweekly records that Defendants' produced. Nicole Cornwell's hours are not included because Defendants concede that Cornwell was not subject to Pandey's supervision.

      (2) The employee's primary duty includes the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

      (3) The employee's primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 CFR 541.200.

The first step in analyzing whether an employee falls under the administrative exemption is to determine which, if any, of the employee's duties are exempt duties. Whether an employee's particular activities are exempt or non-exempt duties is a question of law. *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986). How an employee spends her working time is a question of fact. *Id*. Because a "combination exemption" is not available to Defendants, all duties must be analyzed under only the administrative exemption's requirements.

The second step is to determine whether Pandey's "primary duty" was to perform exempt activities. Because all or almost all of Pandey's duties were not exempt, her primary duty must necessarily be the performance of nonexempt work.

For the sake of completeness, Pandey will also discuss the other factors used in determining an employee's primary duty. Predictably, all of the additional factors indicate that Pandey's primary duty was nonexempt work.

The Regulations allow employers to "combine" duties from two exemptions in order to meet the primary duty requirement of either. 29 CFR 541.708. An employer may only combine duties when all of the other requirements of an exemption are met. *IntraComm, Inc., v Bajaj*, 492 F.3d 285, 294 (4th Cir. 2007). In other words, an employer may not skirt the requirements of one exemption by "combining" those duties with another exemption.

In this case, Defendants are not able to use a "combination" administrative/executive exemption because all of the executive exemption's requirements have not been satisfied. This is

important to note because, while some administrative duties may overlap with some executive duties, not all do. The exemptions are meant to cover different types of jobs. *Stranger v. Glenn L. Martin Co.*, 56 F.Supp. 163, 166 (D.C. Md. 1944) (Finding "[t]he terms 'executive' and 'administrative' are, to a large extent, overlapping in common usage, but we may assume they were not intended to cover precisely the same types of employment or they both would not have been used. If the term 'administrative' be defined as merely a lower form of 'executive,' then all executives would qualify under the 'administrative' exemption and the term might well have been left out of the Act.")

The administrative exemption requires that the employee's primary duty include the exercise of discretion and independent judgment with respect to matters of significance. 29 CFR 541.200. Some "executive duties" do not meet this requirement. Because a combination exemption is unavailable to Defendants, such duties must be considered nonexempt work for purposes of this case. Where applicable, this will be noted in the discussion of Pandey's duties.

Whether an employer correctly classifies an employee as exempt depends on the character of her responsibilities and tasks. *Justice v. Metropolitan Gov't of Nashville*, 4 F.3d 1387, 1392 (6th Cir. 1993). The DOL Regulations provide some guidance on whether a particular task falls within the administrative exemption.

The Regulations first require that exempt administrative work be office or non-manual. 29 CFR 541.200. As discussed below, this will clearly exclude some of Pandey's duties from being exempt work.

Second, the work must be "directly related to the management or general business operations of the employer or the employer's customers." *Id.* To meet this requirement, the work must be "directly related to assisting with the running or servicing of the business." 29 CFR

541.201(a). The DOL regulations specifically distinguish this from working on a production line or selling a product. *Id.*

The Regulations give a number of examples of work that is generally directly related to management or general business operations. These examples include:

> work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; computer network, internet, and database administration; legal and regulatory compliance; and similar activities.

29 CFR 541.201(b).

Third, exempt administrative work must include the exercise of "discretion and independent judgment with regard to matters of significance." 29 CFR 541.200. Discretion and independent judgment generally "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 CFR 541.202(a).

The Regulations provide a number of factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance. These factors include:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has the authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies or procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates

and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 CFR 541.202(b).

Exercise of discretion and independent judgment "must be more than the use of skill in applying well-established techniques, procedures, or specific standards described in manuals and other sources." 29 CFR 541.202(e). Further, the exercise of discretion and independent judgment also does not include "clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent, or routine work." *Id.*

1.  **Defendants' Own Description of Pandey's work Demonstrates that Nearly All of Her Tasks Were Nonexempt Activities.**

Defendants have attempted to downplay Pandey's time spent as a veterinary assistant. Even so, Gonzalez testified that Pandey performed almost exclusively non-exempt work such as 1) acting as a cashier by collecting money at the end of a clinic; 2) performing secretarial work like answering phones, updating forms, and scheduling clinics and appointments; 3) handling routine customer service issues; and 4) performing bookkeeping functions like collections and reordering supplies.

This comports with Defendants' description of Pandey's primary duty "[i]t would have been doing office stuff, making sure the office stuff was taken care of, the admin stuff, the admin duties. And then assist as needed."[6] (Gonzalez dep. at 331).

What follows is a detailed analysis of Pandey's duties within the context of the administrative exemption. The time Pandey spent on each task, according to Defendants, is also included for further analysis later. The duties are organized in descending order based on how much time Pandey spent on the particular task.

a.  *Veterinary Assisting and Cleaning*

Much of what Pandey did at RASCAL was acting as a veterinary assistant. Assistant work encompasses a wide range of tasks. *See supra* pp. 15 and 17. The tasks include helping directly with animals (holding them for surgeries, shaving animals, etc.), performing general office work, sweeping and mopping RASCAL's truck. (Overbee dep. at 46-50).

Veterinary assisting work is almost exclusively manual in nature and comprised of nonexempt activities. The only dispute is how much time Pandey spent performing the duties. It is most useful to divide this time between travel clinics and Dublin clinics.

Pandey contends that the vast majority of her time on travel clinics was spent as a veterinary assistant. (Pandey affidavit ¶ 5). This is consistent with other witnesses' testimony (Overbee dep. at 67, Cornwell dep. at 52, 54-56, 58-59, 61-62). Jena Sgobbo, a former RASCAL employee stated "Because RASCAL is a high volume surgery clinic, the vast bulk of [Pandey]'s time was spent assisting with surgeries and providing pre- and post-op instructions to clients. [Pandey]'s duties included assisting with patients, holding animals, and bringing animals to the surgery area. (Sgobbo affidavit ¶ 5).

Gonzalez had no idea how much time Pandey spent acting as an assistant on travel clinics. (Gonzalez dep. at 291). Gonzalez did admit, however, that "Some days, yes, she would have spent most of her time doing [veterinary assisting work]." (*Id*.).

It is Defendants' duty to establish by clear and affirmative evidence that Pandey meets every requirement of an exemption. *Thomas*, 506 F.3d. at 501. If the record is unclear as to an exemption requirement, employer will be held not to have satisfied its burden. *Martin*, 940 F.2d at 901. Here Defendants are unable to provide clear and affirmative evidence of how much time Pandey spent acting as a veterinary assistant on travel clinics. Therefore, the Court should

32

conclude that Pandey spent most of her time in that capacity because this would be consistent with the available testimony.[10]

Gonzalez testified that Pandey spent about 20%-30% of her time assisting and cleaning at the Dublin location. (Gonzalez dep. at 445). Gonzalez claimed the rest of Pandey's time was spent in the Dublin location office area. Most likely, Pandey spent more time than this assisting and cleaning. Cornwell testified that she thought Pandey spent about half of her time assisting. (Cornwell dep. at 97, 116).

Gonzalez admitted that, if only three employees worked on an office surgery day, Pandey "probably would have been doing quite a bit of assisting." (Gonzalez dep. at 331-332). For about a fourth of Pandey's employment[11], RASCAL only employed a total of three workers (including Pandey). *See* Appendix A.

Cornwell testified that Pandey spent about 25%-50% of her time assisting on office appointment days. (Cornwell dep. at 122). This is somewhat in line with Gonzalez's estimate of 20%-30% assisting time.

In any case, it is apparent that Pandey spent much of her time at the Dublin location acting as a veterinary assistant. She spent more time by far on this task than any other.

           b.    *Directing the "Flow" During Travel Clinic*

Gonzalez claims that Pandey, at times, directed employees and the "flow" on travel clinics. (Gonzalez dep. at 280). The "flow" refers to moving animals in and out of the truck in such a way as to efficiently queue animals for the veterinarian performing surgeries. (Cornwell dep. at 78-79). RASCAL's high volume work necessitates a smooth "flow" in order to function properly.

---

[10] This is mostly moot because Pandey's other duties on travel clinics are nonexempt activities.
[11] From January 1, 2007 until June 2007, RASCAL employed Pandey, Cornwell, and then either Sgobbo or Rodas.

In describing this task, Gonzalez testified that Pandey tried to make sure work got done by telling people to do certain tasks. (Gonzalez dep. at 289). For example, if patient records began to pile up or animals needed moved, Pandey might ask someone to work on the lagging task. (*Id.*). Anyone else working on a travel clinic day could also ask people to work on a particular task. (Cornwell dep. at 75-75).

The work that Pandey "directed" was the same work she herself was doing. (Gonzalez dep. at 290). In fact, Cornwell testified that Pandey regularly stepped in to take care of tasks that were lagging.

> Q: So while Pandey would take animals in and out of the truck she would also tell another assistant or Mick to take animals in and out of the truck[?]
>
> A: Yes."

(Cornwell dep. at 74).

> Q: With regard to paperwork not lagging or falling behind, what would Meagan do with respect to that?
>
> A: Well, if the other assistant was doing other duties like moving animals in and out of the truck, the paperwork would start to get backed up so she would do that, keep up with the – keeping up with the paperwork to make sure it goes out in the appropriate amount of time. She would just step in if the other assistant was busy doing something else.
>
> Q: When you say "step in," you mean she would actually do the paperwork herself to make sure it was done[?]
>
> A: Yes.
>
> Q: Would she do anything else with regard to making sure the paperwork was not lagging or falling behind?
>
> A: No.

(Cornwell dep. at 82).

The sort of activity Defendants describe does not meet the Regulation's requirements for exempt administrative work. The work is neither directly related to RASCAL's management or general business operations, nor does it require the use of discretion and independent judgment.

Exempt administrative work must involve "running the business itself or determining its overall course" as opposed to simply "day to day carrying out" of business affairs. *Bertrand v. Children's Home*, 489 F. Supp. 2d 516, 520 (D. Md. 2007); *quoting, Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1125 (9th Cir. 2002). Here, Pandey simply participated in RASCAL's service: high-volume surgeries. High-volume surgeries could not be accomplished without employees communicating to each other about which tasks needed done.

Even if Pandey had delegation authority, such authority is not evidence of exempt work. *Bertrand*, 489 F. Supp. 2d at fn. 1. (Finding the plaintiff's duties, which included "having authority from the executive director to delegate assignments to be completed," "overseeing all work completed by the receptionist and directing her in order of priorities," and "maintaining special events," were secretarial in nature and not managerial. The Court also found that the existence of a hierarchy among clerical staff did not mandate the conclusion that Plaintiff's work was directly related to the defendant's management or general business operations.).

Like in *Bertrand*, Pandey (at most) delegated tasks and assignments during travel clinics. Such delegation was part and parcel to RASCAL's service, not running its business.

Pandey's "authority," as Defendants described, did not involve "the exercise of discretion and independent judgment." The Regulations require that the exercise of discretion and independent judgment "be more than the use of skill in applying well-established techniques, procedures, or specific standards described in manuals or other sources." 29 CFR 541.202(e).

Here, we must keep in mind what RASCAL does: A veterinarian performs a high-volume of spay and neuter surgeries while everyone else assists in that effort. Pandey simply applied the techniques, procedures, and standards that she learned to help make sure things moved smoothly.

Even if Pandey's sole job was to stand in the truck and "direct traffic" for the veterinarian, it would not constitute administrative work. The person exercising discretion and independent judgment is the veterinarian (and even then, the veterinarian is mostly applying well-established techniques, procedures, and standards). Pandey could only possibly be following that person's lead.

Pandey's work "directing" during travel clinics did not pertain to matters of significance. Matters of significance include matters of broad scope and significant detail that have a profound effect on an employer's business. *Alvarez v. Key Transp. Serv. Corp.*, 541 F. Supp. 2d 1308, 1313-14 (S.D. Fla. 2008) (Holding that a night dispatcher was not exempt under the administrative exemption. The night dispatcher's duties included dispatching drivers to assigned jobs; ensuring they arrived on time; interacting with clients, airport representatives, and other drivers; updating trip logs for recordkeeping; reporting vehicle breakdowns to upper management; and alleviating driver and customer complaints. The court found that to conclude the plaintiff as an exempt administrative employee "would render the phrase 'directly related to the general business operations of an employer' so broad that almost any job could be shoehorned onto it.").

