IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Meagan Pandey, | : | |
| Plaintiff | : | Civil Action 2:09-cv-550 |
| v. | : | |
| Rascal Unit, Ltd., *et al.*, | : | Magistrate Judge Abel |
| Defendants. | : | |

**OPINION AND ORDER**

I.  **Claims Addressed**

Plaintiff Meagan Pandey ("Pandey") brought this action against her former

employer, Rascal Unit, Ltd. ("Rascal"), and its owner, Alba M. Gonzalez, DVM,

("Gonzalez"), for the following claims:  failure to pay overtime in violation of the Fair

Labor Standards Act ("FLSA"), 29 U.S.C. §207(a) and the Ohio Minimum Fair Wage

Standards Act ("MFWS"), O.R.C. §4111.01 *et seq.*; conversion of personal property;

conversion of Plaintiff's right to enjoyment of webhosting services; conversion of certain

domain names; tortious interference with business relations; retaliation in violation of

Article II, §34(a) of the Ohio Constitution, breach of obligations arising under ERISA;

and failure to pay minimum wage in violation of the FLSA and MFWS.  (Doc. 23.)

Defendants brought a counterclaim for cybersquatting in violation of 15 U.S.C.

§1125(d).  (Doc. 25.)

On April 30, 2010, the Court granted Plaintiff judgment on the pleadings to the

extent her claim under the Ohio Constitution alleged actionable failure to furnish

employment information, and denied it to the extent that it alleged that such failure to furnish itself constituted actionable retaliation. On May 20, 2010, the parties filed a notice stating that Plaintiff was dismissing her ERISA claims.

Now before the Court is Plaintiff's second motion for partial summary judgment (Doc. 47). In it, she argues that she is entitled to judgment as a matter of law on her claims of unpaid overtime and failure to pay minimum wage, as well as upon Defendants' claim for cybersquatting. Defendants have opposed summary judgment, although they have not crossmoved.

    II.    **Summary Judgment**

        A.    <u>Standard</u>

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving

2

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (concluding that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). In responding to a motion for summary judgment, however, the nonmoving party "may not rest upon its mere allegations [...] but [...] must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Celotex*, 477 U.S. at 324. Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Matsushita*, 475 U.S. at 587-88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

### B.   Determination of Exempt Status

This dispute substantially turns on the question of whether Plaintiff was an employee exempt from the statutory requirement to pay overtime. Plaintiff argues, on summary judgment, that no genuine issue of material fact exists and that Defendants cannot demonstrate that she was an exempt employee. She posits that the Court, in ruling on such motion, must determine as a matter of law whether such exemption does or does not exist:

> Defendant's burden of proof must be integrated in the analysis of Plaintiff's Motion for Partial Summary Judgment, thereby imposing a heavier burden on Defendants to rebuff partial summary judgment. Beyond that, the

ultimate decision of whether an employee is exempt from overtime compensation is a question of law, which this Court may resolve based on the established facts.

(Doc. 47 at 9, citations omitted.)

Defendants have not cross-moved for summary judgment.  In their memorandum contra, they assert that Plaintiff is "arguably exempt from overtime", but that "[d]isputed issue[s] of material fact regarding the duties she performed and the number of hours she worked preclude summary judgment."  (Doc. 61 at 6.) Nevertheless, Defendants set out in detail their argument that the evidence of record demonstrates that "Pandey is properly exempt from overtime" (*id.* at 25), a proposition which, were the trier of fact to find it proven by a preponderance of the evidence, would be determinative of this claim.

The Court concludes that there are three possible resolutions of Plaintiff's motion for summary judgment: that no genuine issue of material fact exists and that Pandey is not exempt from overtime (granting summary judgment on this claim to Plaintiff); that genuine issues of material fact still exist, precluding a determination whether Pandey was or was not exempt (denying summary judgment to any party); *or* that no genuine issue of material fact exists and that Pandey was exempt from overtime (granting summary judgment on this claim to Defendants).  While Defendants did not specifically request that the Court grant the third of these outcomes as relief, it is plain from Plaintiff's brief that she is aware of the possibility that Defendants might "rebuff partial summary judgment" by carrying their "heavier burden" of proving the existence of the exemption.  Fed. R. Civ. P. 56(f)(1).  *See Delphi Automotive Systems, LLC v. United Plastics, Inc.*, 2011 WL 1196015 at *5 (6th Cir. 2011); *In re Foster*, 448 B.R. 914, 918

4

(S. D. Ohio 2011).

III.   **Unpaid Overtime Claim**

The central claim at issue in this dispute is Pandey's allegation that she should have been, and was not, paid overtime during the period in which she was a salaried employee of Rascal.  Pandey claims that Defendants incorrectly classified her as an employee exempt from the overtime provisions of FLSA and MFWS.  Both sides have presented an extensive amount of factual information concerning Pandey's employment and duties, including numerous deposition transcripts and affidavits.  The Court will summarize the evidence before it concerning the history and nature of Pandey's employment, set forth the law of employee exemptions, and evaluate whether Defendants have established by a preponderance of the evidence that Pandey falls into one or more of the statutory exemptions.

A.   Pandey's Employment at Rascal Unit

1.   Individual Duties

In autumn of 2005, Gonzalez, who was then medical director at Westerville East Animal Hospital, developed an idea for a mobile veterinary clinic, which could operate out of a large truck and offer lower-cost routine veterinary services on site at animal shelters or other locations.  According to Gonzalez, she "discussed the concept with" Pandey, who was a veterinary assistant at Westerville East.  Pandey testified at deposition that Gonzalez asked her about mobile practices because she had had "a lot of experience working with" such operations before.  (Doc. 61-2 at 25-27.)  A few months later, after Gonzalez had begun making plans for setting up the business,

Pandey and/or Gonzalez devised the name "Rascal".[1]  Pandey registered the domain

name "rascalunit.com" on December 3, 2005.  Rascal Unit, Ltd. was organized on

December 13, 2005.  (Doc. 61-7 at 2.)

Pandey testified that she never made a formal decision to work for Rascal,

because she did not know at first if Gonzalez planned to establish a non-profit operation

which simply employed volunteer assistants.  (Doc. 61-2 at 34.)  She began 2006

working for another veterinarian, but began working full-time for Rascal in mid-April of

that year.  (*Id.* At 22-23.)  Gonzalez likewise never formally offered her a job:

> Q.  When did she propose a full-time job?
> A.  Honestly I don't believe that any point did she actually propose a full-
> time position.  It just became sort of a full-time position.  Because partway
> through Rascal through the beginning months of Rascal [sic] I was still
> working for another veterinarian as a veterinarian assistant.

(Doc. 61-2 at 36.)  Pandey also testified that, as she understood it, Gonzalez' original

concept for Rascal was a side business offering low-cost veterinary services, but that

management at Westerville East eventually became alarmed at the project and fired her

in February 2006.  (Doc. 61-2 at 38.)  Pandey then began helping get Rascal off the

ground:

> A.  Well, I was reaching out to everybody in the animal welfare community
> letting them know that this project was sort of coming underway and that
> we needed their support to get this off the ground.
>
> So I was sending out e-mails to people who I knew did low-cost spay and
> neuter in Columbus and also surrounding areas.  Just having worked in
> the animal welfare community for a number of years I had a long list of e-
> mails of people and shelter contacts that I know they'd be interested in

---

[1]  Gonzalez testified that the parties had developed the business name together.
(Doc. 61 at 8.)  Pandey testified that she devised the name herself.  (Doc. 61-2 at 32-
33.)

utilizing this type of service in their area.

So I was sending e-mails, I was talking to people, and I also, I was getting information for Dr. Gonzalez as far as how many surgeries other practices did that were like the one she was thinking about kind of moving to.  And what their pricing was and things like that.

(Doc. 61-2 at 39.)

According to Gonzalez, she had discussed a position as hospital manager with Pandey as early as the beginning of 2006.  (*Id.* at 65.)  Pandey from the outset sent emails on behalf of Rascal identifying herself as "manager".  Gonzalez had no objection, as she saw management as Pandey's role as the business grew.  (*Id.* at 63.)  Before Rascal's first commercial engagement (on April 1, 2006), Pandey worked for free, and paid for approximately $450.00 in expenses in advance of Rascal beginning to receive revenue.  (Doc. 50-1 at 71.)