Like in *Alveraz*, Pandey "directed traffic." In addition to doing some "dispatching," Pandey stepped in to "drive the taxi" herself. Such work does not relate to matters of significance.

Gonzalez did not know how much time Pandey would have spent directing the flow on travel clinics. "… most of what I do is stay in the back and do surgeries. So I wasn't monitoring her all day long. I just know that – I do know that she was telling people things to do and I know that I did see her do some of these things. I just can't say how much time she did one or the other." (Gonzalez dep. at 290).

c.    *Accounts Receivable and Collections*

While at the Dublin location, Pandey performed routine collections work. Gonzelez testified that Pandey printed lists of people who owed RASCAL money (simply generated from the computer program RASCAL used to keep track of accounts receivable) and then performed certain tasks depending on the amount owed. (Gonzalez dep. at 339).

For amounts owed up to $2.00, RASCAL considered these accounting errors and Pandey edited the computer file to reflect that the whole amount had actually been paid. (*Id*.). For larger bills that were not in error, Pandey either called the client or sent an invoice. (Gonzalez dep. at 342). For any amounts of $100 to $150 or higher, Pandey had to get Dr. Gonzalez involved. (Gonzalez dep. at 340-341).

Pandey's collections work is routine bookkeeping. *Friou v. L.E. Coppersmith Inc.*, 1998 WL 526378 at 5 (S.D. Tex. 1998). *See also, Butler v. Hartford Tech. Inst., Inc.*, 704 A.2d 222, 229 (Conn. 1997) (Finding that handling accounts receivable and accounts payable were nonexempt bookkeeping duties.). Bookkeeping work does not involve discretion and independent judgment and, thus, is not exempt work. 29 CFR 541.202(e).

Gonzalez estimated that it took Pandey between three and five hours per week to do this task. (Gonzalez dep. at 343-344). She also stated it could take as long as ten hours. (*Id*.). This

estimate was based on how long Gonzalez believes it takes a current employee to handle the task. (*Id*.).

> d.  *Reordering Supplies and Matching Invoices to Items Received*

As a veterinary practice, RASCAL regularly goes through medical supplies (such as vaccines, gloves, and cleaners). When RASCAL's stocks ran low, Pandey reordered supplies from predetermined vendors. (Gonzalez dep. at 581-583).

Pandey's ability to purchase supplies was limited to routine purchases. She had no control over RASCAL's finances or bank accounts. (Gonzalez dep. at 430-432). Gonzalez had to tell Pandey whether RASCAL actually had the money to pay for supplies. (Gonzalez dep. at 430-431). While Pandey could shop for the lowest price on some items, she could only choose from those vendors that RASCAL had contracts with. (Gonzalez dep. at 583).

Pandey was allowed to make small purchases of items that were on sale if RASCAL would use the item before it expired. (Gonzalez dep. at 421). Purchases of several thousand dollars had to be approved by Gonzalez. (*Id*.).

Ordering supplies as they run low is a clerical, non-administrative duty. *Nelson v. Master Vaccine, Inc.*, 382 N.W. 2d 261, 263-264 (Minn. App. 1986) (Finding that an employee who spent 50% of her time handling inventory and ordering supplies and 20% of her time on clerical matters supported a jury's finding that an employee was not exempt.). Further, that Pandey needed approval for purchases of several thousand dollars is evidence that she lacked the authority to bind RASCAL on significant matters - a factor in determining whether an employee exercises discretion with regard to matters of significance. 29 C.F.R. 541.202(b).

In addition to placing orders, Pandey matched invoices to the items received. (Gonzalez dep. at 433). This is clerical, non-exempt work and similar to the work in *Marshall v. Nat'l*

*Freight*, 1979 WL 1977, at \*10 (D.N.J. 1979). The court in *Marshall* found that matching checks to invoices did not involve the use of discretion and independent judgment. *Id*.

Gonzalez estimated that Pandey spent approximately one to two hours per week taking an inventory of RASCAL's supplies and then about 10-15 hours per month ordering supplies. (Gonzalez dep. at 435). This equates to approximately 2.5 – 3.72 hours per week on this task.

e.     *Scheduling Employees*

Pandey created RASCAL's employee schedules. (Gonzalez dep. at 388). RASCAL's schedules were based in part on Gonzalez's instructions regarding when she wanted to work and travel. (Gonzalez dep. at 396-398). Employees also told Pandey when they wanted to or could work (based on preference or other job obligations). (Gonzalez dep. at 389-390). From there, Pandey simply scheduled the correct number of assistants and/or technicians for the upcoming clinic schedule. (Gonzalez dep. at 390-391).

Creating employee schedules is work typically associated with the executive exemption. But the executive exemption is unavailable to defendants, as is a "combination exemption." Therefore, creating employee schedules must be examined only using the administrative exemption's requirements. *IntraComm, Inc.*, 492 F.3d at 294.

In order for a duty to be exempt administrative work, it must involve the exercise of discretion and independent judgment. 29 CFR 541.200(3). The Regulations explain that "the exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures, or specific standards described in manuals or other sources." 29 CFR 541.202(e).

Here, Gonzalez testified that "[Pandey] would assign the people that would be scheduled to the travel clinic. And for the most part it would be a matter of scheduling at least one

technician and one assistant. But she would know from experience what clinics were busier than others and know to schedule perhaps two assistants and one technician or at least three people." (Gonzalez dep. at 573). Because creating RASCAL's schedules only involved established techniques, procedures, and standards, it cannot be considered exempt administrative work.

Further, scheduling workers is not directly related to employers' management or general business operations. *Cotten v. HFS-USA, Inc.*, 620 F.Supp. 2d 1342, 1349 (M.D. Fla. 2009) (Approving that scheduling subcontractors and delivery of supplies and inspecting subcontractor's work were tasks not directly related to the management or general business operations of the employer.). As in *Cotton*, Pandey's scheduling work was "producing the product [the defendant] existed to market rather than servicing [the defendant} itself." *Id. citing Gottlieb v. Construction Services & Consultants, Inc.*, 2006 WL 5503644 (S.D. Fla. 2006).

Gonzalez was unsure how much time Pandey might have spent on this task. Gonzalez claimed that creating employee schedules currently takes her approximately one hour per week. (Gonzalez dep. at 391).

Compared to when Pandey worked for RASCAL, scheduling now is more complicated. RASCAL now has more employees and a second truck. (Gonzalez dep. at 392). Less than an hour per week is probably a fair estimate.

f. *Scheduling Travel Clinics and Individual Clients*

Pandey was the primary person who handled travel clinic scheduling. (Gonzalez dep. at 364). She also scheduled individual pet owner's appointments. (Gonzalez dep. at 580). This job duty can be broken up into two broad categories of work: customer service/secretarial work and sales work.

Pandey both scheduled travel clinic dates requested by clinic organizers and answered questions about the clinics. (Gonzalez dep. at 364-365). Pandey fielded questions such as "… our requirements as far as rabies vaccination, things that we could do, how many surgeries we could do in a day. What time they should expect for us to be there. About how long to tell people to wait until it was time to pick up." (Gonzalez dep. at 366). After scheduling a travel clinic, Pandey mailed RASCAL's forms to the organizer. (Gonzalez dep. at 365).

RASCAL required Pandey to follow certain rules regarding adding clinics to the schedule.[12] Deviation from these rules required Gonzalez's approval.

Pandey's work scheduling and answering questions is nonexempt secretarial or customer service work. The tasks are devoid of the discretion and independent judgment required by the Regulations. This work is also related to RASCAL's product and not management of the business itself.

Pandey also called clinic organizers in an effort to generate additional travel clinic dates. (Gonzalez dep. at 364). Pandey's work involved "… talking to the interested people, seeing if we were a good match for what they were looking for, trying to get an idea of they sounded like they would be ready to host a RASCAL clinic." (*Id*.). By the end of 2007, RASCAL no longer needed to solicit business in this way. (*Id*.)

Calling potential customers to solicit additional work is sales work. The Regulations are clear that exempt administrative work does not include sales work. 29 CFR 541.201(a).

Travel clinic scheduling was typically only opened up twice per year. (Gonzalez dep. at 366-367). Gonzalez was unsure how long Pandey spent scheduling or soliciting travel clinic

---

[12] For example, Gonzalez determined certain days when RASCAL would be closed (like holidays). (Gonzalez dep. at 398). Gonzalez also ordered that RASCAL would not operate three travel days in a row. (Gonzalez dep. at 396).

dates. She testified that it could take between one and several hours in a day, but would not occur every day. (Gonzalez dep. at 381).

g.      *Talking to Clients and Clinic Organizers during Travel Clinics*

Gonzalez claimed that, during travel clinics, Pandey spent time outside of RASCAL's truck and talked clinic organizers and pet owners. (Gonalez dep. at 282). Gonzalez gave this activity the grandiose title "public relations." (*Id.*). In reality, Pandey was providing routine customer service that one might expect from a sales associate in a retail store.

Gonzalez explained that Pandey answered organizers' questions about RASCAL's prices or how to schedule with RASCAL. (Gonzalez dep. at 282-283). With respect to clients (individual pet owners), Pandey fielded questions about their animals or RASCAL's services. (Gonzalez dep. at 284-285).

RASCAL's "product" is providing veterinary services. Answering questions for customers is part of RASCAL's product; it is not servicing RASCAL's business. Any veterinarian's customer would expect that the "product" they receive includes someone to answer questions about the veterinarian's services or the prices of those services.

In order for a task to fall under the administrative exemption, it must be directly related to the management or general business operations of the employer or employer's customers. 29 CFR 541.200. The Regulations distinguish between work that is directly related to assisting with the running or servicing of the business itself and producing or selling the business's product. 29 CFR 541.201(a).

This "production versus administrative" dichotomy is intended to distinguish between work related to the goods and services which constitute the business' marketplace offerings and work which contributes to "running the business itself." *Davis v. J.P. Morgan Chase & Co.*, 587

F.3d 529, 535 (2nd Cir. 2009). Any time Pandey spent answering questions is not time spent "running the business itself" but merely part of RASCAL's product.

Gonzalez had no idea how much time Pandey spent as a veterinary assistant versus performing other work, like talking to organizers and clients. (Gonzalez dep. at 291). While Pandey was an independent contractor, the time she did not spend acting as a veterinary assistant was spent talking to organizers and clients.

Gonzalez indicated that much of Pandey's time could have been spent answering questions:

Q: Isn't that a lot of time to be talking to people?

A:      Not if you come to one of our clinics. I mean we're talking about 20 to 30 people that were being scheduled at first and then as time went on 30 to 60 animals, every single animal coming with an individual, and a lot of people have questions.
        So talking to some of these people, especially the people that are really grateful for what we do and everything else is not "Hey I just wanted to say thanks and Goodbye." It is usually a more elaborate conversation. So, yeah, it's not too much time.

(Gonzalez dep. at 77).

Presumably then, the time Pandey spent on this task would be somewhat variable, but be significantly less than that spent on travel clinic assisting duties.

h.      *Monitoring the Dublin Location Floor and Collecting Checklists*

Gonzalez testified that Pandey periodically checked the Dublin location floor to make sure clients were not waiting in the front, cages were clean, and charts were not piling up. (Gonzalez dep. at 446). In the event of a problem (like charts piling up), Pandey either told someone to take care of the matter or handled it herself. (Gonzalez dep. at 448-449).

The Regulations specifically distinguish between employees that "spot check and examine" subordinates' work for the purpose of evaluating their performance generally and

43

employees that check work in the same way as any other worker. 29 CFR 541.703(b)(3). The former being potentially exempt work and the latter indicating nonexempt work.

In the capacity Defendants describe, Pandey acted as a second set of eyes for other employees. She was assisting other employees perform nonexempt work and was, herself, performing nonexempt work.

In 2007, RASCAL started to use checklists to make sure that tasks were completed. (Gonzalez dep. at 454). The checklists included duties like sweeping or mopping, cleaning cages, and printing forms for the next day.

Employees initialed tasks that they completed. (*Id*.). Pandey was also responsible for performing the duties listed on the task sheets and initialing tasks that she completed. (Gonzalez dep. at 456-457, Overbee dep. at 202-203, Cornwell dep. at 224). At the end of the day, employees put the completed checklists on Cornwell's or Pandey's desk. (Cornwell dep. at 223). Cornwell testified that the checklists were typically disposed of within a day or two. (Cornwell dep. at 223-224).

Arguably, collecting checklists to make sure work is completed could be considered work indicative of the executive exemption. That exemption is not available and this duty must be examined only in the context of the administrative exemption.