Rascal Unit's general method of operation was to work with local organizers to establish a day when the mobile clinic would travel out to a site to perform pet surgeries, chiefly spays and neuters.  Later, Rascal began to also offer general veterinary services out of a warehouse office space in Dublin, Ohio.

During 2006, Pandey was an independent contractor, and was paid an hourly wage of $15.00 for time spent actually working on Rascal's clinic truck.  (Doc. 50-1 at 75.)  According to Gonzalez, she did other work without pay, such as visiting with prospective clients and setting up the company's website.  (*Id.*)  Gonzalez estimated that during Pandey's period as an independent contractor, she spent about fifty percent of her paid hours assisting with veterinary procedures and cleaning, and the remainder dealing with clients and answering questions at a clinic site:

7

> Q.  Isn't that a lot of time to be talking to people?
> A.  Not if you come to one of our clinics.  I mean we're talking about 20 to 30 people that were being scheduled at first and then as time went on 30 to 60 animals, every single animal coming with an individual, and a lot of people have questions.
> So talking to some of these people, especially the people that are really grateful for what we do and everything else is not just Hey, I just wanted to say thanks, and Goodbye.  It's usually a more elaborate conversation.  So, yeah, it's not too much time.

(Doc. 50-1 at 77.)  A few other persons worked as independent contractors or volunteers for Rascal on a limited basis throughout 2006.  (Doc. 61-2 at 47-48, 52.) However, Pandey testified that "the truck didn't have any clinics unless I was there."  (*Id.* at 47.)

Pandey became an employee of Rascal effective January 7, 2007.  (Doc. 61-2 at 55.)  She testified that her expectation at the time was that she would continue to do the same work as before, except full-time.  (*Id.*)  According to Gonzalez, she discussed with Pandey changing from an independent contractor to an employee, and Pandey requested a weekly salary equal to her existing hourly wage multiplied by forty hours per week.  (Doc. 50-1 at 125.)  She also recollected discussing with Pandey increased duties as Rascal grew bigger, adding employees who would require scheduling but who would permit Pandey, who wanted to spend less time traveling, to remain back at Rascal's office and do administrative work rather than traveling on the truck.  (*Id.* at 125-129.)

Pandey testified that her job duties in 2007 consisted of a wide variety of mundane tasks necessary to keep Rascal operating, such as extensive cleaning of the truck and the surgical space inside, restocking supplies, cleaning the office space in Dublin, and handling receptionist duties for clients who came to the office.  (Doc. 61-2 at

8

63-70.) She also scheduled staff. (*Id.* at 63.) At first, she continued, to travel on all the field clinics. (*Id.* at 57.) On the truck, Pandey talked to pet owners about their animals and their needs, assisted with surgeries, put animals in a cage or on the floor after surgery, monitored them after surgery, pulled up vaccines, performed dental procedures, and made bags for the animals to go home with. (*Id.* At 71-77.) Travel clinics were 12 hour days. (*Id.* at 95.) Pandey was on the truck four days a week. So, according to Pandey, she spent approximately forty-eight to sixty hours per week at mobile clinics. She also spent about ten to fifteen hours per week performing routine receptionist duties, and about ten hours per week talking to customers about their animals.[2] (Doc. 61-2 at 89, 93, 95.) After Gonzalez hired a second veterinarian, Pandey was on the truck two days a week and spent four days a week at the office clinic. (*Id.* at 99-100.)

Pandey estimated that in the first half of 2007 she spent 30% of her time cleaning the truck and the clinic. After Dr. Evans was hired that percentage increased to 40. (*Id.* at 101.) Although she was not a licensed veterinary technician, Pandey estimated that in the first half of 2007 she spent 60-70% of her time doing technician work. (*Id.* at 103.) This amounted to 35-40 hours a week. After Dr. Evans was hired her time assisting the veterinarian increased to 45-55 hours a week. (*Id.* at 105.)

Pandey testified that she also spent around six hours a week handling problems with accounts receivable. She spent about five hours a week taling to customers about

---

[2] Gonzalez testified that she could not specifically refute Pandey's estimates of the number of hours she worked. However, in an affidavit, she stated that "I am absolutely certain she did not work all of the days and hours she claims." (Doc. 61-7 at 9.)

9

other matters. (*Id.* at 106.)  After Dr. Evans started work, Pandey spent around 10 hours

a week talking on the telephone to customers.  (*Id.* at 108.)

    During 2008, there were additional employees and Pandey worked fewer hours.

As of July 2008, she no longer worked on the truck.  (*Id.* at 113.)  Pandey also testified

that during the second quarter of 2008 her hours spent cleaning dropped from about 35

to 15-20 hours a week.  (*Id.* at 114.)  Her work as a veterinary assistant reduced during

the second half of 2008 from 45-55 hours a week to 10-15 hours a week. Rascal hired a

part-time receptionist in 2008, reducing Pandey's time spent on those duties to 15 hours

a week and then, during the second half of the year, to eight hours a week.  (*Id.* at 115-

16.)

    During 2007 and 2008, Pandey testified, she scheduled travel clinics and staff for

both the travel clinics and the office clininc.  (*Id* .at 118-19.)  She kept a clinic planning

book to assist her in scheduling travel clinics.  (*Id.* at 241-43.)

    Moreover, Pandey had additional responsibilities.  In 2006, Gonzalez established

a non-profit corporation, Rascal Charities, to provide free pet food and supplies and to

subsidize the cost of veterinary services to low-income clients.  (Doc. 61-7 at 10.)  At

Gonzalez' request, Pandey made inquiries and located an attorney to perform the legal

work to establish Rascal Charities.  Pandey also served as the new corporation's

statutory agent, and sat on its board.  (Doc. 50-1 at 68-70, 37.)  Pandey performed work

for Rascal Charities while on the clock at Rascal Unit;  she testified that work for Rascal

Charities was "part of [her] responsibilities".  (Doc. 50-1 at 37;  Doc. 61-2 at 121.)

Pandey testified that she wrote grant proposals throughout 2007 and 2008 for Rascal

Charities, because she "knew who to apply to" due to her experience in the industry.[3]
(Doc. 61-2 at 125; 128-129. *See also* Doc 61-15 at 1.) When Rascal Charities received
funding, Pandey was responsible for arranging local clinic events to utilize the funds and
ensuring with local organizers that only low-income individuals would be served at the
events. (Doc. 50-1 at 39-40.) Pandey applied to at least two seminars to deliver a talk
about managing high volume, low cost spay and neuter surgery. (Doc. 50-1 at 68.) In
addition, Pandey organized and attended a Halloween 2008 fundraiser at the Bar of
Modern Art in Columbus, and arranged Rascal's participation in Dublin's Fourth of July
and St. Patrick's Day parades. (Doc. 61-2 at 129; Doc. 61-7 at 8.) Pandey came up
with the idea for, and produced, a joint Rascal Unit/Rascal Charities newsletter,
obtaining content from various Internet and supplier sources and writing some material
herself. (Doc. 50-1 at 44-45.) Pandey arranged for the newsletter to be printed for free
by a local printing firm. (Doc. 61-2 at 135.) She also had a tri-sheet brochure printed.
(*Id.* at 136.)

---

[3] One such draft grant application is Doc. 61-15. It stated:

The project leader will oversee all three areas of this venture. It will be the
responsibility of the project leader to work collaboratively with humane
organizations to identify the greatest need for veterinary care in a target
area. Following identification and implementation of the program, the
project leader will be responsible for monitoring the progress of each
aspect of the program and identifying problems and solutions to ensure
success. [...] The project leader will also possess exceptional record
keeping and problem solving skills, with the ability to promptly evaluate a
situation and present a constructive response. (see resume for project
leader Meagan Pandey and medical director Dr. A. Michelle Gonzalez in
appendix i).

(*Id.* at 8.)