The purpose of collecting RASCAL's checklists was to make sure necessary duties were completed. This is in contrast to spot checking and examining subordinates' work for the purpose of evaluating their performance. 29 CFR 541.703(b)(3). Collecting the task sheets then was simply another method Pandey could make sure tasks were done; tasks she was also responsible for doing.

Further, collecting the checklists requires little discretion. Either tasks are done or they are not. And, of course, assuring the completion of menial tasks is not a matter of significance to RASCAL's business operations.

Defendant Gonzalez claimed that Pandey might quickly step outside of the office area to check the Dublin location floor about once an hour. Given the small size of the Rascal location, such a check would not likely take more than five minutes. That is about 45 minutes spent in a nine hour day or 3 hours per week.

          i.      *Collecting Money at the End of a Travel Clinic*

Gonzalez testified that Pandey collected money from clinic organizers at the end of travel clinics. (Gonzalez dep. at 277). Gonzalez described this task as adding up all of the amounts due for services performed during a travel clinic, presenting that total to the clinic organizer, and collecting payment for those services. (*Id*.). This is just acting as a cashier and is not exempt administrative work. Although Cornwell believed that Gonzalez took care of this duty, she estimated it took about ten to 15 minutes to complete. (Cornwell dep. at 67).

          j.      *Updating the RASCAL Website*

Pandey updated information and the calendar on the RASCAL website. (Gonzalez dep. at 383). The website was first created before Pandey became a RASCAL employee. Defendants agreed that "at no time did Ms. Pandey work independently on creating the website; rather she consistently took direction from Dr. Gonzalez." (Gonzalez dep. at 587).

Pandey's only role with regard to the website was to keep information and the calendar current. (Gonzalez dep. at 384-386). This work may have required certain computer skills, but not "the exercise of discretion and independent judgment with respect to matters of significance." Using computer skills without independent judgment and discretion is not exempt

work. *Lang v. Midwest Advanced Computer Services, Inc.*, 506 F.Supp 594, 602 (E.D. Mich. 1981).

Gonzalez did not know how much time Pandey spent updating on the website. (Gonzalez dep. at 387-388). Most site updates occurred rarely. Pandey did regularly update RASCAL's travel schedule posted on its website. (Gonzalez dep. at 386). One hour per month might be a reasonable time for this duty.

k.      *Handling Minor Client Complaints and Questions*

Pandey had a role in dealing with minor customer complaints and questions regarding RASCAL's pricing. (Gonzalez dep. at 398, 406). Gonzalez provided some examples of issues that Pandey had a role in dealing with.[13] All examples evidence Pandey provided routine customer service.

Pandey's power to deal with such customer complaints was quite restricted. Defendants admitted that Pandey's discretion was limited to crediting customer accounts up to $100. (Gonzalez dep. at 588-589). Gonzalez was at a loss as to whether Pandey actually did credit any accounts. (*Id.*).

Handling customer service issues is part of RASCAL's product. Because it is not directly related to the management or general business operations of the employer or the employer's customers, it is not exempt work.

---

[13] A client did not believe his dog was pregnant and disputed a $5.00 additional fee for a pregnant spay. (Gonzalez dep. at 410). Pandey confirmed with Gonzalez that the dog was, in fact, pregnant and informed the owner of this. (*Id.*) A client became irate when she was told she could pick up her animals by 3:00. She started swearing and Pandey asked her to leave. (Gonzalez dep. at 406-407). When a client was charged for two mass removal surgeries and disputed the double charge, Pandey explained that the procedures were separate billable events. The client filed a Better Business Bureau complaint. Pandy sent in a response to the Bureau that explained what happened. (Gonzalez dep. at 403-404). Clients became upset that their animals were not operated on, Pandey talked to the owners about why that happened. (Gonzalez dep. at 409-410). The client filed a complaint with the licensing board, which Gonzalez dealt with. (Gonzalez dep. at 410).

46

Further, the Regulations require that exempt administrative work deal with "matters of significance." 29 C.F.R. 541.200(3). Factors to consider when determining whether a matter is of significance include "whether the employee has the authority to commit the employer in matters that have significant financial impact" and "whether the employee has the authority to negotiate and bind the company on significant matters." 29 C.F.R. 541.202(b). It is difficult to imagine matters of $100 having "significant financial impact" on RASCAL.

Gonzalez estimated that Pandey dealt with between one and two complaints or pricing questions per week. Gonzalez testified that spending 20 or 30 minutes on a complaint or pricing issue would be "a very long time." (Gonzalez dep. at 400). An estimate of less than 30 minutes per week would be generous for this duty.

l.     *Working on the RASCAL Newsletter*

RASCAL produced a several page newsletter as an informational tool for both RASCAL Unit and RASCAL Charities. (Gonzalez dep. at 40-41). The newsletter contained articles about animal health issues and was produced on approximately a quarterly basis. (Gonzalez dep. at 363-364). Pandey's role with regard to the newsletter was to find articles on the internet to include in the newsletter, write some articles herself, and put the newsletter together. (Gonzalez dep. 43-44).

While RASCAL's primary "product" is veterinary services, the newsletter is another RASCAL product. Creating this item is nonexempt work related to RASCAL's marketplace offerings, not its management or business operations.

Defendant Gonzalez testified that she was unsure how long this task took Pandey. Defendant Gonzalez's only guess was between four and six hours quarterly. (Gonzalez dep. at

363). This was based on how long it takes Defendant Gonzalez to construct the current RASCAL newsletter. (*Id.*).

  m.  *Teaching Newer Employees Basic Tasks*

Defendants generally claim that, at times, Pandey "trained" Rascal staff. (Gonzalez dep. at 574). This "training" consisted of three primary activities, none of which are exempt administrative duties.

First, Pandey had some role in scheduling vendors to give presentations on various products. This activity is not exempt work. *See infra* p. 56.

Second, Defendants claimed that Pandey directly trained staff. According to Gonzalez, Pandey's "training" included things like "showing people how to wrap instrument packs," how to use the Intervet computer program," "teaching them to clock in and clock out" and generally showing people what to do while on RASCAL's truck. (Gonzalez dep. at 574-575). Pandey was simply a more experienced co-worker showing newer co-workers how things were done at RASCAL. Cornwell confirmed this.

Q: So with regard to training employees at Rascal, it was primarily experience

that dictated who would train, correct?

A: Yes.

(Cornwell dep. at 200).

Overbee also described Pandey's "training" as showing her how to do basic tasks that Pandey was familiar with. (Overbee dep. at 164-165). She explained that "[b]asically everyone who was around" trained her. (Overbee dep. at 165).

48

Pandey showed less experienced employees how to do basic tasks. This does not "involve the comparison and evaluation of possible courses of conduct and making a decision after consideration of the various possibilities" and is thus not exempt work. 29 CFR § 541.202(a).

Third, Defendants claimed that Pandey created training materials. They produced three documents, two of which RASCAL never used.

The first item Defendants produced is labeled "RASCAL Unit Office Assistant Training Manual." This item is a general description of a RASCAL office assistant's job duties. While Pandey did type the document, it was apparently never finished or actually used. RASCAL employees testified that they had never even seen the document before their depositions. (Overbee dep. at 166, Cornwell dep. at 201).

The second document is titled "RASCAL Frequently Asked Client Questions." Again, there is a question of whether this document was even used. (Overbee dep. at 167). In any case, it is difficult to imagine how drafting an FAQ can be seen as involving "the exercise of discretion and independent judgment with respect to matters of significance."

Finally, Defendants produced an outline for or minutes of a staff meeting on December 14, 2007. Pandey drafted the item and it includes some issues to go over with RASCAL's employees like "Food! Keep it in the food area and clean it up when you're done please," "wrapping all instruments- they are expensive to replace when they get lost! Please ask if you don't know how they are wrapped," and "staff e-mails- everyone has one now."

Assuming the outline lists talking points for a meeting, *and* Pandey presided over the meeting, this is not evidence of Pandey "training" the staff. Like the "direct training" claimed by Defendants, it is evidence of a more experienced co-worker going over items of interest to newer co-workers.

Most of what RASCAL deemed to be training is already included in the times above. For example, Gonzalez testified that when Pandey scheduled vendors to come in and talk about new products, Pandey "trained" staff. This time is included under "scheduling presentations."

Presumably, much of Pandey's "direct training" is also accounted for in the time she spent monitoring the office/correcting employees. Certain other tasks, like showing a fellow employee how to clock in and out, would be extremely difficult to measure.

n.  *Screening Job Applicants, Giving Facility Tours, Placing Help Wanted Ads*

Gonzalez testified that Pandey had a role in hiring at RASCAL. Gonzalez based Pandey's hiring duties on what Westerville East's office manager did. (Gonzalez dep. at 524). That manager, of course, was a nonexempt worker entitled to overtime. (Gonzalez dep. at 132-133).

"Hiring" is typically exempt work. Here, however, Defendants have disingenuously labeled nonexempt secretarial work as "hiring."

Pandey's "hiring" work was limited to placing ads, screening applicants, and giving tours of RASCAL's facility. These activities are not exempt duties.

Gonzalez made the final hiring decisions at RASCAL. (Gonzalez dep. at 485). Other employees, however, participated in a limited way in RASCAL's hiring process. RASCAL's hiring process typically consisted of two phases: a screening interview and a working interview.

First, RASCAL brought a job applicant in for a screening interview. (Gonzalez dep. at 486). "We would do a quick sit-down, 15, 20 minutes or something like that to let them know what the job was about." (*Id*.).

Second, "[i]f everything looked good after that first interview" job applicants would be asked to schedule a "working interview." (Gonzalez dep. at 487). Although Gonzalez claimed

not to always personally "conduct" working interviews, she admitted to being present and observing applicants work at RASCAL. (Gonzalez dep. at 509-510).

Pandey conducted a number of minor tasks when it came to hiring new applicants. Most of the tasks are secretarial in nature.

First, when Gonzalez determined to hire a new employee, Pandey occasionally placed "help wanted" ads in the newspaper. (Gonzalez dep. at 486). This, of course, is nonexempt secretarial work. Placing an ad in a newspaper does not involve discretion and independent judgment with respect to matters of significance.

Second, Gonzalez claimed that Pandey conducted some screening interviews either with Gonzalez or on her own. (Gonzalez dep. at 488). The preliminary interviews were just screening tools to weed out people who were obviously not good fits. (Gonzalez dep. at 490).

Screening job applicants is not exempt work. 29 C.F.R. 541.203(e). "Personnel clerks who 'screen' applicants to obtain data regarding their minimum qualifications and fitness for employment generally do not meet the duties requirements for the administrative exemption." Id.

Third, Pandey made suggestions regarding when RASCAL needed a new employee. (Gonzalez dep. at 483). Gonzalez was only able to recall two specific suggestions, both of which were in 2007 and regarded RASCAL's need to hire a receptionist. (Gonzalez dep. at 485).

Anyone can suggest their company hire additional staff. Without more, this is nonexempt work. Gonzalez admitted that RASCAL's budget was the determining factor in hiring decisions, something Pandey did not deal with. (*Id.*).

Fourth, Defendants alleged that Pandey gave hiring recommendations for every RASCAL employee. (Gonzalez dep. at 504). Gonzalez could only remember one instance of Pandey giving such a recommendation. (Gonzalez dep. at 505).

Cornwell testified that any other employee could and would give hiring recommendations, "[a]nybody could have recommended somebody. I mean, honestly, anybody." (Cornwell dep. at 180). Cornwell clarified that any recommendations Pandey gave were not part of her job duties:

> Q: But you said anyone could make a recommendation, so I'm wondering if it's part of your regular job duties or if you're just making recommendations like anyone else.
>
> A. Yeah, just like anybody else.
>
> Q: Would [Pandey] also be making recommendations just like anybody else?
>
> A: Yeah.
>
> (Cornwell dep. at 182).

Gonzalez's testimony with regard to specific employees demonstrates Pandey's limited role in hiring as described above.[14] Gonzalez also testified that Pandey had a more substantial role with regard to Jessica Fritz and several employees that were hired "without" Gonzalez's involvement.

In 2007, Pandey suggested that RASCAL could use a receptionist and recommended Fritz for the job. (Gonzalez dep. at 502). Fritz was the granddaughter of a clinic organizer that used RASCAL's services. Gonzalez told Pandey that RASCAL could not afford to hire a receptionist. (*Id.*). Sometime later, Pandey made the suggestion again, and Gonzalez approved it.