11

The parties agree that Pandey had responsibility over maintaining veterinary supply levels and placing orders with suppliers, although they characterize Pandey's level of responsibility differently. Pandey, in her deposition testimony, presented this part of her job as straightforward restocking:

> Q. You mentioned earlier that you had some responsibilities for maintaining adequate supplies. What did that entail?
> A. Whatever supplies Rascal was utilizing, just making sure that there was enough stock to keep the clinic running for a week.
> Q. How did you know to do that? How did you know what needed to be there?
> A. I would look and see what was in stock and what was on the shelves and then if something was low, I would write it down or someone else would write it down. If they were on the truck and they noticed something was running low and they had gone to stock it and they noticed it was low, they would, you know.
> Q. How did you arrange to restock it?
> A. I would e-mail the person, the pharmaceutical representative or the Butler representative and say here's what we need for this week.

(Doc. 61-2 at 152-53.) Rascal had four to six suppliers. It typically ordered a large volume of similar supplies every week. (*Id.* at 153-57.) Many products came from a single vendor. However, Pandey had to shift orders amongst different suppliers when Rascal had exhausted its credit with one or another. (*Id.* at 158.) Pandey kept track of how much Rascal owed each vendor and would provide that information to Gonzalez with the most recent bill. When a shipment arrived, Pandey unpacked the boxes and checked the supplies in them against the packing slip, then put the supplies away. (*Id.* at 159.)

Gonzalez asserts that she devolved responsibility for purchasing onto Pandey, including authority to take advantage of volume discounts on products if Pandey determined that the promotion was worthwhile:

12

> I did not want to deal with day to day purchasing beyond determining what Rascal Unit's cash flow could support in a given week. Within that limit, I expected Ms. Pandey to buy what we needed as cheaply as possible without bothering me. Thus, I limited my contact with suppliers to matters that involved a medical decision. For weekly ordering, Rascal Unit's suppliers dealt with Ms. Pandey, not me.

(Doc. 61-7 at 7.) Veterinary technician Nicole Cornwell ("Cornwell"), who worked with Pandey and took over responsibility for purchasing after Pandey left, stated in an affidavit:

> 12. Supply ordering is a matter of knowing what is needed, how much is one hand, and filling the gap. Like clinic schedules, Dr. Gonzalez expects me – and expected Ms. Pandey – to get the job done without routinely involving her.

> 13. Rascal operates on a very thin margin. Thus, there's a premium on having enough supplies on hand to operate reliably, but no more. Like Ms. Pandey, I order what experience tells me Rascal will need during the next week or ten days. If we have a busy schedule and I expect to use more supplies, I order more; if the schedule is slower – we have few or no travel clinics between mid-December and mid-January – I order much less.

(Doc. 61-5 at 3.)[4]

Pandey also testified at deposition that she had various roles in dealing with the outside public. She was responsible for talking to disgruntled customers to address complaints and explain Rascal's procedures. (Doc. 61-2 at 166.) Pandey "set up one appearance for Dr. Gonzalez on WOSU AM radio" and participated, with Dr. Gonzalez and other employees, in at least two television news stories about Rascal. (*Id.* at 196-98.) Dr. Gonzalez recalled also that Pandey was responsible, during travel clinics, for

---

[4] Pandey testified that Rascal followed, in effect, a just-in-time inventory strategy of maintaining only one week worth of necessary supplies, because Rascal did not have the ability to store supplies in bulk. (Doc. 61-2 at 156-57.)

handling complaints from customers or local clinic organizers that procedures had been mischarged; Pandey would examine the problem, apologize to the customer or organizer if an error had occurred, and correct the invoice. (Doc. 50-1 at 302.) In addition, in October 2007 Pandey attended a veterinary convention in Atlantic City, at Rascal's expense.[5] (Doc. 61-7 at 3; Doc. 61-2 at 247; Doc. 62 at 24-25.) Gonzalez testified at deposition that, after Pandey's return from the convention, she changed Rascal's procedures to follow OSHA standards, including putting up safety posters, ordering veterinary safety manuals, and appropriately labeling containers. Pandey also directed Jessica Fritz to create a Materials Safety Data Sheet manual. (Doc. 50-2 at 288-291.)

Gonzales testified that Pandey was chiefly responsible for setting up the travel clinics. (Doc. 52-1 at 84.) In 2007, before Rascal was well established, Pandey was responsible for contacting hosting organizations to see if they were interested; by 2008, prospective customers were calling Rascal. (Doc. 50-2 at 55.) Pandey would usually handle the arrangements over the telephone, including talking to the organizers "to see if we were a good match for what they were looking for" and "trying to get an idea if they sounded like they would be ready to host a Rascal clinic." (*Id.*) Sometimes she would go to the prospective client site in person to meet with them. Then, if the client were interested, Pandey would schedule the clinic, give them pricing information including possible shelter discounts, and go over information such as Rascal's policies on rabies

---

[5] Pandey testified that she attended classes at the convention about feline behavior, shelter medicine, and "possibly a loss prevention class as well." She also testified that classes she attended "probably" addressed OSHA. (Doc. 61-2 at 247-48.)

vaccination and how long it would take pet owners to get their animals.[6] (*Id.* at 56-57, 70.)

Finally, Pandey stated that, as Rascal Unit increased in size and performed more in-house veterinary services, it outgrew its original warehouse location:

> Q. Have they ever had plans to acquire a more visible location? I mean old Avery Road is essentially a warehouse.
> A. Uh-huh. Yes.
> Q. What role have you played in that?
> A. Well, I was trying to do work that was necessary to acquire the resources to get the new hospital built.
> Q. What was the work required to get the resources? What do you mean by that?
> A. I was talking to my father about securing financing for the project.
> Q. And how was that going to work?
> A. He was going to secure financing for $3 million and Dublin Building Systems was going to – their projected cost of the hospital was 2 and a half million and we were going to have a $500,000 payout to buy supplies for the hospital.

---

[6] The record contains an August 18, 2008 email from Pandey, signing herself as "Manager, RASCAL", to the Jackson County Humane Society, complaining that Rascal's staff had been "treated as inept" during clinics and that "[c]omments have been made" concerning Rascal's pricing and practices. (Doc. 61-13 at 1.) Pandey stated in closing:

> "I am opening scheduling in October for 2009 clinics. I hope we can continue a long, successful relationship with the Humane Society of Jackson County, and if there are any questions or issues that you have to bring up with me or Dr. Gonzalez please let me know so they can be resolved. If you don't want to continue to bring us to the area, there are plenty of counties on a waiting list that I will contact, but I want to find out what are your thoughts?"

(Doc. 61-2 at 167.)[7]  Pandey began searching for sites to locate a new animal hospital

in April 2008, and contacted Grubb & Ellis, a commercial real estate broker, regarding

existing locations.  (*Id.* at 173-74.)  The broker then set up site visits at various

properties for "Gonzalez and me and sometimes her husband".  (*Id.* at 170.)

> Q.  Sounds like you were doing a lot of this on your own.  Did you have
> any supervision from Dr. Gonzalez?
> A.  You know, Dr. Gonzalez, even since Westerville East, has talked about
> getting her own hospital, and all through Rascal working in a garage we
> always talked about like the new hospital, getting a different hospital,
> working in the air conditioning and all of this other stuff.
> So I would, like, proceed with the thought that this was what Dr. Gonzalez
> wanted was to get her own hospital, but she wouldn't say call this guy or
> something.
> Q.  So you were hunting a hospital without a whole lot of close
> supervision, if I understand you right, hospital site.
> A.  Right.  Well, I was calling about potential sites that were available.
> Q.  Is that part of your job?
> A.  You know, I don't know.
> Q.  Were you ever told not to do it?
> A.  No.
> Q.  Were you ever given any encouragement to keep doing it?
> A.  Yeah, I guess they told me that I should do it.

(*Id.* at 174-75.)

---

[7]  Pandey testified that her father is a commercial real estate developer.  (Doc.
61-2 at 169.)