Pandey then interviewed Fritz and offered her a job. (Gonzalez dep. at 503). Gonzalez testified that her involvement was limited to determining how much RASCAL would offer to

---

[14] Pandey gave Kelly Abbatiello a tour of the warehouse and explained veterinary assistants' duties. (Gonzalez dep. at 493). Abbatiello then followed Ashley Overbee around to observe her work. (*Id.*). Pandey showed Kate Churchill around the warehouse and told what had to be done in the warehouse. (Gonzalez dep. at 497). Pandey conducted a screening interview with Karly Thomas and then scheduled a time for her to come in for a working interview. (Gonzalez dep. at 499). Pandey did a screening interview with Laura Witherup, gave her a tour, and scheduled a time for a working interview. (Gonzalez dep. at 500-501.) Pandey conducted a screening interview for Erin Walker. (Gonzalez dep. at 513).

pay Fritz. (*Id.*). Gonzalez also admitted that she thought Fritz could be a good fit for RASCAL before she was even interviewed. (Gonzalez dep. at 504).

Pandey's token role in hiring Fritz demonstrates a lack of discretion and independent judgment necessary to deem to work exempt. Gonzalez made the decision whether RASCAL could hire Fritz prior to the interview. Gonzalez determined the rate of pay RASCAL would offer Fritz, an integral role in any job offer. Pandey, at most, conducted a screening interview; work the Regulations label as nonexempt. 29 C.F.R. 541.203(e).

Defendants also claim that Pandey may have hired a couple employees without Defendant's involvement. Gonzalez's testimony on this issue was simply that, because Gonzalez was not involved in the decision, Pandey may have made the decision. (Gonzalez dep. at 515). This is not clear and affirmative evidence required to exempt an employee from receiving overtime. Cornwell testified that there was never a time when Pandey hired someone without consulting with Gonzalez. (Cornwell dep. at 179-180).

Time Pandey spent with regard to hiring is difficult to quantify. Even for purposes of summary judgment, Defendants lack clear and affirmative evidence to show Pandey did more than a couple discrete "hiring" related tasks. The facts and times that Gonzalez testified to demonstrate the absence of a preponderance of evidence.

First, over the course of Pandey's two-year employment, RASCAL hired the following:

| | |
|---|---|
| Erin Rodas | April 2007 (Volunteer until she was hired) |
| Crystal Decker | June 2007 |
| Jennifer Stahl | June 2007 |
| Kate Churchill | August 2007 |
| Michael Monska | August 2007 (Gonzalez's brother-in-law) |
| Ashley Overbee | August 2007 |
| Erin Walker | December 2007 |
| Kelly Abbatiello | December 2007 |
| Jessica Fritz | January 2008 |
| Erin Brockhart | March 2008 |

Laura Witherup            April 2008
Karly Thomas              April 2008
Kristin Quicksall         July 2008

(Exhibits 1 and 2).

Second, Gonzalez testified that preliminary interviews took between 15 to 20 minutes and working interviews took about four hours. (Gonzalez dep. at 486-487). Defendant claimed that Pandey was present for some parts of some working interviews. (Gonzalez dep. at 488).

Taking all hiring activities that Defendant contends Pandey participated in, she would have spent approximately 13 hours on such activities.[15] Even if an opinion on every other employee is included,[16] the total is 15.5 hours.

Pandey worked approximately 101 weeks for RASCAL. Her possible 15.5 hours of "hiring" duties amounts to an average of .15 hours per week.

> o.    *Correcting Employees*

Defendants claim that Pandey "initiated corrective action up to and including termination." (Gonzalez dep. at 541). Gonzalez admitted that this simply meant Pandey told people when they were doing something incorrectly. (*Id.*). Pandey disputes that she disciplined employees, but admits that she probably told employees when she thought they were doing something wrong. (Pandey affidavit ¶ 6). RASCAL had neither a formal discipline system nor any kind of write-up system. (*Id.*)

---

[15] The following times are used: Two hours allocated for participation in "working interviews," 30 minutes allocated for opinions given, 30 minutes allocated for ads posted, 18 minutes for screening interviews. Defendants claimed that Pandey conducted the following hiring activities with regard to the following employees: Abbatiello – posted ad, screening interview, gave opinion; Churchill – screening interview, gave opinion; Quicksall – posted ad, gave opinion; Fritz – initial interview; Walker – screening interview; Overbee – screening interview; gave opinion; Thomas/Witherup – gave opinion comparing both; General – may have been present for some of these employees' working interviews (4).

[16] Excluding opinions for Monska because he is Gonzalez's brother-in-law and Rodas because she had already worked for RASCAL.

Defendants listed twelve instances of Pandey issuing "oral reprimands" to fellow employees as examples of discipline. *See* Exhibit 6 at Interrogatory 18. Gonzalez claimed there was most likely other examples of "oral reprimands," but was unable to recall any. (Gonzalez dep. at 550). Because Defendants have the burden of producing affirmative evidence, the Court should conclude that these are the only reprimands.

Some of this dispute may come down to semantics. For example, Cornwell testified that Pandey "reprimanded" people, but did not consider this "discipline." (Cornwell dep. at 190). Overbee testified that she assumed Pandey had the power to discipline employees. (Overbee dep. at 146). Overbee conceded that she based this assumption only on the fact that Pandey's job title was "manager." (*Id*.).

The Court need not make a determination on this dispute. If the "reprimands" are characterized as one co-worker explaining to another how to do things, then Pandey's actions are clearly not exempt activities. If the reprimands are characterized as some kind of preliminary discipline, then the reprimands might fit within the executive exemption. But, because the executive exemption is unavailable to Defendants, the oral reprimands must be examined only in the context of the administrative exemption.

This is an important distinction because the executive exemption does not require that an employee perform functions with regard to "matters of significance." 29 CFR 541.100. The administrative exemption does. 29 CFR 541.200.

The Regulations list factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance. 29 CFR 541.202(b). The listed factors make it clear that "matters of significance" constitute actions of gravity. The Regulations use words like "major assignments," "affects business operations to a substantial

degree," and "significant financial impact." Id. Here, Pandey corrected incidental work problems.[17] Limited discipline for minor work problems cannot meet the definition of "matters of significance" required by the administrative exemption.[18]

p.      *Receiving Marketing Information and Scheduling Presentations from Suppliers*

As a means of marketing, distributors and vendors contact veterinary practices to talk about special deals on products or to schedule presentations about their products. (Gonzalez dep. at 413). Pandey fielded these calls from vendors and distributors. (Gonzalez dep. at 414).

According to Gonzalez, Pandey was allowed to schedule distributors and vendors to give presentations to RASCAL's employees. (Gonzalez dep. at 414). Gonzalez was able to recall this happening between three and four times. (Gonzalez dep. at 415-416).

Receiving marketing calls and scheduling presentations are not "matters of significance" as required by the Regulations. This is simply nonexempt, secretarial work.

Gonzalez testified that scheduling talks did not happen very often. (Gonzalez dep. at 415). Further, time spent on this task is included in the 10-15 hours spent on "reordering supplies" above. (Gonzalez dep. at 435).

q.      *Updating RASCAL's Forms*

Pandey helped update RASCAL's forms such as patient records and pricing information pages. (Gonzalez dep. at 354). Such updates were clerical matters like adjusting prices on forms to reflect RASCAL's price changes. (Gonzalez dep. at 355).

---

[17] For the Court's reference, the reprimands were regarding the following matters: tardiness; use of work computer for personal use; error in estimating fees; eating during work hours; failure to clean cages; failure to wear appropriate T-shirts on travel clinics; pricing error; failure to promptly answer the phone; attempting to leave work before the truck was cleaned; referring to doctors by their first names; being too slow with end of the day tasks/failure to keep employees focused. *See* Exhibit 6 at Interrogatory 18.

[18] The work could still be work exempt under the executive exemption.

Gonzalez set RASCAL's prices, determined its services, and decided what information was important for her patient records. (Gonzalez dep. at 356). Updating forms according to the boss's instructions is routine secretarial work and not exempt administrative work. 29 C.F.R. 541.202(e).

This task was done rarely. Defendant Gonzalez testified that forms may need updated at least twice per year. (Gonzalez dep. at 356).

r.    *Terminating Employees*

Gonzalez testified that Pandey had a role in terminating employees. (Gonzalez dep. at 525-526). Pandey's role appears to be limited to two aspects of termination: providing a recommendation regarding termination and delivering the news of termination to the targeted employee. (Gonzalez dep. at 526).

Delivering bad news on behalf of management is not, by itself, exempt administrative work. The decision has been made and no discretion or independent judgment is needed.

The only thing left is Pandey's conversations with Gonzalez prior to the terminations. Defendants characterized the conversations as Pandey recommending that an employee be terminated. (Gonzalez dep. at 526). Gonzalez's description about the actual conversations, however, indicates that Pandey was simply complaining about bad work behavior to Gonzalez. (Gonzalez dep. at 527, 528-529, 323). Of course, complaining about other employees' bad behavior is not exempt work.

Still, because the Court must view the facts in the light most favorable to Defendants, it may conclude that Pandey gave termination recommendations. The exercise of discretion and independent judgment "may consist of recommendations for action rather than the actual taking

of action." 29 C.F.R. 541.202(c). Therefore, this work could be considered exempt under either the administrative or executive exemption.

Termination at RASCAL was a very rare event. During Pandey's employment, RASCAL terminated three employees. (Gonzalez dep. at 526). Given its rarity, the time spent on this task is *de minimis*. At most, then, this was peripheral to Pandey's regularly performed duties. While any degree of discretion and independent judgment may be considered, RASCAL was a very small workplace with one overall supervisor, Defendant Gonzalez, its owner, who observed most of the work performed by employees and made the termination decisions. Defendants have not adduced evidence that any of Pandey's recommendations were significant factors in those termination decisions.

s.        *Attending an Employee Review*

Defendants claimed that Pandey "participated in staff performance evaluations." *See* Exhibit 5 at Interrogatory 15. Gonzalez testified that Pandey was present for two staff reviews. (Gonzalez dep. at 561). No written records of these reviews exist, nor did RASCAL even have a formal review system. (Gonzalez dep. at 561, 564).

Gonzalez indicated that Pandey may have been present for an employee review when Overbee was promoted to senior veterinary assistant. (Gonzalez dep. at 560). Overbee, however, did not remember whether she was actually reviewed. She stated "[s]o there may not have been a review. There may not have been." (Overbee dep. at 155). In any case, RASCAL did not promote Overbee to senior veterinary assistant until about May of 2010, after Pandey was terminated. (Overbee dep. at 38).

Gonzalez also testified that Pandey might have been present for a "mini review" of Overbee when Overbee was switched to salary. (Gonzalez dep. at 560). Pandey's role was

apparently just to help convince Overbee to become a salaried employee.[19] (*Id*.). "A big part of [Pandey's] role was that because [Pandey] was a salaried employee she was telling them about the benefits of being salaried." (*Id*.).

Gonzalez also testified that she believed Pandey was present for a review of Karly Thomas. (Gonzalez dep. at 561-562). Gonzalez was not, however, able to testify as to what happened at the review. (*Id*.).

Actually conducting performance reviews can be exempt work under both the administrative and executive exemption. Simply attending a performance review or helping Gonzalez extol the virtues of being on a salary is not exempt work.

Whether Pandey attended and had a nonexempt role in Thomas' review are factual disputes. Therefore, the Court may hold that Pandey's attendance at Thomas' review both occurred and consisted of exempt work. Of course, the time spent attending one performance review over the course of two years is *de minimis*.

### 2. The Administrative Exemption Does Not Apply Because Pandey's Primary Duty Was the Performance of Nonexempt Work.

After having analyzed Pandey's various job duties and activities, the final step in resolving whether she was an exempt administrative employee is to determine Pandey's "primary duty."[20] Pandey can only be exempt from receiving overtime pay if her primary duty "includes the performance of office or non-manual work directly related to the management or

---

[19] Of note, RASCAL began working Overbee overtime (without paying her overtime wages) upon switching her to salary. (Overbee dep. at 36-37). Gonzalez admitted that she came to the understanding that Overbee was, in fact, entitled to overtime pay. (Gonzalez dep. at 136-137). Sometime in January/February 2010 Gonzalez claimed she decided to pay Overbee back wages for the overtime owed. (Gonzalez dep. at 139). Still, by the date of Gonzalez's deposition on November 15, 2010, she had not done so. (*Id*.).

[20] The below discussion regarding "primary duty" focuses on the administrative exemption. It also applies to the executive exemption. The only exception is that a few duties Pandey performed could be considered exempt executive duties. Where applicable, that is noted in the duty's description.

generally business operations of the employer" and "includes the exercise of discretion and independent judgment with respect to matters of significance." 29 CFR 541.200.