2.    Hiring and Supervisory Responsibilities

Hiring.  By the beginning of 2008, Rascal Unit had expanded and hired other

employees.[8]  Defendants assert that Pandey, as manager, was responsible for hiring

and supervising most of the other employees:

> 18.  I determined what mix of technicians and assistants was necessary to
> efficiently provide clinical services, when Rascal Unit could afford to hire
> and what Rascal Unit could afford to pay.  Within those parameters, I
> expected Ms. Pandey to: (a) advise me when she felt we needed more
> staff (because she scheduled staff she was probably more aware than I of
> Rascal Unit's needs), (b) solicit applications when I felt Rascal Unit could
> afford to hire, (c) screen applications to avoid investing time in people who
> were clearly unsuitable, (d) interview those she considered viable
> candidates, (e) arrange "working interviews" for those who satisfied her in
> the initial interview and (f) provide meaningful input when making a final
> selection or make the final selection herself.
>
> 19.  Ms. Pandey scheduled all staff.  Her job was to ensure an appropriate
> mix of employees were present for travel clinics, office surgery days,
> shelter surgery days and office appointment days.  She set schedules,
> handled change requests, dealt with absenteeism and tardiness, etc.
> [...]
>
> 22.  Ms. Pandey knew what had to be done to make things work
> efficiently.  She combined that knowledge with good situational
> awareness: no matter what she was doing herself, she remained aware of
> what was going on around her.  That allowed her to anticipate bottlenecks
> before they occurred and redirect other staff to avoid them, to notice work
> – such a cleaning – that was being ignored and assign someone to do it.
> Both because she has a strong personality and because everybody knew
> she was in charge, staff obeyed when Ms. Pandey told them to do
> something.

(Doc. 61-7 at 4-5.)

Pandey testified that after Gonzalez hired a second veterinarian in mid-2007, the

_____

[8]  According to Plaintiff's spreadsheet of employee hours (Doc. 47-1), Rascal Unit
employed at least two full-time-equivalent employees other than Pandey as early as
July 2, 2007, and did so continually from January 6, 2008.  *See also* Doc. 61 at 30-31.

number of travel clinics she worked on decreased, and she began working chiefly at the Dublin location, maintaining the facility and performing ordinary receptionist and cleaning work.  (Doc. 61-2 at 93.)  She estimated that she spent about fifteen to twenty hours per week cleaning, and about forty-five to fifty-five hours per week acting as a veterinary assistant.  (*Id.* at 114-115.)  By March or April 2008, Rascal had hired enough staff that Pandey no longer had to do "everything from top to bottom" as before, and "was sort of not doing a lot of that stuff anymore."  (*Id.* at 113-114.)  Nevertheless, she still spent at least ten hours per week cleaning, and ten to fifteen hours performing veterinary assistant work.  (*Id.* at 114-115.)  By the second half of 2008, Pandey was rarely participating in travel clinics.  (*Id.* at 117.)

According to her deposition testimony, Pandey's role in screening and hiring new employees was limited.  She stated that she did not review resumes and decide whether anyone would be interviewed, but rather forwarded any submitted resumes on to Dr. Gonzalez.  (*Id.* at 142.)  Pandey stated that she would talk to prospective employees when they came to Rascal about the work, and participate in "working interviews".  However, she never made recommendations to Gonzalez about who to hire.  (*Id.* at 142-45.)

Dr. Gonzalez maintains that Pandey had essentially complete control over hiring:

26.  I did not want to spend time reviewing resumes or conducting initial interviews to separate the sentimental from those who really wanted to work in a veterinary hospital.  For that reason, employment applications went to Ms. Pandey, not me.  Ms. Pandey decided whether to offer an initial interview and, based on her impressions during that interview, decided whether the applicant merited a "working interview" to assess technical skills (veterinary technicians) or comfort with both animals and the work Rascal Unit actually did (all others). [...]
27.  I would have completely avoided working interviews had I been able.

18

Because I was the only personal performing surgery in 2007 and much of 2008, however, nobody could be exposed to actual surgery without me. That meant I had to be present for most or all technicians' and some assistants' working interviews.  After the first couple of working interviews, I was passive: I provided the surgical exposure; Ms. Pandey and Ms. Cornwell (Rascal Unit's head veterinary technician) assessed the candidate.  I relied on their judgment and never hired anyone they did not recommend.  By mid or late 2007, Ms. Pandey conducted working interviews for receptionists and veterinary assistants on her own and hired people I had never met.

(Doc. 61-7 at 6.)

The parties conducted numerous depositions of, and took affidavits from, Pandey's fellow employees.  Ashley Overbee, who went to work at Rascal in March 2007, recalled that she set up an interview with Dr. Gonzalez after hearing about the business, and that Dr. Gonzalez conducted her interview.  She did not recall if Pandey was even present.  (Doc. 50-3 at 22-23.)  Dr. Gwyneth Duncan, DVM ("Duncan") was hired as Rascal's second veterinarian in 2008.  She testified that she initially contacted Pandey to see if they were hiring; Pandey scheduled and conducted the initial interview concerning the position and her experience.  It appeared to her that all prospective hires first interviewed with Pandey, who gave them a tour and set up a working interview. (Doc. 61-1 at 11-12.)

Laura M. Witherup, who started in February or March 2008, met with Pandey for an initial interview concerning her prior work experience and resume; Pandey then gave her a brief tour of the facility and scheduled a working interview.  (Doc. 61-3 at 7-8.) Katherine M. Churchill ("Churchill"), who was hired in mid-2007 at Rascal's receptionist, stated in an affidavit that Pandey conducted her initial interview and supervised the working interview; Pandey told her that she was hired, and she believes that Pandey

made the decision to do so. (Doc. 61-4 at 1.) Jessica Fritz ("Fritz"), who was hired as a receptionist in January 2008, stated in an affidavit that Pandey conducted her initial and working interview; Pandey offered her a job at the end of the working interview. She did not speak to Dr. Gonzalez about her employment until after she was hired. (Doc. 61-6 at 1.)

Supervisory Responsibilities. Gonzalez testified that Pandey determined which employees worked at each travel clinic. (Doc. 50-1 at 85.) Defendants assert that, in addition to scheduling when her fellow employees would work, Pandey was responsible for supervising them and directing their work. Gonzalez, although she could recall few specific instances, testified that while out on travel clinics Pandey would direct the veterinary technicians and assistants in what to do next or to change to a different job if necessary. (Doc. 50-1 at 293.) Churchill stated that she considered Pandey to be her immediate supervisor. Although Pandey pitched in on whatever labor needed to be performed, she oversaw day-to-day non-medical operations in the office and directed employees to perform tasks. (Doc. 61-4 at 2.) Fritz stated likewise that Pandey was her supervisor and directed her work, and that she reported to Pandey instead of to Dr. Gonzalez. Dr. Duncan testified at deposition that Pandey spent the majority of her time at travel clinics supervising her fellow employees' work rather than directly assisting. (Doc. 61-1 at 15.) She recalled one occasion in which Pandey had informed her that she would take over what Dr. Duncan was doing and directed her to perform a different task instead; Duncan "perceived her to have the authority to do that." (*Id.* at 19.) Witherup testified that Pandey initially introduced herself as Rascal's manager, and that everyone in the clinic understood her as such and referred non-technical disputes or

20

scheduling questions to her.  (Doc. 61-3 at 12.)  She also stated that Pandey supervised

at travel clinics and directed employees in which tasks they needed to perform to keep

work moving.  (*Id.* at 13-14.)

Pandey denied supervising or disciplining employees.  (Doc. 61-2 at 145-46.)  On

further questioning, Pandey admitted that she might have told Jessica Fritz to try to

make sure she was at work on time and to make sure she was focusing on work rather

than posting on Facebook.  (*Id.* at 145-46.)  She told Erin Rodas that she needed to

make sure the cages were clean before she left work. (*Id.* at 149.)  When Jennifer Stahl

started work as an intern, Pandey said she probably talked to her about her job duties.

When Stahl was leaving Rascal, Pandey called her, at the direction of Gonzalez, and

told her she didn't have to finish out her last two weeks of work.  (*Id.* at 149-50.)