The Regulations state that "determination of an employee's primary duty must be based on all the facts of a particular case, with the major emphasis on the character of the employee's job as a whole." 29 CFR 541.700(a). As a preliminary consideration, nearly all of Pandey's work consisted of nonexempt tasks. This leads to the conclusion that her primary duty must have been the performance of nonexempt work.

The Regulations provide some additional guidance on this matter by providing examples of the sort of work envisioned by the Regulations:

> work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; computer network, internet, and database administration; legal and regulatory compliance; and similar activities.

> 29 C.F.R. 541.201(b).

The Regulations' examples illustrate a higher-level employee's duties.

Defendants have attempted to attach important-sounding labels to some of Pandey's duties (like "public relations" or "purchasing"). In spite of that, Defendants descriptions of the actual work Pandey performed make it clear that Pandey did not work in *any* of the functional areas used as examples in the Regulations. Pandey's duties, as described by Defendants, are those of a low-level, nonexempt employee.

Further, Defendants admit that Pandey's primary duty while at the Dublin location was "… doing office stuff, making sure that the office stuff was taken care of, the admin stuff, the admin duties. And then assist as needed." (Gonzalez dep. at 331).[7]  Defendants clarified that

"office stuff" or "admin stuff" simply meant clerical or secretarial work.[21] (Gonzalez dep. at 334-336).

Pandey's duties paint a clear picture of a nonexempt employee. Based on the above, Pandey asks that the Court rule that she was not exempt under the administrative exemption. Still, for the sake of completeness, Pandey will address all of the factors used in determining "primary duty."

The Regulations list several non-exhaustive factors to assist in determining an employee's "primary duty." The factors include:

- the relative importance of exempt duties as compared with other types of duties;

- the amount of time spent performing exempt work;

- the employee's relative freedom from direct supervision;

- the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."

29 C.F.R. 541.700(a).

Pandey will address each of these factors below. As would be expected based on Pandey's individual duties, all of the factors indicate Pandey's primary duty was the performance of nonexempt work.

a.      *Comparative Wages*

In determining Pandey's primary duty, the Court should compare Pandey's effective hourly rate with the hourly rate of RASCAL's other employees. *Thomas*, 506 F.3d at 508-509. If a plaintiff's effective hourly rate is significantly higher than that of subordinates, this factor will weigh in favor of the plaintiff's primary duty being the performance of exempt work. *Id*.

---

[21] When asked what Pandey's non-assistant duties included, Gonzalez listed talking to distributors, assembling packets of bills, confirming whether the bills were correct, working on the website, scheduling travel clinics,

Otherwise, the factor is neutral or favors the plaintiff's primary duty being nonexempt work. *Johnson v. Big Lots Stores, Inc.*, 604 F.Supp. 2d 903, 918 (E.D. La 2009). In this case, Pandey's effective hourly rate is lower than or comparable to the employees Defendants claim she supervised.

Starting approximately June 16, 2008, Pandey received a pay raise of $150 per week. Therefore, Pandey's effective hourly rate will be calculated for two separate time periods – before and after her raise. This is consistent with the court's method in *Johnson*. *Id*.

For comparison purposes, Defendants' employees' base hourly rates are below:

| Last rate | Name (title) | Dates of employment |
|---|---|---|
| $13.00/hour | Laura Witherup (vet tech)[22] | April 08 – present |
| $13.00/hour | Jessica Fritz (receptionist)[23] | Jan 08 – present |
| $10.50/hour | Jena Sgobbo (vet tech) | Jan 07 – Mar 07 |
| $9.50/hour | Karly Thomas (vet tech)[24] | April 08 – present |
| $9.25/hour | Michael Monska (driver) [25] | July 07 – present |
| $9.25/hour | Erin Rodas (vet assistant) | April 07 – Sept 07 |
| $9.00/hour | Kelly Abbatiello (vet assistant) | Dec 07 – present |
| $9.00/hour | Ashley Overbee (vet assistant) [26] | Aug 07 – present |
| $9.00/hour | Crystal Decker (vet assistant)[27] | June 07 – Sept 07 |

---

creating the newsletter, updating forms as needed, and performing collections work. (Gonzalez dep. at 334-336).
[22] Witherup was switched to salary around August 2008. *See* Exhibit 2.
[23] Fritz began as a receptionist making $8.25/hour. She was later promoted to assistant manager and placed on salary. (Gonzalez dep. at 149). Sequent (RASCAL's HR company) informed Rascal that Fritz was not, in fact, an exempt employee. (Cornwell dep. at 191-192). Fritz was returned to an hourly employee. (*Id.*)
[24] Thomas was switched to salary around August 2008. *See* Exhibit 2.
[25] Monska drives RASCAL's truck and occasionally acts as a veterinary assistant. (Gonzalez dep. at 276, Cornwell dep. at 152).
[26] Overbee was put on salary in 2008 and was later promoted to "senior veterinary assistant." Her salary rate equaled $9.60 per hour for 40 hours per week. (Gonzalez dep. at 134) *and see* Exhibit 2.  Overbee started at $8.00/hour. *See* Exhibit 1.
[27] Decker also worked a month in 2008 for the same rate of $9.00/hour. *See* Exhibit 2.

| | | |
|---|---|---|
| $9.00/hour | Meghan Brockhart (vet assistant) | Mar 08 – Sept 08 |
| $8.50/hour | Kristin Quicksall (vet assistant) | July 08 – Dec 08 |
| $8.25/hour | Kate Churchill (vet assistant) | Aug 07 – Oct 07 |
| $8.25/hour | Erin Walker (vet assistant) | Dec 07 – Mar 08 |
| $8.00/hour | Jennifer Stahl (vet assistant) | June 07 – Aug 07 |

*See* Exhibits 1 and 2.

In order to determine Pandey's effective hourly rate, the amount of hours she worked is divided by her salary. *Thomas*, 506 F.3d at 508. This number is then compared to the hourly rate of other employees.

From January 1, 2007 until June 15, 2008, Pandey worked approximately 4185.9 hours.[28] Pandey's total hours during this time is divided by the 71 weeks that Pandey worked during this period to get her average hours per week of 59.[29] Pandey's weekly salary of $600 is divided by her average weekly hours to find her effective hourly wage. The final result is that Pandey earned an average effective hourly wage of $10.17.

Pandey's effective hourly wage of $10.17 is lower than or in line with that of other employees. An hourly rate that is only one to three Dollars higher than that of "subordinate" employees is considered to be "neutral" for this factor. *Johnson v. Big Lots Stores, Inc.*, 604 F.Supp. 2d 903 at 918. When, as in Pandey's case, an employee's effective hourly wage is lower than that of "subordinates," this factor should be considered evidence that the employee's primary duty is the performance of nonexempt work.

---

[28] Pandey's hours worked is derived from the damages section. *See infra* pp. 71-74.
[29] The 71 weeks number discounts the first week of January 2007 (Pandey's disputed hours that week are also not included in either of the above totals of hours worked), the two weeks Pandey was on her honeymoon (and was not paid), and the week of July 30 when Pandey did not work.

63

Turning to the second time period in question, from June 16, 2008 until December 9, 2008, Pandey worked approximately 1435 hours over the course of 26 weeks. During this time period, Pandey worked an average of 55 hours per week. Pandey's salary at this time was increased to $750 per week. Therefore, her effective average hourly wage was approximately $13.64.

Pandey's effective hourly wage is about $0.64 higher than two of Rascal's "subordinate" employees and a little under $4.60 more than most of the other employees. The court has found that an hourly rate of 30% more than that of subordinates is sufficient to weight this factor in favor of exempt work as an employee's primary duty. *Thomas*, 506 F.3d at 508-509.

Here, Pandey's effective hourly rate is approximately 5% higher than RASCAL's highest paid hourly, nonexempt employees. This is below the 30% number from *Thomas* and is in line with *Johnson*'s one to three Dollar range. *Johnson*, 604 F.Supp. 2d at 918. The Court should find this factor neutral as to primary duty because Pandey's hourly wage is within the acceptable range from *Johnson*.

In this case, Pandey's effective hourly rate indicates that her primary duty was the performance of non-exempt work for 71 out of 97 weeks of work (73%). For the final 26 weeks of Pandey's employment, she both received a wage increase and began working fewer hours. While these two factors skew the results in Defendants' favor, Pandey's hourly rate is still only slightly higher than some of RASCAL's other nonexempt, hourly workers.

After comparing Pandey's effective hourly rate to that of other nonexempt RASCAL workers, the factor supports Pandey's nonexempt status. RASCAL paid Pandey a similar amount as other nonexempt workers, particularly taking into account the fact that Pandey had been with the company longer than anyone else.

b.      *Comparative Importance of Duties*

In determining the importance of exempt duties compared with other duties, the Court must keep in mind "the end goal of achieving the overall success of the company." *McKinney*, 656 F.Supp.2d at 123, *citing Thomas*, 506 F.3d at 505. As discussed above, almost none of Pandey's duties were, in fact, exempt administrative duties. Obviously, if this is the case, then her nonexempt duties must be more important than her exempt duties. Still, some facts are worth noting regarding this factor.

First, while Pandey was an independent contractor, RASCAL only paid her for time she spent working on RASCAL's truck. (Gonzalez dep. 74-75). This indicates that her primary duty was exactly that – working on the truck. During this period, RASCAL paid Pandey $15.00 per hour.

Upon becoming a RASCAL employee, Pandey's effective hourly rate dropped to $10.17 per hour. Pandey's duties certainly did not decrease commensurate with her pay cut. In fact, Gonzalez claimed she intended Pandey to take on additional duties after becoming an employee. (Gonzalez dep. at 64-65). That Defendants actually reduced Pandey's effective hourly wage when she was expected to take on additional duties indicate those duties were of little importance; the bulk of Pandey's job was to continue as a veterinary assistant.

Second, RASCAL did not hire anyone to assume Pandey's former position. (Gonzalez dep. at 611). A company's failure to fill a position after an employee leaves suggests that the position was nonessential. *Alvarez*, 541 F.Supp. 2d at 1317.

RASCAL simply split up Pandey's duties (beyond veterinary assisting and cleaning) among current employees – Cornwell took on scheduling travel clinics and ordering supplies; Overbee took on "safety issues;" Gonzalez took on employee scheduling, website maintenance,

and the newsletter; Fritz took on collections and receivables; Joe Monska took on ordering office supplies; Wendy Lowe took over financial matters (including Gonzalez's old duties). (*Id*.). Apparently, none of what Pandey did was important enough to warrant hiring someone else as "manager."

Third, Pandey performed veterinary assistant duties whenever asked or needed. (Cornwell dep. at 96-97). With respect to the executive exemption, "[g]enerally, exempt executives make the decision regarding when to perform nonexempt duties…" 29 CFR 541.106(a). At a veterinary office (particularly a high-volume surgery practice) assisting with animals (including making sure cages are clean, holding animals for vaccines, etc.) is every employee's most important duty.

Fourth, Gonzalez claimed that Pandey's presence on a truck actually created additional work for other employees. (Gonzalez dep. at 320). Defendants' attempted to minimize Pandey's role as a veterinary assistant by claiming she directed other employees during travel clinics. Yet, Defendants admit that, when Pandey traveled, she was in the spot of an assistant. (Gonzalez dep. at 306). Defendants later claimed that, when Pandey was on a clinic, the other assistant would essentially be doing "double the work." (Gonzalez dep. at 320).

Defendants apparently contend that Pandey would be brought in place of an assistant and not work as one. And Pandey's alleged role in directing employees was so ineffective that it forced someone to do "double the work." (*Id*.).

Aside from this testimony not passing the smell test, it demonstrates that any supervisory role Pandey had was not only unimportant to RASCAL achieving success, it was actually detrimental to the company. This indicates that Pandey's primary role was not to direct employees and was, more likely, to act as an ordinary assistant with a few additional duties.

66

In sum, Pandey did help RACAL achieve success. But she did so simply as a veterinary assistant with a few additional clerical duties. None of this work, though important to RASCAL's success, is exempt work.

c.     *Amount of Time Spent Performing Exempt Work*

DOL Regulations state that "the amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of the employee." 29 CFR 541.700(b). The Regulations caution that time is not the sole test and that exempt employees are not required to spend more than 50% of their time on exempt work. Id.

How an employee spends her working time is a question of fact. *Icicle Seafoods, Inc.*, 475 U.S. at 714. While there is some dispute as to how much time Pandey spent on various duties, the Court need not resolve that dispute. Even if Defendants' contentions are taken as the facts in this case, the time Pandey spent on nonexempt tasks supports finding her to be a nonexempt employee.