Pandey testified that she had responsibility for training new employees. (*Id.* at

175.)  She set up "lunch and learns" for new staff.  (*Id.* at 176-77.)  She prepared a

written agenda for those meetings.  (*Id.* at 178-80.)  She also wrote the Rascal Unit

Office Assistant Training Manual and daily tasks job checklists.  (*Id.* at 181-85.)  The

tasks checklists communicated job duties to new staff and reminded employees what

needed to be done throughout the day and at the end of the day.  (*Id.* at 185, 190.)  The

checklists—to be completed by the employee—said that failure to turn them in would

result in disciplinary action or termination, which Pandey described as a "meaningless

warning." (*Id.* at 187, 191-92.)

When asked whether she assigned tasks to employees, Pandey responded that

"if something needed to be done and somebody wasn't doing it, I would say[,] Hey,

make sure that cage gets cleaned because we have this animal that needs to go in a

21

cage." (*Id.* at 233.)  But she denied being in charge when Gonzalez was not present. (*Id.*)

Pandey left Rascal at the end of 2008.  On December 7, 2008, she sent an email to Dr. Gonzales stating that she did not wish to continue at Rascal, but hoped that Gonzalez would "allow [her] to continue with RASCAL until I find something where I find more peace."  (Doc. 61-21 at 11.)  Pandey stated that she had received "generous pay, benefits, and gifts" at Rascal, but that she did not feel that she got enough respect from her fellow employees.  She referred to herself as a "'glorified secretary' and 'staff member with just a few privileges more than the receptionist.'"  Pandey also stated that she was sending a resignation email in part to clear up confusion as to whether she found her workload excessive;  "[o]n the contrary, my work load has diminished substantially due to the delegation of many duties to various staff members."  (*Id.*)  She subsequently applied for numerous other positions, citing her job title as "manager" on her resume and applications.  (Doc. 61-2 at 193-95; Doc. 61-8 at 1.)  Pandey was also approached by the director of Columbus Dog Connection about starting a spay and neuter clinic in Central Ohio.  (Doc. 61-2 at 206.)  She testified that the director approached her because "she knew that I had been involved with spay and neuter projects for a decade", and that in response Pandey told her that "whatever resources she had available to her, I could start a spay and neuter program with it if that's what she wanted to do."  (Doc. 61-2 at 206-07.)

B.     Law of Overtime and Exemptions

1.     Fair Labor Standards Act

The Fair Labor Standard Act provides, at 29 U.S.C. §207(a)(2), that no employer

22

shall employ any person for longer than forty hours in a work week unless such employee receives compensation at a rate of not less than one and one-half times the regular rate for hours in excess of forty.  However, 29 U.S.C. §213(a)(1) exempts "any employee employed in a bona fide executive, administrative, or professional capacity" from minimum wage and maximum hour requirements.[9]  Defendants claim that Pandey was exempt from receiving overtime under the administrative or executive exemptions, or a combination of the two.

What constitute "bona fide" executive or administrative employees are defined by regulations promulgated by the Secretary of Labor:

> (a) The term "employee employed in a bona fide executive capacity" in section 13(a)(1) of the Act shall mean any employee:
>
> (1) Compensated on a salary basis at a rate of not less than $455 per week...;
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
> (3) Who customarily and regularly directs the work of two or more other employees; and
> (4) Who has the authority to hire or fire other employee or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. 541.100 (2008).

> (a) The term "employee employed in a bona fide administrative capacity" in section 13(a)(1) of the Act shall mean any employee:
>
> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week...;

---

[9]  O.R.C. §4111.03(A) likewise requires payment of overtime, subject to the exemptions in 29 U.S.C. §213.  The Court need therefore only consider federal law on this question.

(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. §541.200 (2008). Neither definition is self-explanatory; additional regulations supply factors for a court to consider in determining what constitutes, *e.g.*, "two or more other employees", "particular weight" given to hiring suggestions, or "discretion and independent judgment". *See* §§541.104; 541.105; 541.202. The regulations also provide for a so-called "combination exemption":

> Employees who perform a combination of exempt duties as set forth in the regulations in this part for executive, administrative, professional, outside sales and computer employees may qualify for exemption. Thus, for example, an employee whose primary duty involves a combination of exempt administrative and exempt executive work may qualify for exemption. In other words, work that is exempt under one section of this part will not defeat the exemption under any other section.

29 C.F.R. §541.708.

FLSA overtime exemptions are affirmative defenses. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974). A defendant must prove each element of an exemption in order to establish that the exemption applies to an employee. *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501 (6th Cir. 2007). Such proof must be by a preponderance of the evidence. *Renfro v. Indiana Michigan Power Co.*, 497 F.3d 573, 576 (6th Cir. 2007). Furthermore, exemptions are to be narrowly construed against employers. *Ale v. Tenn. Valley Auth.*, 296 F.3d 680, 691 n. 4 (6th Cir. 2001).

Defendants' position is, in brief:

> Plaintiff did not supervise 2 full-time equivalent employees to the extent required [to] satisfy the executive exemption during 2007. Because her duties included a mix of executive and administrative functions, her

24

position is arguably exempt from overtime compensation under either the administrative or combination exemptions.

Rascal Unit employed enough people during 2008 and its records establish they worked sufficient hours that Plaintiff's position could be exempted pursuant to the executive exemption. Because her duties included a mix of executive and administrative functions, her position is arguably exempt from overtime compensation under either the administrative or combination exemptions.

(Doc. 61 at 6.)

2.    Combination Exemption

The parties dispute the extent and applicability of the "combination" exemption established in 29 C.F.R. §541.708. This exemption recognizes that a particular employee's primary duty could be, *e.g.*, a blend of administrative and executive duties. Plaintiff argues, citing *IntraComm, Inc. v. Bajaj*, 492 F.3d 285 (4th Cir. 2007), that an employer can only claim that the combination exemption applies where the employee satisfies all the requirements of each exemption to be combined. (Doc. 47 at 28-29.) Defendant argues that this interpretation of 29 C.F.R. §541.708 would render the combination exemption superfluous, because if an employee satisfied all the requirements of any one exemption, there would be no purpose in considering whether she also might meet another.

The purpose of the combination exemption is to address a scenario where an employee would otherwise fall between two categories because his primary duties comprised one kind of exempt work or another, but not always the same kind of exempt work. As the regulation states: "In other words, work that is exempt under one section of this part will not defeat the exemption under any other section." It applies where "(1) an employee performs more than one type of work that would be exempt except that (2)

25

neither type of work alone can be termed the employee's primary duty, but (3) all of the putatively exempt work taken together constitutes the employee's primary duty." *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1232 (5th Cir. 1990), citing *Int'l Association of Fire Fighters, Alexandria Local 2141 v. City of Alexandria*, 720 F.Supp. 1230, 1232 (E.D. Va. 1989). In *Condren v. Sovereign Chemical Co.*, 142 F.3d 432 (6th Cir. 1998), for example, the appellate court found that an employee whose time was occupied either performing exempt administrative work or exempt outside sales satisfied the combination exemption; exemption would not be defeated simply because neither kind of work alone, even if he satisfied the other requirements, was extensive enough to occupy the great majority of his time. *Id.* at *5.[10]

Accordingly, Pandey could be found to satisfy the combination exemption only if her primary duties consisted of administrative work which would otherwise render her an exempt employee, combined with executive work which would otherwise render her an exempt employee. The combination exemption is not superfluous, because it shields Defendants against an argument that, *e.g.*, although she did both, neither Pandey's exempt administrative nor exempt executive duties were *by themselves* significant enough to comprise her primary duty.

---

[10] *Condren* applied an older version of 29 C.F.R. §541 which contained an explicit test for the percentages of an employee's time which could be occupied by work not directly related to his primary duty. As addressed below, the regulations applicable here now hold the amount of time occupied to be a factor for the court to consider, but no longer a necessary element to be satisfied.

26

C.    **Pandey's Employment**

1.    Elements of Exemptions

Both the administrative and executive exemptions hinge upon the Court's

determination of an employee's "primary duty".  The regulations define "primary duty":

> (a) To qualify for exemption under this part, an employee's "primary duty" must be the performance of exempt work. The term "primary duty" means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

> (b) The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

29 C.F.R. §541.700 (2008).

The administrative exemption contains two sub-requirements: the first is that the

work forming the employee's primary duty be "directly related to the management or

general business operations of the employer or the employer's customers".  The

regulations define this relationship:

> (a)    The phrase "directly related to the management or general business operations" refers to the type of work performed by the employee. To meet this requirement, an employee must perform work

> directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.