For example, Pandey spent nearly half of her time on veterinary assisting and cleaning duties alone. Pandey worked on approximately 500 days. Of those, Pandey worked at the Dublin location 346 times and worked on a travel clinic 154 times. During the office days, Defendants conceded that Pandey spent 20%-30% of her time on veterinary and assisting duties. (Gonzalez dep. at 291). During travel clinics, Gonzalez had no idea how much time Pandey spent assisting and cleaning. Other witnesses testified that Pandey typically or mostly acted as a veterinary assistant on travel clinics. (Overbee dep. at 67, Cornwell dep. at 52, 54-56, 58-59, 61-62, Sgobbo affidavit ¶ 5). Assuming Pandey only spent about 80% of her time assisting and cleaning on travel clinics, she would have spent approximately 192.4 to 227 out of 500 days on those duties.

In other words, 38% to 45% of Pandey's time was spent on duties like holding animals and cleaning cages.

Considering the above and then if the Court were to only find a few of Pandey's other duties to also be nonexempt, well over half of her time would have been spent on nonexempt duties. Time spent on particular duties is a "useful guide" in determining an employee's primary duty. 29 CFR 541.700(b).

The Regulations state that "employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement *if the other factors support such a conclusion*." *Id.* (Emphasis added.) Because all of the other factors support finding Pandey's primary duty was nonexempt work, the time factor further strengthens her position.

The reality, of course, is that virtually none of Pandey's time was spent on exempt duties. "No circuit courts have found management was a primary duty when an employee spent 80 to 90% of his time performing nonexempt tasks." *Johnson*, 604 F.Supp. 2d at 914. That is the case here; nearly all of Pandey's time was spent on nonexempt activities.

          d.     *Employee's Relative Freedom from Direct Supervision*

Whether and how much Pandey was free from direct supervision is a factor to consider in determining whether her primary duty was the performance of exempt administrative work. 29 CFR 541.700(a). In this case, Pandey was rarely free from direct supervision.

RASCAL is a veterinary operation and, necessarily, run by a veterinarian. Regardless of how Defendants wish to characterize Pandey's work now, Pandey was, at most, second in command to the veterinarian (of which, two worked during Pandey's tenure). Cornwell testified that Pandey never worked without a veterinarian in the same location. (Cornwell dep. at 195).

Even in those areas where Defendants now claim Pandey had discretion, she took direction from Gonzalez. For example, Gonzalez claimed that Pandey had the authority to "orally reprimand" people. Still, Gonzalez testified that she corrected the way that Pandey reprimanded employees. (Gonzalez dep. at 552-555).

Gonzalez also testified that she, at times, told Pandey when to update the website. (Gonzalez dep. at 387). Most of Pandey's other duties required Gonzalez's involvement on one level or another. *See* sections "accounts receivable and collections," reordering supplies," "scheduling employees," "scheduling travel clinics," "screening job applicants," "updating RASCAL's forms," "terminating employees," and "attending an employee review." *See supra* pp. 37, 39, 40, 45, 50, 58.

Pandey worked almost exclusively with a supervisor present. She also was subject to consistent direction in most of her tasks. Therefore, this factor further demonstrates that Pandey's primary duty was nonexempt work.

Even when viewed in the light most favorable to RASCAL, Pandey's primary duty was not the performance of exempt administrative work. This is most evident by examining Pandey's specific duties. All of the Regulation's factors also support this conclusion.

The above analysis is applicable to both the administrative and executive exemption. There is no genuine issue of material fact blocking judgment as a matter of law that Pandey was not an administrative employee.

### E.    Pandey Is Entitled to Damages, Fees, and Costs on Her Overtime Claim.

Because Pandey is not exempt from receiving overtime, she will be entitled to certain damages and awards. The Court may rule on the issue of damages separately from the issue of liability. Fed. R. Civ. P. 56(d).

The FLSA entitles Pandey to her unpaid overtime, liquidated damages, and attorney's fees and costs. The FLSA requires employers to compensate nonexempt employees that work more than forty hours in a workweek at one-and-one-half times their regular pay. 29 U.S.C. § 207(a)(1). Therefore, determining the damages in this case is a matter of multiplying Pandey's overtime hours by her regular pay rate.

Initially, Pandey bears the burden to prove that the FLSA has been violated and to produce "some evidence to show the amount and extent of the violation." *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1331 (5th Cir. 1985). Whether the FLSA has been violated is addressed above, and Defendants do not dispute that Pandey worked more than 40 hours in some weeks and that RASCAL did not pay Pandey any overtime wages.

Determining the amount of damages is typically a factual question. Here, however, Defendants either do not or are unable to dispute Pandey's estimation of damages. Both the FLSA and the Ohio Constitution mandate that employers maintain records of their employees' hours worked. 29 U.S.C. 211(c) and Ohio Const. art. II § 34(a). RASCAL failed to keep any records of Pandey's hours worked. (Gonzalez dep. at 120).

When an employer fails to keep proper wage and hour records, the employer "cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with requirements of… the Act." *U.S. Dept. of Labor v. Cole Enterprises, Inc.*, 62 F.3d 775, 781 (6th Cir. 1995). Employees are not to be penalized for an employer's failure to keep proper records. *Id.* To hold otherwise "would place a premium on an employer's failure to keep proper records in conformity with his statutory duty..." *Id.*

1. **Pandey Has Adduced Sufficient Evidence to Eliminate Any Genuine Issue of Material Fact on the Hours She Worked for Defendants and Her Rate of Pay.**

In cases like this, where an employer fails to keep proper records, employees meet their burden if they produce sufficient evidence to show the amount and extent of their work as a matter of just and reasonable inference. *Beliz*, 765 F.2d at 1331. Here, in support of Pandey's estimation of damages, she attaches to this motion a calendar summarizing her evidence on damages. *See* Appendix B. The evidence used in the creation of this calendar is discussed below.

Pandey created a calendar documenting her hours worked for purposes of this litigation. (Pandey affidavit ¶ 7). Pandey based this calendar on memory and from RASCAL's online calendars viewable via the "Way Back Machine" (http://www.archive.org/web/web.php). (*Id.*). During Discovery, Pandey produced this calendar to Defendants. Because Pandey was able to produce evidence "to show the amount and extent of [her] work as a matter of just and reasonable inference," the burden shifts to the employer to produce evidence to "negative the reasonableness of the inference to be drawn from the employees' evidence." *Beliz*, 765 F.2d at 1331. Pandey's calendar forms the basis for Appendix B.

Gonzalez testified regarding any inaccuracies she found in Pandey's calendar. (Gonzalez dep. at 172). In order to help Gonzalez give accurate testimony, she used a previously prepared document that listed any dates, times, or locations Gonzalez thought were inaccurate. (Gonzalez dep. at 174).

Gonzalez was able to produce some documents to back up her testimony regarding the specific dates that she thought were inaccurate. Therefore, Pandey's original calendar was adjusted to reflect Gonzalez's testimony.[30] The work times are based on either Gonzalez's

---

[30] Pandey adjusted her original 2007 calendar based on the following (Gonzalez's deposition transcript page numbers are in parentheses): The clinic locations on the following dates were changed: June 2 (182-183), June 7

testimony or Pandey's recollection of typical work days of the type Gonzalez testified to. (Pandey affidavit ¶ 8).

Gonzalez also testified that she generally thought some hours were long or dates incorrect.[31] She was not, however, able to produce any evidence or even really testify with any certainty regarding these work times. Gonzalez stated "That's the thing, I don't have anything to show that [Pandey] could have been there or not on any of these days. So she could have been there. She could have been at the office all five of those, she could have been there three of those, there's no way for me to know. All I can say is where we were." (Gonzalez dep. at 187).

Gonzalez's generalized complaints are precisely what the *Cole* court warned about – employers "cannot be heard to complain that the damages lack the exactness and precision of

---

(184-185), June 9 (186), June 20 (187), June 23 (188-189), July 11 (189-190), July 25 (190), September 12 (191-192), September 26 (193-194), October 4 (194), October 17 (200-201), November 8 (203), and December 6 (205). The June 22 clinic was cancelled. (188). RASCAL was closed on July 4. (189). RASCAL was closed September 3. (191). RASCAL was closed on October 5. (195). Pandey attended a conference with Gonzalez in Atlantic City October 8-11. (196). Gonzalez testified that RASCAL closed for the year starting December 20 and, therefore, Pandey would not have worked the 20 and 21. (Gonzalez dep. at 207). Patient records reveal, however, that RASCAL operated on December 22. *See* Exhibit 3. Still, Pandey removed those dates from her calendar.

Pandey adjusted her original 2008 calendar based on the following: The clinic locations on the following dates were changed: January 17 (209), January 30 (212), February 13 (213), February 14 (213), February 23 (220), February 27 (221), March 13 (226), March 20 (227), March 28 (227), April 17 (227-228), April 25 (229), June 5 (230), June 19 (230), and July 9 (231-232). On February 19 and 20, Pandey was scheduled not to work. (215). Gonzalez testified that the OVMA was scheduled for February 21 and 22 and Pandey attended the OVMA. (218). While there, she worked for RASCAL. (218-219). Still, one of the dates was removed from the calendar. Pandey contends that, if she attended the OVMA, it would only have been for one day and she would have worked the other. (Pandey affidavit ¶ 9). Pandey was scheduled not to work February 24. (218-219). The time Pandey worked on February 25 was changed. (218-219). Pandey was scheduled off February 28 and 29. (218-219). The March 9 clinic was cancelled due to snow. (223). The April 20 clinic was cancelled. (228). The clinic on June 1 was cancelled. (230). The July 11 clinic was moved to September 13-14 to reflect Gonzalez's testimony and the patient records. (234) *See also* Exhibit 3.

[31] Gonzalez thought that it was not likely every clinic in January 2007 lasted as long as Pandey listed. (Gonzalez dep. at 178). She admitted, however, that "I don't have any way of disputing or otherwise these times." (Gonzalez dep. at 176). Gonzalez testified that it was possible that the clinic on January 10, 2007 was cancelled, but was unsure. (Gonzalez dep. at 178). Gonzalez also thought some February, March, April, May, August, 2007 times looked long, but had no specific recollection regarding those dates. (Gonzalez dep. at 179). Gonzalez believed that Pandey would not have worked seven days in a row. (Gonzalez dep. at 209). Gonzalez did not believe that Pandey would have worked six days in a week every day in March and April 2008. (Gonzalez dep. at 223, 227). Gonzalez testified that Pandey would have worked either a travel day and four weekdays or five weekdays. (Gonzalez dep. at 235).

measurement that would be possible had he kept records in accordance with requirements of… the Act." *Cole Enterprises, Inc.*, 62 F.3d at 781. The Court should disregard Gonzalez's generalized complaints. Otherwise, Defendants' failure to keep proper (or any) wage and hour records will be rewarded. *Id.*

Finally, Pandey examined RASCAL's patient records that contain her handwriting. Defendants produced these items during Discovery. Gonzalez agreed that, if Pandey's handwriting appears on a patient record, it would be a good indication that she worked that day. (Gonzalez dep. at 243). In light of those records, Pandey's calendar was adjusted to reflect the information on the Patient records. *See* Exhibit 9.

The result of Pandey's recollection, Way Back Machine archives, Gonzalez's testimony, and the documentary evidence is summarized in a calendar format and attached as Appendix B. This forms the basis of Pandey's damages calculation.

As outlined above, the parties agree on most of Pandey's work time and locations. There are, however, two specific disputes. In each case, Defendants' failure to keep any records or produce any evidence regarding the dispute warrants the dispute being resolved in Pandey's favor. *Cole Enterprises, Inc.*, 62 F.3d at 781.

First, the parties agree that Pandey worked on September 15 and 16 2007 at a RASCAL event called the Neuter-A-Ton. (Gonzalez dep. at 192). Gonzalez testified that the event was over by 3:00 the first day and 3:30 the second. (*Id.*). In support of this contention, Gonzalez produced an employee's timesheet that showed clock out times of 3:00 and 3:30. (*Id.*).

Pandey specifically recalls that she stayed at the event later so that she could wait for people to pick up their pets. (Pandey affidavit ¶ 10). Pandey remembers that it was dark when she left and estimates that she left after 6:30-7:00 both days. (*Id.*).