29 C.F.R. §541.201 (2008). The second requirement is that the work involve "the exercise of discretion and independent judgment with respect to matters of significance":

> (a) In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term "matters of significance" refers to the level of importance or consequence of the work performed.

> (b) The phrase "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation in which the question arises. Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

> (c) The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision. However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. Thus, the term "discretion and independent judgment" does not require that the decisions

made by an employee have a finality that goes with unlimited authority and a complete absence of review. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment. For example, the policies formulated by the credit manager of a large corporation may be subject to review by higher company officials who may approve or disapprove these policies. The management consultant who has made a study of the operations of a business and who has drawn a proposed change in organization may have the plan reviewed or revised by superiors before it is submitted to the client.

29 C.F.R. §541.202 (2008).

The executive exemption contains three sub-requirements: the first is that the

employee's primary duty be "management of the enterprise":

Generally, ``management'' includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. §541.102 (2008). The second is that the employee must "customarily and

regularly direct[] the work of two or more employees":

The phrase ``customarily and regularly'' means a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed ``customarily and regularly'' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks.

29

29 C.F.R. §541.701 (2008). Finally, the employee must have authority "to hire and fire other employees", or her "suggestions and recommendations" on the matter must be "given particular weight":

> To determine whether an employee's suggestions and recommendations are given ``particular weight,'' factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs. It does not include an occasional suggestion with regard to the change in status of a co-worker. An employee's suggestions and recommendations may still be deemed to have ``particular weight'' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.

29 C.F.R. §541.205 (2008).

This analysis will first examine what work Pandey performed fell under the administrative or executive exemptions, and then determine whether such work was her primary duty.

2.   <u>Exempt Administrative Work</u>

Plaintiff has presented herself as one of several veterinary assistants, who chiefly performed manual labor such as cleaning, restocking, and preparing and holding animals for surgical procedures. She asserts that this work occupied the great majority of her time, and that any other work such as purchasing supplies or scheduling clinics was incidental or has been exaggerated in its importance by Defendants.

One extraordinary aspect of Pandey's employment, setting her apart from a typical veterinary assistant, was her work, while on the clock, on behalf of Rascal

30

Charities. She was closely involved with setting up and maintaining the charity, serving on its board and as its statutory agent. Pandey testified that she understood performing work for Rascal Charities as part of her job responsibilities, and that this work included drafting grant proposals, carrying out the charity's purposes by arranging for the expenditure of donated funds, and organizing fundraisers. Rascal's eponymous charity, in addition to benefitting the general public, served the business purposes of increasing the practice's exposure to the public eye and of generating a source of charity-funded work. Pandey's work for Rascal Charities was therefore directly related to Rascal Unit's business operations. In addition, in using her contacts to arrange charitable clinic events and drafting grant proposals because she "knew who to apply to", Pandey was exercising her own independent judgment in carrying out these tasks. *See Renfro v. Indiana Michigan Power Co.*, 497 F.3d 573, 577 (6th Cir. 2007) (technical writers developing documents for a generally delineated purpose engaged in exempt administrative work). This was therefore exempt administrative work.

Plaintiff testified that she performed a wide variety of other work, such as troubleshooting customer complaints, maintaining the company website, creating the company's customer newsletter, and discussing Rascal and its services with prospective clinic organizers. Her efforts to locate a site for Rascal's prospective new facility, including working with a real estate broker and touring prospective locations with Gonzalez, could be considered to be work directly related to management or general business operations and of a greatly different character than "working on a manufacturing production line or selling a product in a retail or service establishment".

Finally, the parties agree that Pandey had responsibility for taking stock of

31

Rascal's supplies and reordering whatever was needed.  Pandey described this duty as looking to see what was running low and e-mailing in orders.  Nevertheless, she stated that she sourced different products from different suppliers depending upon factors such as available discounts and Rascal's credit with the distributor.  Cornwell and Gonzalez both testified that it was important to Rascal Unit not to have its working capital tied up in inventory.  Although Pandey testified that she did not forecast demand and had only a limited number of suppliers from which to choose, it is clear from the nature of Rascal's business in operating a low-margin mobile clinic that taking inventory and purchasing were matters of significance, and that Pandey was to exercise discretion and independent judgment in doing so. This work was also exempt administrative work.

The uncontradicted evidence demonstrates that Pandey was engaged in performing the described exempt administrative work for Rascal at least some of the time during both 2007 and 2008.

### 3.    Exempt Executive Work

The parties are in agreement that payroll records reflect that, for most of 2007, Rascal's staff was not large enough for Pandey to have been able to supervise the equivalent of two full-time employees.  For that period of time, therefore, Pandey could not have been performing exempt executive work.  However, for at least four two-week pay periods in 2007, and for all pay periods in 2008, Rascal paid for at least 160 employee hours, or the equivalent of two full-time employees. (Doc. 47-1 at 4.)  It would thereafter have been possible for Pandey to "customarily and regularly direct" enough work from subordinates to satisfy the third element of the executive exemption.

Pandey disputes that she was a manager in anything but name.  Her primary

argument is that, as courts have interpreted "customarily and regularly" to mean that a putative executive must spend at least 75-80% of her time supervising employees, and Rascal did not have enough employees to supervise for almost half of the period she was employed there, she logically cannot fall under the executive exemption. (Doc. 47 at 26-27, citing *McKinney v. United Stor-All Centers LLC*, 656 F.Supp.2d 114, 131-32 (D.D.C. 2009).) Under the combination exemption, however, the question is whether *some* of her work fell fully under the executive exemption, and whether that work, combined with other exempt work, formed her primary duty.[11]

Defendants have presented testimony from Gonzalez herself and from several of Plaintiff's fellow co-workers, including Dr. Duncan, Witherup, Overbee, Cornwell, Churchill, and Fritz, to the effect that Pandey had supervisory and disciplinary authority over other employees, that she scheduled them, directed their work, and handled questions or disputes concerning their employment, and that she played a significant role in either hiring employees outright or conducting their initial interviews and passing on hiring recommendations to Dr. Gonzalez. In short, her former co-workers testified that Pandey engaged in the "management" tasks identified in 29 C.F.R. §541.102.

---

[11] Plaintiff objects to the notion of subdividing her employment, on grounds that Gonzalez testified at deposition that Pandey's role and duties did not change from one year to the next. (Doc. 62 at 12, citing Doc. 50-2 at 149, 153-55, 162.) This conclusion, however, relies upon an unreasonable interpretation of Gonzalez' testimony that Pandey's work as a veterinary assistant, when she performed it, did not change over the relevant time period. *See, e.g.*, Doc. 50-2 at 149:

Q. Would Meagan's role or duties with regard to office surgery days have changed in any way from the beginning of 2007 to the end of the 2008?
A. No. Just less need for her to come out and help out as we had more staff.

Pandey herself was asked at deposition about her former co-workers' opinions:

> Q.  So if I asked all staff members other than Nicole
> Cornwell and Ashley Overbee, both of whom said they
> thought you were kind of the boss when Dr. Gonzalez wasn't
> there, who would tell me that no, you were just a flunky?
> A.  Nobody I don't think.  Except for maybe Dr. Gonzalez.
> Q.  Let me rephrase that.  Who would tell me you were not a
> manager?  Who would tell me you weren't in charge?
> A.  I think that maybe some people may have mistakenly
> thought that I was in charge.  I think most people mistakenly
> thought I was in charge.
> Q.  Well, we've deposed two people, both of whom thought
> you were.
> A.  Right.

(Doc. 61-2 at 223.)

However, Pandey has offered evidence to the contrary.  She denies ever

recommending an applicant for employment. She denies acting as a supervisor, denies

assigning tasks during the work day, denies having the authority to discipline

employees, and denies doing so.  Plaintiff also argues that any time spent in

"supervisory" activities was dwarfed by time spent doing clearly non-managerial tasks.