While this kind of dispute is typically a fact dispute for a jury to decide, in this case, the Defendants have the burden to produce evidence contradicting Pandey's contentions. Other than Gonzalez's guess at Pandey's time, Defendants lack any specific evidence. Although Pandey's estimate may be imprecise, in the absence of records from Defendants, the court should find her estimate binding in this case. Still, Pandey is willing to give Defendants the benefit of the doubt and accepted an ending time for both days of 5:00.[32] *See* Appendix B.

Second, Gonzalez testified that Pandey did not work on March 8, 2008 because she attended the Columbus Pet Expo. (Gonzalez dep. at 223-224). Pandey recalls that she did not attend the Pet Expo because of the weather that weekend. (Pandey affidavit ¶ 11). This comports with Gonzalez's testimony. (Gonzalez dep. at 223). Instead, Pandey worked that Friday, March 7, 2008. (*Id.*). Again, this dispute must be resolved in Pandey's favor because Defendants failed to keep any records or produce evidence regarding the dispute. *Cole Enterprises, Inc.*, 62 F.3d at 781.

Based on the above, Pandey worked approximately 1,454.5 hours of overtime from January 1, 2008 until June 16, 2008. *See* Appendix B. From June 16, 2008 (after Pandey received a raise) until her termination on December 9, 2008, Pandey worked approximately 424 hours of overtime. Id.

Pandey is entitled to receive 1.5 times her regular rate for all hours worked over forty in a week. 29 U.S.C. § 207(a)(1). "Regular rate" is an hourly rate. 29 CFR 778.109. Where an employee is paid on a salary basis, "regular rate" is computed by dividing the salary by the number of hours that the salary is intended to compensate. 29 CFR. 778.113.

There is a rebuttable presumption that a salary is intended to compensate for 40 hours per week. *Giles v. City of New York*, 41 F.Supp. 2d 308, 317 (S.D.N.Y. 1999). Here, Pandey was

---

[32] This 5:00 time is conceded only for purposes of this summary judgment motion.

originally paid as an independent contractor at a rate of $15 per hour. (Gonzalez dep. at 125). Upon becoming an employee, RASCAL began paying her a salary of $600 per week.

$600 is, of course, $15 per hour multiplied by 40 hours and strengthens the presumption that RASCAL intended Pandey's salary to compensate her for 40 hours. After June 16, 2008, Pandey received a raise taking her salary to $750 per week. Based on a 40 hour week, this is $18.75 per hour.

At Pandey's regular rate, she is entitled to overtime pay of $22.50 for each overtime hour worked prior June 16, 2008 and $28.125 thereafter. Multiplying Pandey's overtime rates with her overtime hours equals her total unpaid overtime compensation.

Pandey's overtime damages are $32,726.25 prior to June 16, 2008 and an additional $11,925.00 after. These amounts total $44,651.25 in unpaid overtime wages.

### 2.    Pandey Is Entitled to Liquidated Damages Because Defendants Are Unable to Prove Good Faith and Reasonable Grounds for Believing They Complied with the FLSA.

Pandey is also entitled to liquidated damages equal to the amount of her total unpaid overtime. 29 U.S.C. 216(b). Liquidated damages must be awarded unless an employer proves that it acted in good faith and had reasonable grounds to believe its conduct did not violate the FLSA. 29 U.S.C. 260. If an employer is able to prove both, then the court may award a lesser amount or no liquidated damages. *Id.*

The burden on an employer to prove good faith and reasonable grounds is substantial. *Martin*, 381 F.3d at 584. If the employer fails to meet its burden, "the court may not limit or deny liquidated damages." *Id*. To prove it acted in good faith, an employer must show that it took affirmative steps to ascertain the FLSA's requirements, but nonetheless violated its provisions. *Id*.

Here, Gonzalez admitted that she did nothing to determine whether Pandey was, in fact, exempt under the FLSA. (Gonzalez dep. at 134-135). Gonzalez based her decision to treat Pandey as exempt only on having worked with a veterinary office manager who was paid on a salary basis. (Gonzalez dep. at 131). Interesting, Gonzalez admitted to more recently working with a veterinary office manager who was not exempt. (Gonzalez dep. at 132-133). Gonzalez chose the route that would be most profitable for her and did no further research to ensure she was in compliance with the law.

An award of liquidated damages is a matter for the Court, rather than the jury, to decide. *McClanahan v. Mathews*, 440 F.2d 320, 322 (6th Cir. 1971).  The language of the FLSA presumes that liquidated damages will be awarded: "Any employer who violates the provisions of section 206 or section 207 of this title ***shall be liable*** to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation . . . and an in an additional equal amount as liquidated damages."  29 U.S.C. § 216(b) (emphasis supplied). The good faith and reasonable grounds showing is Defendants' rebuttal of that presumption.

Importantly, Pandey need not prove that Defendants recklessly disregarded her FLSA rights, even though the record leaves little doubt that they did.  The purpose of the liquidated damages provision is not to punish the employer, but rather to compensate the plaintiff for the losses he or she suffered by not being paid the appropriate wages in a timely manner.  *Viciedo v. New Horizons Computer Learning Center of Columbus, Ltd.*, 246 F.Supp.2d 886, 905-06 (S.D.Ohio 2003) (citing *McClanahan*, 440 F.2d at 322-23) ("compensation, not a penalty or punishment").

The rebuttal requires proof by Defendants of both elements – "the act or omission giving rise to such action was in good faith and that [they] had reasonable grounds for believing that

[their] act or omission was not a violation of the" FLSA.  29 U.S.C. § 260.  Consequently, they

"must demonstrate that [their] conduct was both in good faith and reasonable for the court to

determine that liquidated damages are improper."  *Viciedo*, 246 F.Supp.2d at 906 (citing *Dole v.*

*Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968 (6th Cir. 1991)).

Because Defendants have no argument to reduce the liquidated damages in this case, the

Court should hold that Pandey is entitled to the full amount of liquidated damages for her

overtime claim. This amounts to $44,651.25.

Successful plaintiffs in overtime cases are also entitled to their reasonable attorney's fees

and costs. This award is mandatory, not discretionary. 29 U.S.C. 216(b). Because fees and costs

continue to accrue, Pandey asks that she be allowed to separately brief the issue of the amount of

reasonable fees and costs after a determination on liability and damages is made.

Pandey asks that the Court make a determination on damages in this case. First, she asks

that the Court rule that she is entitled to overtime compensation in the amount of $44,651.25.

Second, Pandey asks the Court to rule that she is entitled to liquidated damages equal to the

amount of unpaid overtime compensation. These amounts total $89,302.50.

### F. <u>Pandey Is Entitled to At Least a Minimum Wage for the Week She Worked But Was Not Paid.</u>

Pandey seeks the payment of minimum wage for the week of January 1, 2007 through

January 6, 2007. Defendants do not dispute that they did not pay Pandey anything for the week

of January 1, 2007. Instead, Defendants argue that Pandey was not an employee for the first

week of January 2007. (Gonzalez dep. at 86).

Pandey brings her minimum wage claim under Ohio Constitution Art. II § 2.34(a) and 29

U.S.C. § 206(a). Both provisions require an employer to pay each employee at least the

minimum wage for all hours worked in a workweek. While there are a few, specific exemptions to minimum wage, none apply to Pandey in this case.

For the first week of 2007, Defendants inexplicably claim that Pandey was a "future employee." (Gonzalez dep. at 86). Defendants' classification of Pandey's employment status is irrelevant; if she meets the definition of "employee" under the FLSA, then she is entitled to minimum wage for hours worked that week.

The FLSA defines "employee" as "and individual employed by an employer." 29 U.S.C. 203(e)(1). "Employ" means "to suffer or permit to work." 29 U.S.C. 203(i). As noted in *U.S. v Rosenwasser*, 323 U.S. 360, 362-363 (1945), "[a] broader or more comprehensive coverage of employees… would be difficult to frame." This definition is necessarily a broad one, in accordance with the remedial purposes of the FLSA.

The fact that Pandey performed work for RASCAL's benefit during the first week of 2007 is undisputed. (Gonzalez dep. at 112-113). "Sending the e-mails is work but she wasn't an employee at that time. So she chose to send these e-mails because there were things that she did before the end of the year and she chose not to wait until after the 7th to do it." (Gonzalez dep. at 113).

At the very least, Pandey produced and sent 23 work emails. *See* Exhibit 7. The parties only dispute the amount of work Pandey performed that week.[33] Gonzalez estimated that each email might only have taken one minute to compose and send. (Gonzalez dep. at 113 – 114).

Pandey performed compensable work for RASCAL even assuming *arguendo* that (1) Pandey performed no work other than sending 23 emails and (2) each email only took one

---

[33] Pandey asserted that she performed about 30 hours of work during the first week of 2007. (Pandey affidavit ¶ 3). The work included sending various emails, making some phone calls, and cleaning and preparing Rascal's Dublin location for the upcoming week's clinics. (*Id.*). While Defendants are unable to offer any specific evidence to the

minute to compose and send. *Reich v. Monfort, Inc.*, 144 F.3d 1329, 1333 (10th Cir. 1998) (finding that as little as ten minutes of additional work time is not *de minimis*.) In reality, 23 minutes of work is the bare minimum that a reasonable jury could attribute to Pandey's efforts.

Defendants' claim that Pandey was a "future employee" does not exempt her from FLSA coverage. The FLSA does not require that a person be officially "hired" to be covered by minimum wage laws. *McLaughlin v. Ensley*, 877 F.2d 1207, 1210 (4th Cir. 1989) (holding that people who worked during a one-week orientation period before being hired were "employees" under the FLSA.)

Because Pandey performed significant work for an employer (and thus was an "employee"), no genuine issue of material facts exists about whether Pandey was an "employee" entitled to minimum wage for work performed during the first week of January 2007, and the work she performed was not *de minimis*. Based on partial summary judgment on these issues, a jury may determinate how many hours Pandey worked the first week of 2007.

## G.     <u>The Cybersquatting Counterclaim Fails as a Matter of Law on the Facts Established in the Record.</u>

Defendants have asserted a counterclaim against Pandey under 15 U.S.C. § 1125(d), the Anti-Cybersquatting Consumer Protection Act ("ACPA"). Defendants base this claim on Pandey's use of the domain name www.rascalunit.com. The ACPA was passed "primarily in an effort to stop cybersquatters who register numerous domain names containing American trademarks or tradenames only to hold them ransom in exchange for money." *Bay State Sav. Bank v. Baystate Fin. Servs.*, LLC, 484 F.Supp.2d 205 (D.Mass. 2007) (internal quotations and citations omitted).

---

contrary, Gonzalez merely claimed that she did not think Pandey would have done any work that week because Gonzalez did not work and the office was closed to appointments. (Gonzalez dep. at 116).

To state a violation of the ACPA, Defendants must demonstrate that "(1) [they have] a valid trademark entitled to protection; (2) [their] mark is distinctive or famous; (3) [Pandey's] domain name is identical or confusingly similar to, or in the famous marks, dilutive of, the owner's mark; and (4) [Pandey] used, registered, or trafficked in the domain name (5) with a bad faith intent to profit." *Nationwide Payment Solutions, LLC v. Plunkett*, 697 F.Supp.2d 165, 172 (D.Me. 2010). These elements – all of which must be proven -- are well established in the Sixth Circuit. *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 204 (6th Cir. 2004) (citing *Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 546 (6th Cir. 2003)). They are derived from statutory language:

> (1)(A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person
>
>> (i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
>>
>> (ii) registers, traffics in, or uses a domain name that –
>>
>>> (I)     in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
>>>
>>> (II)    in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or
>>>
>>> (III)   is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

15 U.S.C. 1125(d).

On the critical element – "bad faith intent to profit" – courts are instructed to make "some sense of what motivates the conduct at issue" and engage in "careful thinking about whether the conduct at issue is motivated by a bad faith intent to profit." *Lucas Nursery & Landscaping, Inc.*

*v. Grosse*, 359 F.3d 806, 811 (6th Cir. 2004).  A vindictive effort to harm a domain owner may be impolite, but it does not state an ACPA claim, while a desire to be compensated for out-of-pocket expenses may be a half-hearted, ill-advised, and futile effort to sell a web site, but it is not bad faith.

In *Lucas Nursery*, the user was dissatisfied with the landscaping services provided by the domain owner and registered a similar sounding name to amplify that dissatisfaction.  The Sixth Circuit rejected the ACPA claim, in part because no attempt had been made to divert customers or mislead consumers and the protester had "not acquired any additional domain names, which would be indicative of either an intent to sell such names to those entities whose trademarks were identical or similar, or exploit them for other uses."  *Id.* at 810.