Pandey, and her former co-workers, testified at length that throughout this period she

spent a significant amount of time performing the same routine work as others.  While

the regulations at 29 C.F.R. §541.106 specifically state that "[c]oncurrent performance

of exempt and nonexempt work does not disqualify an employee" from exemption if the

other requirements are met, there are disputed facts related to this factor. [12]

---

[12]  The regulations explain:

> For example, an assistant manager in a retail establishment may perform
> work such as serving customers, cooking food, stocking shelves and
> cleaning the establishment, but performance of such nonexempt work
> does not preclude the exemption if the assistant manager's primary duty is

34

4.     Pandey's Primary Duty

"'Primary duty' does not mean the most time-consuming duty; it instead

connotes the 'principal' or 'chief' – meaning the most important – duty performed by

the employee." *Thomas*, 506 F.3d at 504, citing *Donovan v. Burger King Corp. (Burger*

*King I)*, 672 F.2d 221, 226 (1st Cir. 1982).  Although at one time "primary duty" was

chiefly determined based upon how the employee's time was occupied, the Secretary of

Labor has specifically altered this test so that it is merely a factor to be considered.

*Compare* 29 C.F.R. §541.103 (2003) ("primary duty means the major part, or over 50

percent, of the employee's time"), *with* 29 C.F.R. §541.700(a) (2008) ("primary duty

means the principal, main, major or most important duty that the employee performs").

Dr. Gonzalez stated in her affidavit that "had Rascal Unit needed only another

veterinary assistant, I would have hired one for less than I paid Ms. Pandey".  (Doc. 61-

7 at 5.)  One listed factor in the regulations' definition of "primary duty" is "the

relationship between the employee's salary and the wages paid to other employees for

the kind of nonexempt work performed by the employee".  29 C.F.R. §541.700(a).

Plaintiff, in her motion for partial summary judgment, presented a table of comparative

wages for fourteen current and former Rascal employees, ranging from a veterinary

assistant at $8.00 to a veterinary technician at $13.00 per hour.  Pandey, basing her

calculations on her claim of having worked an average of 59 hours per week, estimated

---

management. An assistant manager can supervise employees and serve
customers at the same time without losing the exemption. An exempt
employee can also simultaneously direct the work of other employees and
stock shelves.

29 C.F.R. §541.106(b).

that her initial weekly salary of $600 gave her an effective hourly wage of $10.17, and

her weekly salary of $750 ($39,000 per year)[13] after June 2008 gave her an effective

hourly wage of $13.64. She argues that this comparatively low wage is evidence that

her primary duty was non-exempt work.[14] Defendant argues that, in the first place, were

a jury to conclude that Pandey actually worked forty to fifty hours per week, her effective

hourly wage at a $600 salary would be between $12.00 and $15.00. Furthermore,

Defendant points out, Pandey was a veterinary assistant, not a licensed veterinary

technician, and as her compensation cannot be compared to nonexempt work she could

not perform, her only comparable employees are veterinary assistants, who ranged in

wages from $8.00 to $9.25 per hour.[15]

The regulations also note "the relative importance of the exempt duties as

compared with other types of duties". In *Thomas*, *supra*, the Sixth Circuit Court of

Appeals addressed the situation of a gas station manager who spent a substantial

---

[13]  Doc. 61-2 at 203.

[14]  Plaintiff cites *Johnson v. Big Lots Stores, Inc.*, 604 F.Supp.2d 903, 918 (E.D. La. 2009), for the proposition that an hourly rate only one to three dollars higher than subordinates is neutral as to whether management is an employee's primary duty. *See also Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1257-58 (11th Cir. 2008). Here, she says, for the majority of her employment her effective hourly wage was less than that of fellow employees, and should be considered evidence that her primary duty was nonexempt work.

[15]  Plaintiff rebuts that there is no reason not to compare Pandey to veterinary technicians, because technicians "regularly performed the same tasks as veterinary assistants, including cleaning, stocking the truck, and answering phones." (Doc. 62 at 21.) Nevertheless, the State of Ohio licenses veterinary technicians, who because of their training are given authority to practice a limited degree of veterinary medicine under supervision. O.R.C. §4741.19(C)(1). Although attorneys often, or even regularly, perform the same tasks as paralegals, there are likewise important distinctions in the tasks they are permitted to perform and the value they contribute to an organization.

amount of time performing routine manual labor:

> Under a proper analysis of this factor, we consider Thomas's non-managerial duties on the one hand, which include stocking merchandise, sweeping floors, and cleaning bathrooms.  And, on the other hand, we consider Thomas's managerial duties, which include hiring employees, training employees, and assigning the weekly work schedule.  If Thomas failed to perform her nonmanagerial duties, her Speedway station would still function, albeit much less effectively. [...] If, however, Thomas failed to perform her managerial duties, her Speedway station would not function at all because no one else would perform these essential tasks.  Surely, a gas station cannot operate if it has not hired any employees, has not scheduled any employees to work, or has not trained its employees on rudimentary procedures such as operating the register.

*Thomas*, 506 F.3d at 505.

<h3 style="text-align:center">5.   Conclusion</h3>

Neither the FLSA nor the regulations promulgated to define what is meant by a *bona fide* exempt employee vary in their meaning or effect based upon the size of the enterprise at which the worker is employed.  Rascal Unit, when Pandey was employed there, was a small firm providing professional services to the public, and in such a firm time spent by the professional administering her business operations is time not spent generating revenue.  Delegated duties in maintaining a inventory of medical supplies or directing employees what tasks to perform take on "relative importance... compared with other types of duties".  29 C.F.R. §541.700(a).

The uncontroverted evidence of record demonstrates that most of Pandey's time was occupied in the same tasks as her fellow employees –  handling animals, cleaning, and participating in the day-to-day work of Rascal Unit.  However, Defendants have offered evidence that the chief value Pandey brought to the company was her role, from the very beginning, of assisting Gonzales in building Rascal and developing its client

base, and her later responsibility for supervising her fellow employees on travel clinics and at the office. *See Thomas*, 506 F.3d at 506 (question is whether employee's "managerial duties were much more important" to the company's success than her "non-managerial duties"), *citing Baldwin v. Trailer Inn, Inc.*, 266 F.3d 1104, 1114-15 (9th Cir. 2001). These tasks, although they did not initially occupy the majority of her time and later were performed concurrently with her other work, could be viewed as Pandey's "principal, main, major or most important duty", and what set her apart from other, lesser-paid veterinary assistants. If Defendants' evidence is credited, for the majority of 2007 Pandey's primary duty was work falling under the administrative exemption, and for the remainder of 2007 and all of 2008, her primary duties were a combination of exempt administrative work and exempt executive work.

Here there are disputed material facts regarding whether Pandey's "primary duty" related to the management of Rascal and/or the supervision of employees and whether those duties included "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.R.R. §541.200 (2008). Even though the amount of time spent performing the alleged exempt duties is not the sole test, given the large amount of time Pandey spent performing non-managerial, non-supervisory tasks, the credibility of the witnesses' testimony regarding her managerial and supervisory duties, their importance to Rascal's business, and the discretion vested in her as a supervisor are critical to determining whether Defendants have carried the burden of proving a FLSA exemption for all or part of the years 2007 and 2008. Consequently, neither Plaintiff nor Defendants are entitled to summary judgment on that issue.

IV.    **Minimum Wage Claim**

In her motion for summary judgment, Pandey alleged that she performed a

meaningful amount of work in the first week of January 2007, although she had ceased

to be an independent contractor for Rascal at the end of December 2006 and would not

become a salaried employee until Rascal reopened for business on January 7, 2007.

She claims that Rascal failed to compensate her for this work, and that she is entitled to

be paid minimum wages for this period.  In its response, Defendant stated:

> Rascal Unit was not open for business during the week of January 1,
> 2007.  Despite that, Pandey admittedly sent e-mail that week and claims
> she performed other tasks.  Thus, pursuant to 29 U.S.C. §206, she is
> owed minimum wage for the time she reasonably spent in Rascal Unit's
> service.  It is not clear how much time that is:  she testified that she
> worked 30 hours at Rascal Unit's office and 10 hours at home that week;
> in her affidavit, she claims she worked thirty hours.  According to
> Gonzalez, there was nothing to do at Rascal Unit's office.  So, although
> Pandey is owed something, how much she is owed cannot be determined
> by this motion.