The Sixth Circuit recognizes that the ACPA targets the acts of someone "other than the trademark holder [who] registers the domain name of a well known trademark and then attempts to profit from this by either ransoming the domain name back to the trademark holder or by using the domain name to divert business from the trademark holder to the domain name holder." *DaimlerChrysler,* 388 F.3d at 204 (citing *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 493 (2nd Cir. 2000)).  One of the ACPA's "main objectives is the protection of consumers from slick internet peddlers who trade on the names and reputations of established brands."  *Lucas Nursery & Landscaping, Inc.*, 359 F.3d at 811.  It was enacted in response to concerns "over the proliferation of cybersquatting-the Internet version of a land grab."  *Id.* at 808 (quoting *Virtual Works, Inc. v. Volkswagen of America, Inc.*, 238 F.3d 264, 267 (4th Cir. 2001)).

Cybersquatters are those who "(1) 'register well-known brand names as Internet domain names in order to extract payment from the rightful owners of the marks,' (2) 'register well-known marks as domain names and warehouse those marks with the hope of selling them to the

highest bidder,' (3) 'register well-known marks to prey on consumer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site,' (4) target distinctive marks to defraud consumers, including to engage in counterfeiting activities.' *Id*. at 809.

Defendants' claim is only based on Pandey's assertion of control of www.rascalunit.com after her termination from RASCAL. At that time, she posted a "for sale" sign on the website. (Gonzalez dep. at 637). The "for sale" sign was posted for two or three days. (Gonzalez dep. at 638). Pandey had registered the domain name and personally paid for its renewal, and Defendants acquiesced over the years in her conduct. No allegation is made that she trafficked in any other veterinary services through use of the name she had registered. Consequently, only Pandey's "use," 15 U.S.C. 1125(d), is at issue, specifically posting a "for sale" sign on the website.

From the outset Pandey's activities do not fit any definition of cybersquatting. *See Lucas Nursery and Landscaping, Inc. v. Gross*e, 359 F.3d at 809. Congress intended to combat a very specific problem with the ACPA. *Id*. at 808. The ACPA's scope is intentionally narrow. *Harrods Ltd. v. Sixty Internet Domain Names*, 110 F.Supp. 2d 420, 426 (E.D. Va. 2000). Defendants now attempt to stretch the ACPA into territories far beyond its intended reach.

In this case, both parties claim ownership of www.rascalunit.com. If RASCAL owns the domain name, then Pandey's actions are, at worst, those of a disgruntled employee temporarily messing with the company website. It is not cybersquatting by any of the accepted definitions. If Pandey owns www.rascalunit.com, then she acted entirely appropriately. The domain name was hers to do with what she wanted.

Neither possibility represents the actions of a cybersquatter. Defendants' claim should be rejected out of hand.

In order for liability to attach under the ACPA, Pandey must have used a domain name that "in the case of a mark that is ***distinctive at the time of registration of the domain name***, is identical or confusingly similar to that mark." 15 U.S.C. 1125(d)(1)(a)(ii)(I) (emphasis noted). In other words, when Pandey registered www.rascalunit.com, RASCAL needed to have a valid trademark. It did not have such a mark at that time and therefore cannot make a cybersquatting claim.

A "mark" includes service marks and trademarks. 15 U.S.C. 1127. In order to acquire a protected "mark," one of two requirements must be met. Either the mark must be used in commerce or the mark must be registered by a person who intends to use the mark. *Id.* "Used in commerce" has a couple definitions:

> The term "use in commerce" means the *bona fide* use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed used in commerce –
>
> (1) on goods when -
>
>     (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods make such placement impracticable, then on documents assocated with the goods for their sale, and
>
>     (B) the goods are sold or transported in commerce, and
>
> (2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.
>
> *Id.*

It is undisputed that Defendants did not register "RASCAL Unit" as a trademark. Therefore, the mark is only protected if it was used in commerce as described above. Pandey registered www.rascalunit.com on December 3, 2005. *See* Exhibit 3. RASCAL did not engage in commerce until April 6, 2006. *See* Exhibit 5.

> **Interrogatory 12:** Identify the earliest date that Defendants engaged in commerce using the name "Rascal Unit."

> **Answer:** See Response to Interrogatory 8. Supplier and bank accounts were established during the first quarter of 2006 under Rascal Unit's name. Rascal Unit began providing services to the public on or about April 6, 2006.

Because RASCAL did not have a protected mark prior to Pandey registering the domain name, it cannot hold her liable under the ACPA. 15 U.S.C. 1125(d)(1)(a)(ii)(I).

In order to be liable under the ACPA, Defendants must also show that Pandey acted in bad faith with intent to profit from RASCAL's mark. 15 U.S.C. 1125(d)(1)(a)(i). Defendants evidence utterly fails in this regard.

When asked what facts or evidence Defendants had to support their contention that Pandey acted in bad faith with intent to profit from RASCAL's mark, Gonzalez testified to the following:

> Meagan contacted Melbourne IT [the domain name's registrar] and somehow was able to get them to give her the registration key to the domain name and she went in and changed it back to her information. And changed our password information.
> We were no longer able to get our email, and then [Pandey] changed the face of the rascalunit.com site to say "This website for sale. Impress your friends with its size. For more information contact rascal@rascalunit.com."

(Gonzalez dep. at 637).

These facts fall very short of showing bad faith. The ACPA lists nine non-exhaustive factors to consider when determining whether a party acted in bad faith:

I. the trademark or other intellectual property rights of the person, if any, in the domain name;

II. the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

III. the person's prior use, if any, of the domain name in connection with the *bona fide* offering of any goods or services;

IV. the person's *bona fide* noncommercial or fair use of the mark in a site accessible under the domain name;

V. the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

VI. the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the *bona fide* offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

VII. the person's provision of material and misleading false contact information when applying for the registration of the domain name. the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

VIII. the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

IX. the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15 U.S.C. 1125(d)(1)(B)(i).

The first four factors go toward showing a lack of bad faith "by providing some

reasonable basis for why a defendant might have registered the domain name of another mark

holder." *Lucas Nursery and Landscaping, Inc.*, 359 F.3d at 810. The last five factors are indicative of the presence of bad faith. *Id*.

With regard to factors one and two, Pandey did not have any intellectual property rights in www.rascalunit.com, nor is the domain name part of her legal name.[34] With regard to factors three and four, during her employment Pandey used the domain name to promote RASCAL's services as well as general pet health information.

The fifth factor is also inapplicable to this case. Pandey could not have intended to divert customers from RACAL's website to her own site. The domain names were one in the same. Further, RASCAL maintained a group of "alias sites" it could use to house a website for its business. (Gonzalez dep. at 624-625).

The seventh factor also demonstrates that Pandey did not act in bad faith. She did not provide misleading contact information when applying for registration of the domain name. *See* Exhibit 8. Nor did she fail to provide accurate contact information. *Id.*

The eighth factor is also in Pandey's favor. She did not register or acquire multiple domain names known to be identical or confusingly similar to www.rascalunit.com. While Pandey's Complaint states a claim for conversion of multiple domain names, discovery revealed that she registered alias sites on RASCAL's behalf during the course of her employment. (Gonzalez dep. at 626).

The ninth factor, to the extent relevant, is also in Pandey's favor. The factor asks to what extent the mark incorporated in a domain name registration is distinctive. While "RASCAL Unit" is "distinctive" as that term is used here, it was not a "mark" at the time Pandey registered the domain name.

---

[34] For purposes of section of Pandey's motion, the Court may assume that Pandey does not have any intellectual property rights in the name RACAL Unit.

The sixth factor is really the only one that seems to have some bearing on this case. That factor is "the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the *bona fide* offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct." 15 U.S.C. 1125(d)(1)(B)(i). Preliminarily, it is undisputed that Pandey does not have a pattern of registering domain names and attempting to sell them to trademark holders.

It is also undisputed that Pandey posted a "for sale" sign on www.rascalunit.com following her termination. The parties also do not dispute that, during her employment, Pandey used the website in a "*bona fide* offering of any goods or services." In fact, she used the domain name for RASCAL's benefit.

Even if Pandey had not previously used the site, there is still no evidence that she attempted to assign the domain name for financial gain. The "for sale" sign listed no price, nor did she attempt to sell the domain name back to RASCAL for financial gain. Pandey had paid for the domain name for three years. She was entitled to attempt to recoup some of those losses.

Taken together, the factors indicate that Pandey did not act with a bad-faith intent to profit from www.rascalunit.com. If anything, she acted in RASCAL's best interest for three years, bearing the cost of the domain name herself. When RASCAL terminated her, she sought to get rid of a domain name that she had no use for. Because Pandey did not act with bad faith, Defendants' ACPA counterclaim must be dismissed.

Beyond that, the ACPA contains a "safe harbor" provision that is applicable in this case. The ACPA provides that "bad faith intent described under subparagraph (A) shall not be found in any case in which the court determines that the person believed and had reasonable grounds to

87

believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. 1125(d)(1)(B)(ii). Even if the ACPA applies in this case *and* Pandey acted in bad faith, she is still not liable by virtue of the safe harbor provision.

In this case, Pandey registered www.rascalunit.com prior to RASCAL's effective business date. *See* Exhibits 3 and 4. She did so under her own name and paid with her own money. *See* Exhibits 3, 8 and (Pandey affidavit ¶ 4). Pandey was neither an employee nor an independent contractor at this time. She also helped develop the "RASCAL" name. (Gonzalez dep. at 253).

Gonzalez admitted that RASCAL was "a completely different concept… so is it still going to be here tomorrow?" (Gonzalez dep. at 83). Pandey took on the risk that, if RASCAL was unsuccessful, she would be stuck with the domain name.

Pandey continued to pay for the domain name without reimbursement or asking for reimbursement for three years. (Pandey affidavit ¶ 4). Gonzalez agreed that "I can't say for sure one way or the other whether she requested reimbursement." (Gonzalez dep. at 74).

Pandey had every reason to believe she owned www.rascalunit.com and could sell it if she chose to. Under these facts, there are no genuine issues of material fact and Pandey should be held as a matter of law to have sincerely and reasonably believed that she was lawfully using the domain name and is, therefore, anchored in the ACPA's safe harbor provision.  That judgment need not, however, be reached were the Court to find that Defendants failed to adduce sufficient evidence to prove as a matter of law any ACPA violation in the first place.

## IV.    <u>Conclusion and Request for Partial Summary Judgment</u>

In light of the duties Plaintiff Pandey actually performed, the narrow executive and administrative exemptions to the FLSA and Ohio law, the absence of any reasonable belief by

Defendants that she was exempt, her performance of work without compensation, and the inapplicability of ACPA to her conduct, she requests that the Court enter partial summary judgment that:

a) Plaintiff was not an exempt "executive" employee under 29 U.S.C. § 213(a)(1) and is therefore entitled to overtime compensation;

b) Plaintiff was not an exempt "administrative" employee under 29 U.S.C. § 213(a)(1) and is therefore entitled to overtime compensation;

c) Plaintiff is entitled to unpaid overtime wages for the hours she worked, plus liquidated damages in an equal amount, and her reasonable attorney's fees and costs;

d) Plaintiff's unpaid over time wages are $44,651.25;

e) Plaintiff was Defendants' employee from January 1, 2007 until December 9, 2008 and is entitled to be paid at least minimum wage for all hours worked;

f) Plaintiff performed compensable work during the week of January 1, 2007 and was not paid at least minimum wage for this work;

g) Defendants have failed to assert a claim under the Anti-Cybersquatting Consumer Protection Act;

h) Defendants' claim under the Anti-Cybersquatting Consumer Protection Act is barred because they did not have a protected mark at the time Plaintiff registered the domain name in question;

i) Defendants' claim under the Anti-Cybersquatting Consumer Protection Act fails because Plaintiff did not act in bad faith as required by the statute; and

j) Even if Defendants claim under the Anti-Cybersquatting Consumer Protection Act does not fail due to their inability to adduce sufficient evidence of any violation, it must fail because no genuine issue of material fact exists about protection of Pandey's actions by the safe harbor provision of the Act.

Respectfully submitted,
 /s/ Andrew Biller
Andrew Biller (0081452) (*andrewbilleresq@gmail.com*)
Trial Counsel for Plaintiffs
THE LAW FIRM OF ANDREW BILLER
3789 Preserve Crossing Blvd.
Columbus, Ohio 43230
(614) 939-9022
Fax (614) 583-8107

**Certificate of Service**

I hereby certify that on February 11, 2011, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

John Herbert and Fazeel Khan
100 W. Wilson Bridge Road, Suite 100
Worthington, OH 43085

/s/ Andrew Biller _____