(Doc. 61 at 24.)[16]  Plaintiff agreed in her reply memorandum that the factual question of

how many hours Pandey worked is not raised in the pending motion.

As Defendants have conceded the claim, Plaintiff is entitled to summary

judgment on her claim for failure to pay minimum wage as mandated by the Fair Labor

Standards Act and the Ohio Minimum Fair Wage Standards Act.  The amount of unpaid

wages is not yet determined.

---

[16] Gonzalez testified that Rascal was closed for business the first week of
January 2007.  It provided no services. It made no money.  (Doc. 50-1 at 118.)  There
was no reason for Pandey to have gone into the office that week.  (*Id.* at 87-88.)  She
conceded that e-mails, produced by Plaintiff, to and from Pandey appeared to be job-
related.  (*Id.* at 88-97.)

V.     **Cybersquatting Claim**

Plaintiff registered rascalunit.com on December 4, 2005, at which domain name was established Defendant Rascal's company website.[17]  During the period of her employment, Pandey registered four additional domain names, rascalunit.info, rascalunit.net, rascalunit.org, and rascalunit.vet (the "four additional domains").  (Docs. 61-19; 61-20.)  Rascal instructed the domain name registrar to redirect all traffic aimed at the four additional domains to rascalunit.com.  Eventually, after the conclusion of her employment, Plaintiff contacted the domain name registrar and took control of rascalunit.com.  This she directed to a page advertising the domain name for sale.  The four additional domains continued to redirect traffic to rascalunit.com, and thus, therefore, to Pandey's advertisement.  (Doc. 50-2 at 328-29.)

Defendant's counterclaim pled as follows:

104.  Following her separation from Rascal Unit, Pandey improperly sought to assert control over Rascal Unit's website, mirror sites, domain name and alias domain names and exclude Rascal Unit's owners, employees, and agents therefrom.

105.  Following her separation from Rascal Unit, Pandey altered Rascal Unit's website, replacing its content with an advertisement offering to sell the domain name "www.rascalunit.com."

106.  Pandey acted in bad faith with intent to profit from Rascal Unit's mark in violation of [15] U.S.C. §1125(d).

---

[17]  Plaintiff asserts that rascalunit.com is her own property, that she paid all registration and company webhosting fees, and that she has never been reimbursed by Defendants for these expenses.  (Doc. 23 at 8.)  Rascal asserts that it reimbursed Plaintiff for all expenses, and that she was acting as Rascal's agent when she registered rascalunit.com on its behalf.  (Doc. 25 at 15.)

(Doc. 25 at 15.)[18] In its memorandum contra Plaintiff's motion for summary judgment,

Rascal stated that its claim was not based directly upon Pandey's alleged usurpation of

rascalunit.com:

> Because Rascal Unit did not engage in commerce prior to plaintiff's
> registration of "rascalunit.com" on December 4, 2005, it does not have a
> cybersquatting claim against plaintiff based on her alleged ownership of
> that domain name.

(Doc. 61 at 7.) Instead, Defendant argued, its claim was actually based upon the effect

of her actions upon the four additional domain names:

> Plaintiff claims ownership of 4 other domain names, all of which were
> registered in 2008. Because registration occurred after Rascal Unit used
> its mark in commerce and plaintiff effectively offered those domain names
> for sale in March 2009, disputed issues of material fact regarding plaintiff's
> motives preclude summary judgment. [...]
>
> Viewing the facts in a light most favorable to Rascal Unit and making all
> reasonable inferences in its favor, it is clear that Pandey had a bad faith
> intent to profit from the alias websites. When Pandey took control of
> [rascalunit.com], she did so knowing that anyone who typed in the domain

---

[18] This statute provides, in relevant part:

(A)    A person shall be liable in a civil action by the owner of a mark,
including a personal name which is protected as a mark under this
section, if, without regard to the goods or services of the parties,
that person –

    (i)    has a bad faith intent to profit from that mark, including a
personal name which is protected as a mark under this
section; and

    (ii)    registers, traffics in, or uses a domain name that –

    (I)    in the case of a mark that is distinctive at the time of
registration of the domain name, is identical or confusingly
similar to that mark;

    (II)    in the case of a famous mark that is famous at the time of
registration of the domain name, is identical or confusingly
similar to or dilutive of that mark; or

    (III)    is a trademark, word, or name protected by reason of section
706 of title 18 or section 220506 of title 36.

names for the alias websites would be redirected to the main website. Consequently, she used the alias websites when she took control of []rascalunit.com.

(*Id.* at 7, 40.) The Court notes that the parties are now in agreement that Rascal owns, and has always owned, the four additional domain names. *See* Doc. 62 at 37 fn. 14; Doc. 25 at 14.

Defendant's claim amounts to an assertion that, by posting an advertisement on a website to which she knew Defendant's four additional domain names would redirect, Plaintiff thereby "used" those domain names with a "bad faith intent to profit" from Defendant's mark. This is not a colorable argument. As Plaintiff states:

> Defendants do not contend that Pandey owned the Alias Domains or that she even asserted any control over them after her termination. Instead, Defendants claim that, because the Alternate Domains redirected users to the .com domain, Pandey "used" the Alias Domains by changing content on the .com.

> Defendants' argument must fail; Defendants, not Pandey, had full control over the Alternate Domains. At any time, they could have posted RASCAL's content on the Alternate Domains. Barring that, Defendants could have simply stopped the Alternate Domains from redirecting to the .com Domain. It does not follow that changing one domain name's content "uses" every other domain name that may link to or redirect to that domain name.

(Doc. 62 at 37.)

Plaintiff is correct. She did not either own or exert control over the four additional domains. That they continued to redirect traffic to rascalunit.com, a site which she had altered, was not merely incidental but actually beyond her authority to prevent. Moreover, although Defendant now argues that all four sites "returned a 'For Sale' sign when accessed", Defendant's counterclaim stated that Plaintiff altered the site at

42

rascalunit.com, "replacing its content with an advertisement offering to sell the domain name "www.rascalunit.com."  She did not advertise for sale the four additional domains, or even benefit from possible confusion by advertising "this domain" for sale.  Plaintiff did not "use" or "traffic in" Defendant's four additional domain names where she neither exerted control over them nor attempted to profit from the traffic they redirected to rascalunit.com.  Plaintiff is therefore entitled to summary judgment on Defendant Rascal's claim for cybersquatting.

VI.    **Conclusion**

For the reasons set forth herein, genuine issues of material fact exist with respect to the matters addressed in Plaintiff's motion for partial summary judgment (Doc. 47). The motion is **DENIED** with respect to Plaintiff's claim for unpaid overtime pursuant to the Fair Labor Standards Act, 29 U.S.C. §207(a), and the Ohio Minimum Fair Wage Standards Act, O.R.C. §4111.01 *et seq.*  However, it is **GRANTED IN PART** with respect to Plaintiff's claim for failure to pay minimum wage under 29 U.S.C. §206(a) and O.R.C. §4111.01 *et seq.*  Plaintiff is also entitled to judgment as a matter of law on the counterclaim of Defendant Rascal Unit, Ltd. pursuant to 11 U.S.C. §1125(d).

Plaintiff is **DIRECTED** to file, within fourteen (14) days of the date of entry of this Order, a brief or other materials concerning her damages and attorney fees relating to her claim for failure to pay minimum wage.  Defendants may subsequently file a response within ten (10) days, and Plaintiff may file a reply in support of her brief within seven (7) days thereafter.

Plaintiff is further **DIRECTED** to file, within fourteen (14) days of the date of entry

of this Order, a status report advising Defendants and the Court as to which of the

claims set forth in her Amended Complaint she still intends to pursue in this litigation

and which she no longer intends to pursue.

s/Mark R. Abel
United States Magistrate Judge